Allen Lee **DAVIS**, Petitioner,

v.

Harry K. **SINGLETARY**, Secretary, Department of Corrections, State of Florida, Respondent.

No. 92–251–Civ–J–20.

United States District Court, M.D. Florida, Jacksonville Division.

May 25, 1994.

1494

M. Elizabeth Wells, Steven M. Kissinger, Office of the Capital Collateral Representative, Tallahassee, FL, for petitioner.

Jon Robert Phillips, State Attorney's Office, Fourth Judicial Circuit, Jacksonville, FL, and Mark Christopher Menser, Atty. General's Office, Tallahassee, FL, for respondent.

## *OPINION*

SCHLESINGER, District Judge.

Before the Court is Petitioner Allen Lee Davis' Petition for Writ of Habeas Corpus by Person in State Custody (Doc. No. 1, filed March 9, 1992).

Respondent filed an anticipatory response on March 9, 1992 (Doc. No. 10). On March 16, 1992, the Court ordered Petitioner to submit a supplemental memorandum detailing the procedural history of each of his twenty-five claims and, where appropriate, addressing his right to bring those claims in light of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). The Court also ordered Respondent to file an additional response to the Petition and supplemental memorandum. Petitioner complied by filing a supplemental memorandum on March 26, 1992 (Doc. No. 16) and Respondent complied by filing an amended response on April 6, 1992 (Doc. No. 17). The Court heard oral argument on the Petition on April 27, 1992.

Subsequently, the Court found that Petitioner was entitled to an evidentiary hearing

on the following issues: (1) whether Petitioner's trial counsel rendered ineffective assistance in his investigation of Petitioner's family and social history; (2) whether Petitioner's trial counsel rendered ineffective assistance in failing to challenge the hypnotically induced testimony of a prosecution witness; and (3) whether Petitioner was competent to stand trial. The evidentiary hearing was conducted January 25 through January 27, 1993.

## PROCEDURAL HISTORY

On May 11, 1982, Nancy Weiler and her two young daughters, Katherine and Kristina, aged five and ten, respectively, were brutally murdered in their home near San Pablo Boulevard, in Jacksonville, Florida. Nancy Weiler was beaten over the head with a pistol, "almost beyond recognition." *Davis v. State*, 461 So.2d 67, 72 (Fla.1984), *cert. denied*, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). One daughter was tied up and shot twice, and the other was shot in the back once, then beaten. *Id.* All the acts occurred in the mother's bedroom and the short hallway to that bedroom. *Id.*

On March 2, 1983, Petitioner was convicted and sentenced to death on each of three counts of first degree murder. Petitioner appealed his convictions and sentences of death directly to the Florida Supreme Court. On October 4, 1984, the court rejected Peti-

tioner's five claims of error.[1] *Davis*, 461 So.2d at 68–72.

Petitioner then sought clemency before the Florida Board of Executive Clemency. The board held a hearing on June 26, 1986, and on August 20, 1986, the Governor denied Petitioner's request for clemency. On that date the Governor also signed a death warrant for the week of September 17–23, 1986.

On September 20, 1986, Petitioner filed a petition for extraordinary relief and an application for a stay in the Florida Supreme Court.[2] The court denied the petition on September 22, 1986, and entered an opinion on October 30, 1986. *Davis v. Wainwright*, 498 So.2d 857 (Fla.1986). On September 22, 1986, Petitioner applied for a stay of his execution with the United States Supreme Court. At 11:30 p.m. on September 22, 1986, Justice Powell granted a stay until 3:00 p.m. on September 23, 1986, pending consideration of the stay issue by the entire Court. On September 23, 1986, the United States Supreme Court granted the stay pending the resolution of an application by Petitioner for a writ of certiorari to review the Florida Supreme Court's denial of the petition for extraordinary relief. The Court denied certiorari on October 5, 1987. *Davis v. Dugger*, 484 U.S. 873, 108 S.Ct. 208, 98 L.Ed.2d 159 (1987).

On September 22, 1986, after the denial of the petition for extraordinary relief by the Florida Supreme Court, but before the stay

1. Petitioner argued that: (a) the trial judge abused his discretion (1) by failing to grant a motion for a change of venue, (2) by denying a motion for individual and sequestered voir dire, and (3) by denying a motion for mistrial based on a witness' testimony on redirect examination; (b) the trial judge erred in denying Petitioner's challenge for cause of one prospective juror; and (c) the prosecutor's closing argument rendered the penalty proceeding fundamentally unfair.

2. Petitioner made six claims in the petition as follows:

1. The Florida Supreme Court's statutorily and constitutionally required review of the entire record was thwarted by appellate counsel's failure to include in the record on appeal inflammatory and irrelevant information that was provided to the sentencing judge for his consideration at sentencing and which was in fact filed with the trial court, thus affecting the proceedings below.

2. Appellate counsel was ineffective for failing to challenge the sentencing judge's use of a non-record, confidential psychiatric examination and neurological examination to find the absence of mitigating circumstances.

3. Appellate counsel prejudicially presented Petitioner's case in the least favorable light, in violation of the Sixth, Eighth and Fourteenth Amendments.

4. Appellate counsel was ineffective for not alerting this court that Petitioner's guilt was established through unconstitutional comment by the prosecutor on his failure to testify.

5. Appellate counsel was prejudicially ineffective for failing to challenge the trial court's denial of Petitioner's motion to suppress statements elicited by law enforcement officers, in violation of the Fourth, Sixth, and Fourteenth Amendments.

6. The death penalty is imposed in Florida on the basis of impermissible arbitrary and discriminatory factors, including race, in violation of the Eighth and Fourteenth Amendments.

of the execution by the United States Supreme Court, Petitioner filed a motion pursuant to Fla.R.Crim.P. 3.850 and a motion for a stay of execution in the state trial court.[3] The trial judge denied both motions on September 22, 1986. Transcript of Record of First 3.850 Motion [hereinafter "PC"] at R5–827–28. Petitioner appealed to the Florida Supreme Court, which on September 23, 1986, summarily affirmed the trial court's

denial of both motions. *Davis v. State,* 496 So.2d 142 (Fla.1986).

Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody on September 22, 1986, at 10:30 p.m., in this Court, during the pendency of the appeal to the Florida Supreme Court of the denial of the 3.850 Motion, but before the stay by the United States Supreme Court.[4] On September 23, 1986 at 9:30 a.m., this Court denied

3. The claims presented by Petitioner in the first 3.850 proceeding were as follows:

1. Trial and pretrial counsel provided ineffective assistance by failing to ensure that received competent mental health assistance, in violation of Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

2. Trial counsel was ineffective for allowing the sentencing judge to use non-record, confidential psychiatric "visits" and the neurological examination to sentence Petitioner to death, in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments.

3. Trial counsel was ineffective for allowing the trial court to consider inflammatory, irrelevant and prejudicial information provided by the state through the mail, in violation of the Sixth, Eighth and Fourteenth Amendments.

4. The prosecutor's inflammatory, emotional, and thoroughly improper argument to the jury at sentencing rendered Petitioner's sentencing proceeding and resultant death sentences fundamentally unfair and unreliable, and trial counsel was ineffective for allowing the argument, in violation of the Sixth, Eighth, and Fourteenth Amendments.

5. Petitioner was tried while incompetent, and trial counsel and the court's elevation of Petitioner to status of co-counsel violated his Sixth, Eighth, and Fourteenth Amendment rights.

6. Petitioner was insane at the time of the offense and also could not form specific intent, and thus his conviction, combined with counsel's ineffectiveness on this issue, violated the Sixth, Eighth and Fourteenth Amendments.

7. Counsel was prejudicially ineffective in presenting the motion to suppress statements elicited by law enforcement officers, and for failing to challenge illegal searches and resulting evidence, and appellate counsel was ineffective for failing to challenge the trial court's denial of the motion, in violation of the Fifth, Sixth and Fourteenth Amendments.

8. Petitioner was deprived of due process when the state presented false testimony at his trial, and the resulting conviction and sentence thus violated the Sixth, Eighth and Fourteenth Amendments.

9. Petitioner was deprived of due process when the state suppressed material evidence in violation of *Brady v. Maryland,* and his conviction and sentence therefore violated the Sixth, Eighth and Fourteenth Amendments.

10. Trial counsel's unreasonable failure to attack a key witness' unconstitutionally unreliable hypnotically induced testimony, as well as his failure to even inform the jury of the fundamentally unreliable basis of this testimony, deprived Petitioner of the effective assistance of counsel, in violation of the Sixth, Eighth and Fourteenth Amendments.

11. The prosecutor's interjection of personal beliefs, repeated misrepresentation of the record, and references to extra-record evidence during closing argument at the guilt/innocence phase deprived Petitioner of a fair and impartial jury and rendered his trial fundamentally unfair, in violation of the Sixth and Fourteenth Amendments.

12. The prosecutor's pervasive and unchecked commentary on Petitioner's failure to testify in his own behalf constituted fundamental error, and deprived Petitioner of a fair trial and a fair and impartial jury, in violation of the Sixth, Eighth and Fourteenth Amendments.

13. Petitioner's death sentences violate *Lockett v. Ohio* and *Eddings v. Oklahoma* because the sentencing judge did not consider mitigating circumstances other than those listed in Florida's death penalty statute.

14. Petitioner's sentencing jury was misled and misinformed as to its function, responsibility, and discretion in imposing sentence, and Petitioner's death sentence is the product of a fundamentally unreliable proceeding, contrary to *Caldwell v. Mississippi* and in violation of the Eighth and Fourteenth Amendments.

15. The death penalty is imposed in Florida on the basis of impermissible, arbitrary and discriminatory factors, including race, in violation of the Eighth and Fourteenth Amendments.

4. Petitioner raised the following claims in the previous petition before this Court:

1. Trial and pretrial counsel provided ineffective assistance by failing to conduct proper factual and legal investigation, and by failing to ensure that Petitioner received competent mental health assistance, in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

2. Appellate counsel was prejudicially ineffective for failing to challenge Petitioner's death sentences on direct appeal, conceding that death was the appropriate penalty, despite the availability of numerous statutory and constitutional

the petition because it contained unexhausted claims and because the Court found that it constituted an abuse of the writ. *Davis v. Wainwright,* 644 F.Supp. 269 (M.D.Fla.1986). The court of appeals reversed, and remanded the matter for consideration of the petition on its merits. *Davis v. Dugger,* 829 F.2d 1513 (11th Cir.1987).

On December 23, 1988, this Court dismissed the prior petition without prejudice so that Petitioner could exhaust his fourteenth claim, the one unexhausted claim, or file an amended petition without the unexhausted claim. *Davis v. Dugger,* 703 F.Supp. 916 (M.D.Fla.1988). The fourteenth claim originally was Claim 13 in Petitioner's first 3.850

challenges, in violation of the Sixth, Eighth and Fourteenth Amendments.

3. Trial counsel was ineffective for allowing the sentencing judge to use non-record, confidential psychiatric "visits" and the neurological examination to sentence Petitioner to death, and appellate counsel was ineffective for failing to raise this fundamental error, in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments.

4. Trial court's consideration of inflammatory, irrelevant and prejudicial information, provided by the state through the mail, rendered Petitioner's sentencing proceeding fundamentally unreliable, in violation of his Sixth, Eighth and Fourteenth Amendment rights.

5. The prosecutor's inflammatory, emotional, and thoroughly improper argument to the jury at sentencing rendered Petitioner's sentencing proceeding and resultant death sentences fundamentally unfair and unreliable, and trial counsel was ineffective for allowing the argument, in violation of the Sixth, Eighth, and Fourteenth Amendments.

6. Petitioner was tried while incompetent, and trial counsel and court's elevation of Petitioner to status of co-counsel violated his Sixth, Eighth and Fourteenth Amendment rights.

7. Petitioner was insane at the time of the offense and also could not form specific intent, and counsel's ineffectiveness on the issue violated the Sixth, Eighth and Fourteenth Amendments.

8. Counsel was prejudicially ineffective in presenting the motion to suppress statements elicited by law enforcement officers, and for failing to challenge illegal searches and resulting evidence, and appellate counsel was ineffective for failing to challenge the trial court's denial of the motion, in violation of the fifth, Sixth and Fourteenth Amendments.

9. Petitioner was deprived of due process when the state presented false testimony at his trial, and the resulting conviction and sentence thus violated the Sixth, Eighth and Fourteenth Amendments.

10. Petitioner was deprived of due process when the state suppressed material evidence in violation of *Brady v. Maryland,* and his conviction and sentence therefore violated the Sixth, Eighth and Fourteenth Amendments.

11. Trial counsel's unreasonable failure to attack a key witness' unconstitutionally unreliable hypnotically induced testimony, as well as his failure to even inform the jury of the fundamentally unreliable basis of this testimony, deprived Petitioner of the effective assistance of counsel,

in violation of the Sixth, Eighth and Fourteenth Amendments.

12. The prosecutor's interjection of personal beliefs, repeated misrepresentation of the record, and references to extra-record evidence during closing argument at guilt/innocence deprived Petitioner of a fair and impartial jury and rendered his trial fundamentally unfair, in violation of the Sixth and Fourteenth Amendments.

13. Trial counsel was ineffective for failing to object to the prosecutor's pervasive and unchecked commentary on the defendant's failure to testify in his own behalf, and appellate counsel was ineffective for failing to raise this fundamental error on direct appeal, depriving the Petitioner of a fair trial and a fair and impartial jury, in violation of the Sixth, Eighth and Fourteenth Amendments.

14. Petitioner's death sentences violate *Lockett v. Ohio* and *Eddings v. Oklahoma* because the sentencing judge did not consider mitigating circumstances other than those listed in Florida's death penalty statute.

15. Petitioner's sentencing jury was misled and misinformed as to its function, responsibility, and discretion in imposing sentence, and his death sentence is the product of a fundamentally unreliable proceeding, contrary to *Caldwell v. Mississippi* and in violation of the Eighth and Fourteenth Amendments.

16. The trial court's failure, in light of the extensive and highly prejudicial pretrial media coverage of his case, to grant Petitioner's motion for a change of venue deprived Petitioner of his right to a fair and impartial jury at the guilt/innocence and sentencing phases of his trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. This error, and the resulting prejudice to Petitioner's rights, was compounded by the court's additional failure to grant Petitioner's motion for individual and sequestered voir dire.

17. The improper reference by a state witness to a polygraph examination of Petitioner deprived Petitioner of the presumption of innocence to which he was constitutionally entitled as a matter of due process under the Fourteenth Amendment.

18. Trial court's denial of challenge for cause of juror who had expressly already formed an opinion denied Petitioner a fair and impartial jury, in violation of the Sixth and Fourteenth Amendments.

19. The death penalty is imposed in Florida on the basis of impermissible, arbitrary and discriminatory factors, including race, in violation of the Eighth and Fourteenth Amendments.

motion. That claim was considered by the state courts prior to the decision of *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). The Court, therefore, found that Petitioner's *Hitchcock* claim had not been fairly presented to the state courts. 703 F.Supp. at 920.

On July 31, 1989, Petitioner filed another motion pursuant to Fla.R.Crim.P. 3.850, in which he presented the *Hitchcock* claim, as well as nine other claims.[5] The state trial court held that all of Petitioner's claims except the *Hitchcock* claim were procedurally barred. Transcript of Record of Second 3.850 Motion [hereinafter "PC2"] at R1–141–42. That court also held that the *Hitchcock* claim had no merit. *Id.* at 141. On October 31, 1991, the Florida Supreme Court affirmed the trial court's rulings. *Davis v. State*, 589 So.2d 896 (Fla.1991).[6]

The Governor signed a Death Warrant on February 12, 1992 for the week beginning Tuesday, March 10, 1992 at 12:00 p.m. and ending Tuesday, March 17, 1992 at 12:00 p.m. On March 9, 1992, the instant petition was filed, raising 25 claims.[7] By an Order dated

---

**5.** Petitioner presented the following claims in his second Rule 3.850 motion:

1. Petitioner's death sentences violate *Lockett v. Ohio*, *Eddings v. Oklahoma*, and *Hitchcock v. Dugger* because the sentencing judge limited his consideration of mitigating factors to those listed in Florida's death penalty statute and because the participants' consideration of nonstatutory mitigating evidence was constrained. As a result, Petitioner's sentences of death were obtained in violation of the Eighth and Fourteenth Amendments.

2. Petitioner was deprived of his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, as well as his rights under the Fifth, Sixth and Eighth Amendments, because the mental health expert retained to evaluate him before trial failed to conduct a professionally competent and appropriate evaluation. Additionally, defense counsel failed to establish an available insanity defense and failed to render effective assistance, resulting in a trial at which Petitioner was incompetent and entitled to a competency hearing. Petitioner also was deprived of his rights to a fair, individualized, and reliable capital sentencing determination.

3. Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights were abrogated because he was forced to undergo criminal judicial proceedings although he was not legally competent, in violation of *Pate v. Robinson*, and the trial and sentencing process violated *Faretta v. California*.

4. Petitioner's rights to reliable capital sentencing proceedings were violated when the state urged that he be convicted and sentenced to death on the basis of victim impact and other impermissible factors, in violation of *Booth v. Maryland*, *South Carolina v. Gathers*, and the Eighth and Fourteenth Amendments.

5. Petitioner's sentencing jury was improperly instructed on the "especially heinous, atrocious, or cruel" aggravating circumstance, and this aggravator was improperly argued and imposed in violation of *Maynard v. Cartwright* and the Eighth and Fourteenth Amendments.

6. Petitioner's sentence of death violates the Fifth, Sixth, Eighth and Fourteenth Amendments because the penalty phase jury instructions shifted the burden to Petitioner to prove that death was inappropriate and because the sentencing judge himself employed this improper standard in sentencing Petitioner to death.

7. Prosecutorial argument and inadequate jury instructions misled the jury regarding its ability to exercise mercy and deprived Petitioner of a reliable and individualized capital sentencing determination, in violation of the Eighth and Fourteenth Amendments.

8. Petitioner's death sentence is predicated upon the finding of an automatic, non-discretion-channeling, statutory aggravating circumstance, in violation of the Eighth and Fourteenth Amendments.

9. The prosecutor improperly asserted that sympathy towards Petitioner was an improper consideration for the jury, depriving Petitioner of a reliable and individualized capital sentencing determination, in violation of the Eighth and Fourteenth Amendments.

10. The murder for which Petitioner was sentenced to death was not "cold, calculated and premeditated" as defined by *Rogers v. State*, and the application of this aggravating factor violated *Maynard v. Cartwright* and the Eighth and Fourteenth Amendments because no limiting construction was provided to the jury or employed by the sentencing judge.

**6.** The appeal to the Florida Supreme Court advanced all of the claims made in the trial court except Claim 9, that the prosecutor's assertion that sympathy toward Petitioner was an improper consideration for the jury violated the Eighth and Fourteenth Amendments.

**7.** The claims presented in the instant petition are as follows:

1. The trial court's failure to grant Petitioner's motion for change of venue deprived Petitioner of his right to a fair and impartial jury at the guilt/innocence and sentencing phases of his trial, in violation of the Sixth, Eighth and Fourteenth Amendments.

2. The trial court's denial of Petitioner's motion for individual and sequestered voir dire regarding prospective jurors' knowledge of inflam-

# 1510

matory publicity deprived Petitioner of his right to a fair and impartial jury, in violation of the Sixth, Eighth and Fourteenth Amendments.

3. The trial court's denial of a challenge for cause of a juror who had expressly admitted to having formed an opinion denied Petitioner a fair and impartial jury, in violation of the Sixth and Fourteenth Amendments.

4. Petitioner was denied the effective assistance of counsel at the guilt/innocence phase of his capital trial, in violation of the Sixth, Eighth and Fourteenth Amendments, because trial counsel failed to adequately investigate guilt phase issues and defenses.

5. Trial counsel's unreasonable failure to attack a key witness's unconstitutionally unreliable hypnotically induced testimony or to inform the jury of the unreliability of the testimony deprived Petitioner of the effective assistance of counsel, in violation of the Sixth, Eighth and Fourteenth Amendments.

6. Petitioner was denied effective representation of counsel during the penalty phase because counsel failed to investigate, develop, and present mitigating evidence, to death qualify the jury and to object to improper prosecutorial conduct, thereby denying Petitioner his Sixth, Eighth and Fourteenth Amendment rights.

7. Petitioner was denied his due process and equal protection rights under the Fourteenth Amendment because he was not provided adequate mental health assistance and because counsel failed to provide the experts with the necessary background information and seek an evaluation as to penalty phase issues.

8. Trial counsel was ineffective for allowing the sentencing judge to use non-record confidential psychiatric visits and a neurological examination in his sentencing determination, and appellate counsel was ineffective for failing to raise this fundamental error, in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments.

9. Trial counsel's failure to object to the sentencing court's consideration of inflammatory, irrelevant and prejudicial information, provided by the state through the mail, was ineffective assistance, in violation of the Sixth, Eighth and Fourteenth Amendments.

10. Petitioner was tried while incompetent to stand trial and the trial court's elevation of Petitioner to the status of co-counsel violated his Sixth, Eighth and Fourteenth Amendment rights.

11. Appellate counsel was prejudicially ineffective in failing to challenge Petitioner's death sentences on appeal.

12. Trial counsel was ineffective in presenting the motion to suppress and appellate counsel was ineffective for failing to challenge the trial court's denial of the motion, in violation of the Fifth, Sixth and Fourteenth Amendments.

13. The sentencing jury was misled by instructions and argument which diluted its sense of responsibility for sentencing, in violation of the Eighth and Fourteenth Amendments.

14. The prosecutor's pervasive and unchecked commentary on Petitioner's failure to testify or to fully cross-examine state witnesses deprived Petitioner of a fair trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

15. The prosecutor's interjection of personal beliefs, repeated misrepresentations of the record, and references to extra-record evidence during closing argument at the guilt/innocence phase deprived Petitioner of a fair and impartial jury, in violation of the Sixth and Fourteenth Amendments.

16. The State suppressed material evidence in violation of *Brady v. Maryland* and Petitioner was thereby deprived of his Sixth, Eighth and Fourteenth Amendment rights.

17. Petitioner was deprived of due process when the State presented false testimony at his trial, and the resulting conviction thus violates the Sixth, Eighth and Fourteenth Amendments.

18. The improper reference by a state witness to a polygraph examination deprived Petitioner of the presumption of innocence, which violated Petitioner's right to due process under the Fourteenth Amendment.

19. The prosecutor's improper argument to the jury during the sentencing phase rendered the proceeding fundamentally unfair, and trial counsel was ineffective for allowing the argument, in violation of the Sixth, Eighth and Fourteenth Amendments.

20. Petitioner's death sentences violate *Lockett v. Ohio* and *Hitchcock v. Dugger* because the sentencing judge and the other participants limited their consideration of mitigating factors to those prescribed by statute.

21. The Florida Supreme Court's review of Petitioner's death sentences violated the Eighth and Fourteenth Amendments because that court failed to conduct a harmless error analysis after striking one of the aggravating factors.

22. Petitioner's right to a reliable capital sentencing determination was violated because the sentencing jury did not receive instructions guiding and channeling its discretion by explaining the limiting constructions of the aggravating circumstances; therefore, the jury had unbridled discretion.

23. The finding of the "cold, calculated and premeditated" aggravating factor violated the Eighth Amendment because no rational factfinder could find the elements of this aggravator proven beyond a reasonable doubt.

24. Petitioner's jury was misled and incorrectly informed about its function at the capital sentencing, in violation of the Eighth and Fourteenth Amendments.

25. The penalty phase jury instructions improperly shifted to Petitioner the burden to prove that death was inappropriate, and the judge employed the same improper standard, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

March 11, 1992.

## STANDARD OF REVIEW

 The current version of the habeas corpus statute states that a determination on the merits of a factual issue made by a state court shall be presumed to be correct, unless the applicant for the writ can establish one of the enumerated causes for exception. 28 U.S.C. § 2254(d) (listing enumerated causes); *Cuyler v. Sullivan,* 446 U.S. 335, 341, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). In the Eleventh Circuit, a district court entertaining a petition under 28 U.S.C. § 2254 must resolve all claims for relief raised therein, regardless of whether habeas relief is granted or denied. *Clisby v. Jones,* 960 F.2d 925, 936 (11th Cir.1992). A claim for relief is deemed to be any allegation of a constitutional violation. *Id.*

## CLAIM I—CHANGE OF VENUE

In Claim I Petitioner alleges that in light of the extensive and highly prejudicial pretrial media coverage of his case, the trial court's failure to grant his motion for a change of venue deprived Petitioner of his right to a fair and impartial jury at the guilt/innocence and sentencing phases of his trial, in violation of the Sixth, Eighth, and Fourteenth amendments. Petitioner asserts that this error, and the alleged resulting prejudice to Petitioner's rights, was compounded by the court's additional failure to grant Petitioner's motion for individual and sequestered voir dire. Petition for Writ of Habeas Corpus (Doc. No. 1) ["Pet."] at 8.[8]

This claim originally was raised in Petitioner's direct appeal. The Florida Supreme Court denied the claim, on its merits, on October 4, 1984.[9] *Davis,* 461 So.2d at 70. Therefore, the Court finds that Claim I has been exhausted and is properly before the Court.

With respect to the change of venue issue, Petitioner contends that the greater Jacksonville, Florida, community was exposed to extensive and highly prejudicial pretrial publici-

ty, by both the print and electronic media. Petitioner further contends that this pretrial publicity met both the inherent and actual prejudice standards outlined by the Eleventh Circuit. The examples of pretrial publicity to which Petitioner alludes include: (1) inadmissible evidence of Petitioner's prior criminal record, which contained convictions for manslaughter, two armed robberies, and attempted robbery; (2) inadmissible evidence that Petitioner was on parole at the time of the murders; (3) inadmissible evidence that Petitioner failed a polygraph test; (4) Petitioner's statements to police (the admissibility of which had yet to be determined) placing him in the victims' home at the time the medical examiner believed the murders occurred, and statements claiming that he had a lapse of memory while in the house; (5) ex parte inculpatory statements which the police had assembled, including facts that a handgun belonging to Petitioner's father was missing, that a cord found in the Petitioner's truck matched the cord which bound Kristy Weiler's wrists, and that police had found three eyewitnesses who could "pin down" Petitioner's whereabouts, one of whom saw him in the neighborhood with a gun in his hand; (6) statements by state officials expressing their certainty of Petitioner's guilt, e.g., that they had "the right suspect," and that they had a "very significant case" against him; (7) statements by police to the effect that Petitioner's friends or relatives might interfere with their efforts to find evidence, in particular the missing gun; (8) inflammatory commentary strongly tending to evoke community sympathy for the victims—"and, concomitantly, prejudice against Petitioner, the named suspect"—including an article about Kristy Weiler's school teacher having to impart the news of her death to her classmates, newcasts emphasizing the reaction in the victims' "close-knit, upper middle class, family-oriented" neighborhood, references to Mrs. Weiler having been pregnant at the time of her death, references to Kristy Weiler's tenth birthday party, which was to

---

8. The Court will address the issue of individual and sequestered voir dire in its discussion of Claim II.

9. The issues of change of venue and individual and sequestered voir dire were raised as separate claims in Petitioner's direct appeal.

be held the next day, and the medical examiner's emotional reaction as he left the house; and (9) a telecast denouncing parole authorities for releasing prisoners back onto the streets to commit crimes, and referring specifically to Petitioner as one who "needed to serve a little more time" and who subsequently murdered a child. Pet. at 22–23.

Petitioner also alleges that in addition to the reported items described above, the news reports also contained descriptions of the victims, photographs of the bodies being removed from the Weiler home, photographs of Petitioner in handcuffs, and an editorial attacking the system that released Petitioner on parole.

Respondent notes that following a hearing on the Motion the trial court deferred ruling on the change of venue motion until an attempt was made to seat a jury. Respondent further contends that the jury selected was satisfactory to Petitioner, thereby mooting the issue. Additionally, the state argues that the publicity cited by the Petitioner occurred primarily during the weeks immediately following the murders, namely, the latter half of May, 1982, while the motion for change of venue was heard in August, 1982, and jury selection did not begin until January, 1983. Amended Response to Petition (Doc. No. 17) ["Resp."] at 13.

On August 11, 1982, Petitioner filed a Motion for Change of Venue. Transcript of Trial Record, Volume 1 ["R1"] at 205.[10] The court heard argument on the motion on August 23, 1982. R4–182, et seq. The court received the following evidence: (1) information regarding the total number of registered voters in Duval County, Florida, R3–126; (2) an affidavit from representatives of a local radio station regarding the times stories about Petitioner and/or the murders were aired, id. at 127; (3) an audit report of the circulation of the Florida Times–Union and the Jacksonville Journal newspapers, id. at 128–29; (4) photocopies of local newspaper articles, id. at 130–34; (5) the affidavit of a defense investigator regarding a radio canvas, id. at 134–35; and (6) the deposition of

next door neighbor John Strand, id. at 135–37. The court also heard testimony from representatives of local television stations, including estimates of their potential viewing audiences, and watched videotapes of their broadcasts regarding Petitioner and the murders. Id. at 138–76. The court also heard argument by both sides. R4–182–223. On August 27, 1982, the Court stated that it would defer ruling on the Motion until an attempt to select a panel had been made. Id. at 271. The Court ultimately denied the Motion, and on February 1, 1983, the court empanelled the jury.

■ The standard governing change of venue issues is derived from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, 'indifferent' jurors." Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir.1985) (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)), (cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986)). When pretrial publicity "has so prejudiced the community atmosphere surrounding a trial that an impartial jury cannot be seated, due process requires that a trial court must grant a defendant's motion for a change of venue." Devier v. Zant, 3 F.3d 1445, 1461 (11th Cir.1993). "At issue is the fundamental fairness of the defendant's trial." Coleman, 778 F.2d at 1489.

■ There are two standards which guide the analysis of this question: the "actual prejudice" standard and the "presumed prejudice" standard. Id. Actual prejudice occurs when "the prejudice actually enters the jury box and affects the jurors." Heath v. Jones, 941 F.2d 1126, 1134 (11th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992). A court in this instance must examine the totality of circumstances to determine the extent of the prejudice. Id.

■ Prejudice is "presumed" from pretrial publicity when such publicity is sufficiently prejudicial and inflammatory, and it saturates the community where the trial is

---

10. Appended to the motion were fifteen affidavits of local attorneys stating that, in their respective opinions, there was a substantial likelihood that the petitioner could not obtain a fair trial in Duval County as a result of the pretrial publicity. R2–209–223.

held. *Bundy v. Dugger*, 850 F.2d 1402, 1424 (11th Cir.1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989); *Coleman*, 778 F.2d at 1490. In determining whether news coverage is inflammatory, a court may distinguish, and deem acceptable, any pretrial publicity which is purely factual in nature, as opposed to pretrial publicity which includes prejudicial or inflammatory commentary. *Heath*, 941 F.2d at 1134–35. In order to prove that media coverage saturated the market, a Petitioner must prove (1) that a substantial number of people in the relevant community could have been exposed to some of the prejudicial media coverage, and (2) that the effects of the media saturation continued until the trial. *Id.* Presumed prejudice is rarely applicable, and is reserved for an extreme situation. *Coleman*, 778 F.2d at 1490.

With respect to the "presumed" prejudice standard, the Court will review some instances in which courts have considered allegations of prejudicial, inflammatory and community-saturating pretrial publicity. In *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the defendant confessed in detail to robbing a bank, kidnapping three of its employees, and killing one of them. The videotaped confession subsequently was broadcast three times by local television stations. *Id.* at 724, 83 S.Ct. at 1418. In a community of 150,000 people, the broadcasts reached approximately 106,000 persons. *Id.* The United States Supreme Court was willing to presume prejudice because, in its view, "the conclusion cannot be avoided that this spectacle ... in a very real sense *was* Rideau's trial." *Id.* at 726, 83 S.Ct. at 1419. "Any subsequent proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.*

In *Coleman*, the Eleventh Circuit utilized the presumed prejudice standard.[11] There the Petitioner had been convicted of murdering six family members in rural Seminole County, Georgia. 778 F.2d at 1488. The

county had a population of approximately 7,000, with slightly more than 2,000 households. After reviewing the extensive and inflammatory pretrial publicity that surrounded the case, including the newspaper accounts in the Donalsonville News, a weekly publication that reached 1,800 households in the county, the court of appeals concluded that the showing made by Coleman "equals that made in *Rideau.*" *Id.* at 1539. The court found that the press saturated the community with overwhelming evidence of Coleman's guilt, *id.*, and concluded that the "Petitioner has adduced evidence of inflammatory and prejudicial pretrial publicity that so pervades the community as to render virtually impossible a fair trial before an impartial jury." *Id.* at 1540.

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) the Supreme Court considered several of its earlier rulings in which prejudice was presumed, including *Rideau*, and advised that: "They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to new accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Id.* at 799, 95 S.Ct. at 2036. Rather, a court must look to the totality of the circumstances to determine if a defendant's trial was not fundamentally fair. *Id.*

In *Murphy* the Court reviewed the voir dire transcript and determined that there was no indication of hostility toward the Petitioner, no suggestion of a partiality that could not be laid aside. *Id.* at 800. In addition, the news articles regarding the Petitioner appeared almost entirely seven months before the jury was selected. *Id.* at 802. Furthermore, the articles were largely factual in nature. *Id.*

In *Bundy*, the Eleventh Circuit rejected the Petitioner's claim that the extensive adverse pretrial publicity resulted in a jury that was both presumptively and actually preju-

---

11. The Eleventh Circuit also presumed prejudice in the trials of Coleman's co-defendants. *See*

*Isaacs v. Kemp*, 778 F.2d 1482 (11th Cir.1985),

diced.[12] 850 F.2d at 1424. Among the pretrial publicity at issue was the extensive media coverage of Bundy's previous trial in Leon County, Florida, in which he was convicted and sentenced to death for two murders committed in Tallahassee, Florida. *Id.* at 1406 n. 1 and 1425. The court of appeals instructed therein:

> Although publicity concerning a defendant's involvement in other crimes is relevant in presuming jury prejudice, especially if the defendant's involvement in that crime is inadmissible in the guilt/innocence phase, *Murphy* stands for the proposition that prejudice is not presumed simply because the defendant's criminal record is well publicized.

*Id.* at 1425. The court also noted that the publicity concerning the Leon County case was factual in nature, and not infested with inflammatory and prejudicial remarks from the police and the prosecutor. *Id.; see also Henderson v. Dugger*, 925 F.2d 1309 (11th Cir.1991), *cert. denied sub nom. Henderson v. Singletary*, —— U.S. ——, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992); *Bertolotti v. Dugger*, 883 F.2d 1503 (11th Cir.1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990) (showing of pretrial publicity in each case inadequate to presume prejudice; actual prejudice standard applied).

 Upon review of the record, the Court finds that the pretrial publicity in the instant case does not rise to the levels found to be "presumably prejudicial"—and, thus, unacceptable—in *Rideau* and *Coleman.* In this case, the pretrial publicity was primarily factually based, and primarily occurred shortly after the murders, during the latter weeks of May, 1982. In support of his change of venue motion, Petitioner submitted nine newspaper articles; an affidavit from WQIK 99 FM Radio; the testimony of the assistant news director of WJXT Television (Channel 4); the testimony of the news director of WJSK Television (Channel 17); the testimony of the administrative assistant to the news desk at WTLV Television (Channel 12); and the videotapes of the televised segments relating to this case.[13] R3–127–76. Also submitted for the trial court's review was demographic information regarding registered voters in Duval County, Florida, and estimates of the circulation of the local newspapers, and the listening audiences of the area's electronic media.[14] *Id.*

The Court acknowledges that the articles and newscasts addressed the following: Petitioner's criminal history, including his status as a parolee; his failed polygraph examination; his statements regarding his conversation with Mrs. Weiler on the evening of the murders and his lapse of memory; the reactions of Kristy Weiler's teacher and classmates; the reaction of the coroner; photographs of Petitioner in handcuffs; the Jacksonville Sheriff's Office's failure to recover the gun and its fear that relations or friends might hamper its search efforts; the incriminating evidence found in Petitioner's truck; and Mrs. Weiler's pregnancy. R3–126–76. In addition to these primarily factual accounts, in July, 1982 a local television station broadcast an editorial addressing the fact that Petitioner was on parole at the time of the Weiler murders, and attacking the wisdom of the parole system. *Id.* at 173.

Despite Petitioner's claim to the contrary, the Court finds that the community was not

---

cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

**12.** The *Bundy* trial court granted Bundy's first change of venue motion, but denied his second change of venue motion.

**13.** The dialogue on the videotapes was transcribed by the court reporter and appears in the trial transcript.

**14.** At the change of venue hearing, defense counsel introduced evidence indicating that as of June 30, 1981, the combined daily circulation of the Florida Times–Union and the Jacksonville Journal was 151,266, Saturday circulation was 132,-279, and Sunday circulation was 146,423. R3–128–129. Testimony received indicated that WJXT Television reached approximately 55,000 households at noon, 109,000 households at 6:00 p.m., and 56,000 households at 11:00 p.m., *id.* at 150, WJKS Television reached approximately 19,000 viewers at 11:00 p.m., *id.* at 163–63, and WTLV Television reached 10,000 households for Good Morning Jacksonville, 15,000 at noontime, 40,000 households at 6:00 p.m., and 33,000 households at 11:00 p.m., *id.* at 174. The court also received evidence that there were approximately 251,000 registered voters in Duval County at the time. R4–182.

so saturated by adverse pretrial publicity as to render it "'virtually impossible [for the Petitioner to receive] a fair trial by an impartial jury drawn from the community.'" *Bundy*, 850 F.2d at 1424 (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981) [15]). While Petitioner offers evidence that the print and electronic media potentially reached large numbers of Duval County residents, most of the media attention given this case occurred in May and June, 1982, shortly after the murders. Argument on the motion for change of venue was heard on August 23, 1982, and the jury was not selected until January 31, 1983. Clearly, there was a significant "cooling off" period prior to the selection of the jury. *See Heath*, 941 F.2d at 1135. In addition, most of the pretrial publicity was factual in nature, and, as Petitioner points out, much of what was reported was eventually introduced into evidence by the state, Pet. at 25, making it subject "to the crucible of the adversarial process." *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir.) (footnote omitted), *cert. denied sub nom. Singletary v. Woods*, —— U.S. ——, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991).

▮ Therefore, for the reasons stated above and in the Court's analysis of Claim II, *infra*, the Court finds that Petitioner has failed to demonstrate that the pretrial publicity surrounding his case either was "presumably" prejudicial, or that it resulted in actual

prejudice of the jury. Accordingly, Claim I is without merit.[16]

### CLAIM II—INDIVIDUAL AND SEQUESTERED VOIR DIRE

In Claim II Petitioner contends that the trial court's denial of his motion for individual and sequestered voir dire regarding prospective jurors' knowledge of massive inflammatory publicity deprived him of his right to a fair and impartial jury, in violation of the Sixth, Eighth and Fourteenth Amendments. This claim originally was raised in Petitioner's direct appeal.[17] The Florida Supreme Court denied the claim on its merits. *Davis*, 461 So.2d at 70. Therefore, the Court finds that Claim II has been exhausted and is properly before the Court.

Petitioner contends that the trial court erred in denying his motion for individual and sequestered voir dire. This form of voir dire was requested so that potential jurors could be individually questioned regarding the pretrial publicity, and so their answers would not taint the entire venire by imparting any personal knowledge to other veniremen. R1–142.[18] Petitioner contends that five members of the final jury admitted to having prior knowledge of the case, but due to the lack of individual voir dire, only broad questions were put to them, and thus it was impossible to determine the extent of their

---

**15.** In *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

**16.** The Court further finds that Petitioner's gratuitous comment at the end of Claim I—that his trial counsel was ineffective for failing to renew the motion for change of venue and/or to use the survey results from the public defender's office regarding the level of pretrial publicity—has not been raised in the state court, and is not properly before this Court. Even if it had been previously addressed, the Court finds that this claim is without merit. Section Y of the Appendix attached to the Petition contains photocopies of what appear to be responses to a student-conducted survey. There is no explanation of the survey methodology, no analysis of the survey results, and no evidence that its findings are empirically sound. Any failure on the part of trial counsel to rely on this raw data certainly was not unreasonable.

**17.** The Court notes that in Petitioner's direct appeal, he identified three jurors who indicated during voir dire that they had prior knowledge of the case—Mrs. Richardson, Mrs. Jackson and Mr. Griswold. On Appeal from the Circuit Court of the Fourth Judicial Circuit, in and for Duval, County, Florida, Initial Brief of Appellant at 20. In the instant Petition, Petitioner contends that *five* jurors indicated during voir dire that they had prior knowledge of the case—Mrs. Richardson, Mrs. Jackson, Mr. Griswold, Mr. Cannon and Mrs. Arceneaux. Pet. at 25.

**18.** Petitioner again argues that all evidence in the trial previously had been introduced through the media. He further contends that there was a "lynch mob" mentality in the community, evinced by the fact that Petitioner's roommate, Mary Collins, allegedly was fired and forced to leave Jacksonville due to the pretrial publicity. Pet. at 34.

knowledge.[19] Petitioner argues that the court's individual questioning was too superficial to apprise him of the extent of the potential jurors' bias. Therefore, Petitioner asserts, he lacked sufficient information to exercise his peremptory challenges in a reasonably intelligent manner, and the trial court lacked sufficient information to truly evaluate the credibility of the jurors. Pet. at 38.

Respondent contends that Petitioner accepted the jury without utilizing his final peremptory challenge. On the record, both defense counsel and Petitioner stated that they were satisfied with the jury despite the remaining available challenge. Resp. at 16. Respondent further contends that Petitioner fails to establish "manifest error" by the trial judge, and asserts that Petitioner's speculation that some jurors may have been secretly biased, lied during voir dire, or violated his/her sworn oath is "self-serving conjecture." *Id.* Additionally, Respondent alleges, there is no constitutional obligation imposed on states for individual and sequestered voir dire, even in cases involving extensive pretrial publicity. Thus, Petitioner had a right to a fair and impartial jury, not to a particular selection process, and Petitioner was not entitled to an "ignorant" or "sterile" jury. *Id.* at 17. Therefore, Respondent adds, the existence of "informed" jurors or pretrial publicity does not satisfy the prejudice component. Thus, Respondent contends that because Petitioner was not entitled to a sterile jury, was not entitled to a particular form of voir dire, accepted the final jury without objection, and never exhausted his peremptory challenges, he is not entitled to habeas relief.

 "The purpose of voir dire is to enable the defendant to evaluate the prospective jurors and select a fair and impartial jury." *United States v. Vera,* 701 F.2d 1349, 1355 (11th Cir.1983). The question of the partiality of an individual juror "is one of historical fact to which the presumption of correctness of a state court's factual findings under 28 U.S.C. § 2254(d) applies." *Bundy,*

850 F.2d at 1426; (citing *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984)). Absent evidence to the contrary, the reviewing court must presume that the jurors were fair and impartial, "as indeed they were swore to be." *United States v. Khoury,* 901 F.2d 948, 955 (11th Cir.1990) (footnote omitted). "Thus the question is whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial." *Patton,* 467 U.S. at 1038, 104 S.Ct. at 2892–93 (citing 28 U.S.C. § 2254(d)(8)).

The Supreme Court reiterated this position in *Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), noting that "[a] trial court's findings of juror impartiality may 'be overturned only for "manifest error."'" 500 U.S. at 428, 111 S.Ct. at 1907 (quoting *Patton,* 467 U.S. at 1031, 104 S.Ct. at 2888 (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643)). In further relevant part, the Court stated:

> Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.... [T]hese perceptions should be of assistance to [the court] in deciding how detailed an inquiry to make of the members of the jury venire.

*Mu'Min,* 500 U.S. at 427, 111 S.Ct. at 1906.

 Additionally, the method of conducting voir dire "is left to the sound discretion of the trial court and will be upheld unless an abuse of discretion is found." *Vera,* 701 F.2d at 1355. "The voir dire conducted by the trial court need only provide 'reasonable assurance that prejudice will be discovered if present.'" *Id.* (quoting *United States v. Holman,* 680 F.2d 1340, 1344 (11th Cir.1982)). If jurors can "lay aside preconceptions and base their verdict on the evidence adduced at trial, they need not be completely unaware of the facts in a given

---

**19.** In Claim III, Petitioner seeks relief based on a *sixth* venireman's prior knowledge of the case. Petitioner's claim concerning this venireman—

Mrs. Lane—is discussed in the Court's analysis of Claim III.

case." *Bertolotti*, 883 F.2d at 1521 (citing *Murphy*, 421 U.S. at 799–800, 95 S.Ct. at 2036). Although the use of content questions exploring exactly what pretrial publicity potential jurors had been exposed to may assist counsel in exercising peremptory challenges, "peremptory challenges are not required by the Constitution, *Ross v. Oklahoma*, 487 U.S. 81, 88 [108 S.Ct. 2273, 2278, 101 L.Ed.2d 80] (1988), [and] this benefit cannot be a basis for making 'content' questions about pretrial publicity a constitutional requirement." *Mu'Min*, 500 U.S. at 425, 111 S.Ct. at 1905.

▆▆ "Under the constitutional standard … '[t]he relevant question is not whether the community remembered the case, but whether the jurors … had such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Id.* at 430, 111 S.Ct. at 1908 (quoting *Patton*, 467 U.S. at 1035, 104 S.Ct. at 2891). It is not a violation of the Sixth Amendment or the Due Process Clause for a judge not to inquire into the venire's knowledge of the specific contents of pre-trial publicity. *Mu'Min*, 500 U.S. at 430, 111 S.Ct. at 1908.

On June 9, 1982, Petitioner filed a Motion for Individual and Sequestered Voir Dire. R1–142. The trial court denied the motion in open court, prior to the commencement of jury selection. R6–532. The court granted each side three additional peremptory challenges. *Id.* Although the court denied the Petitioner's motion for individual and sequestered voir dire, the court allowed both the prosecutor and defense counsel the opportunity to examine all potential jurors for possible bias. At the beginning of voir dire, the judge, addressing the potential jurors said: "The Court is going to give you some preliminary instructions and then the Court and the attorneys will have the opportunity to ask you some questions." *Id.* at 536–37.

Among other instructions, the Court informed the potential jurors: (1) that an Indictment is not to be considered evidence of the Petitioner's guilt; (2) that the defendant is presumed innocent and does not have any duty to prove himself innocent; (3) that the burden is on the State to prove the defendant guilty beyond and to the exclusion of every reasonable doubt; (4) that at the end of the

trial, they would be given rules to use in testing the credibility and truthfulness of witnesses, including experts; and (5) that prejudice or sympathy for either side has no place in the consideration of the verdict. *Id.* at 537–38. The judge also told the potential jurors that the jury would be sequestered, and arrangements would be made for their transportation, lodging and meals. *Id.* at 541.

The judge then introduced the prosecutor, defense counsel and the Petitioner to the potential jurors. *Id.* at 541–42. He then stated:

> Now, I am going to ask the entire panel some few individual questions and if your answer is affirmative, I would appreciate it if you would please stand. Do any of you know anything about the facts and circumstances of this case to be tried? If your answer is affirmative, would you please stand?

*Id.* at 542. Mr. Griswold, Mr. Cannon, Mrs. Jackson, and Mrs. Arceneaux were among the jurors that stood in response to the question. The Court then asked the Clerk to call twenty-one prospective jurors and for those called, to take a seat in the jury box. *Id.* Among those called were Mr. Griswold, Mrs. Jackson, Mrs. Arceneaux and Mrs. Richardson. *Id.* at 544–45. After questioning each of the potential jurors about their background, the court asked the group, "Do any of you know any reasons that you could not sit as a fair and impartial juror and render a verdict based on the evidence and the law presented in the courtroom?" *Id.* at 554. He received no response. *Id.* The judge then allowed counsel to question the potential jurors.

During his introductory remarks, the prosecutor stated:

> I want to ask you at this time if anything occurs to you that causes you to have some doubt, even a flicker of a doubt, to have some doubt as to whether or not you could sit as a fair and impartial juror in this case, will you raise your hand and volunteer that, if we don't ask the question?
>
> What we are looking for is open minds to issues and the facts alone. Will you, if

you think of something that we don't ask you, volunteer if you think it might affect you, will each of you do that for us? *Id.* at 556. The prospective jurors answered affirmatively. *Id.*

Shortly thereafter, the prosecutor asked the potential jurors if anyone had heard about the case, either on television or from the newspapers. *Id.* at 560. Five potential jurors indicated affirmatively. *Id.* The prosecutor then asked, "How many of you feel that you could not reach a fair and impartial verdict based on the law and the evidence because you read or heard or know something about this case?" *Id.* at 561–62. Two prospective jurors raised their hands. *Id.* Each of those who raised their hand were individually asked if anything they had heard would interfere with their ability to give the Petitioner a fair trial. *Id.* at 561. During this line of questioning, the transcript does not identify the potential jurors by name. *Id.* at 561–63.

Petitioner identifies five members of the jury panel—Mrs. Richardson, Mrs. Jackson, Mr. Griswold, Mrs. Arceneaux and Mr. Cannon—who acknowledged during voir dire that they had been exposed to media coverage. Pet. at 25. Accordingly, the Court will review those sections of the voir dire transcript in which each of these jurors responded to questions posed by the prosecutor and defense counsel.

Richardson indicated that she had heard or read something about the case. R6–599. She further affirmed that she could put aside any prior knowledge and reach a verdict based on the evidence introduced at trial. *Id.* at 600. Defense counsel also questioned Richardson, and she clarified that she had learned about the case from the newspaper and television. *Id.* at 651. She affirmed that she could set aside anything she had learned from the newspaper and television. *Id.* at 651–52.

Jackson stated that someone had told her about the case, but could not remember who had told her about it. *Id.* at 601–02, 651. When asked by the prosecution if what she had heard would in any way influence her ability to sit and give the defendant a fair trial, she replied: "I could with an open and fair mind." *Id.* at 602. When further questioned if she could give the State a fair trial, she responded: "Yes." *Id.* Defense counsel also asked her if she could judge the case based solely on what she heard from the witness stand, and she replied that she could. *Id.* at 651. When asked if there was any question in her mind whether she could do that, she replied: "No." *Id.*

The prosecutor verified from Griswold that he had been one of the potential jurors who raised his hand in response to the prosecutor's question regarding previous knowledge of the case. *Id.* at 609. When asked if he had an open mind and could and would give the State and the defendant a fair trial, Griswold stated that he could and he would. *Id.*

In the early stages of voir dire, the prosecutor asked Arceneaux if she could vote for the death penalty, and she responded: "I guess so." *Id.* at 590. "But have you an open mind about it?" the prosecutor inquired. "Yes," Arceneaux replied. *Id.* Defense counsel discussed with Arceneaux the concepts of reasonable doubt and individual and jury decisions, and she indicated that she understood the concepts as explained. *Id.* at 647–48. Defense counsel also specifically asked Arceneaux if she could remove from her mind that which she had previously heard about the case and base her verdict on what "comes from the witness stand," and she replied: "Right." *Id.* at 661. Defense counsel followed up with "And you would be able to do that?" and she replied: "Yes, I would." *Id.* at 661–62. In reference to the fact that she had children, and the case involved child victims, when asked if she could give a fair and impartial trial, she responded: "I think I could give a fair and impartial trial." *Id.* at 662.

Cannon was in the third group of prospective jurors called to the jury box. R7–732. At the court's request, Cannon, along with all of the other members of the third group of prospective jurors, recited standard personal information about themselves. *Id.* at 733–37. The court then asked, "[T]hose of you who are new to the jury box, the questions that have been asked earlier by the court and the

attorneys, do you know anything that you need to tell us?" *Id.* at 737. Two unidentified prospective jurors stated they could not render a guilty verdict if it meant the death penalty, and Price was unsure on the issue. *Id.* at 737–38. The court then asked the following questions:

> [D]oes anyone know of any reason that you could not sit as a fair and impartial juror and render a verdict based on the evidence and the law taking into consideration the charges pending against Mr. Allen Lee Davis and also the circumstances relating to the jury not being able to stay at home for this week? Does anyone know of any reason other than those expressed why they could not sit as a fair and impartial juror?

*Id.* at 739. Potential juror Watson expressed concern over the needs of his wife. *Id.*

A review of the transcript indicates that Cannon was not singled out for additional questioning regarding his impartiality. However, he was among the group of jurors who responded to the following questions posed by the prosecutor and defense counsel. The prosecutor stated: "[I]f anything occurs to occurs to you, please volunteer it." *Id.* He also reminded the potential jurors that "citizens are presumed innocent and if he goes to trial for a crime, it is up to the government or the state to prove that he is guilty beyond and to the exclusion of every reasonable doubt, you understand, and accept those principles?" *Id.* at 751–52. The group answered yes. *Id.* at 752. He also asked the group, "Do any of you know of any reason besides the two jurors that have told me when I asked about the death penalty, do any of the other nineteen of you know of any reason at all that you could not give this defendant, Allen Lee Davis, who is charged with three counts of first degree murder on the 11th day of May, 1982, do any of you [know] why you could not give Allen Lee Davis a fair trial in this case?" *Id.* at 759. The group responded, "No." *Id.* He asked again, "Do any of you know of a reason?" *Id.* The group responded, "No." *Id.* The prosecutor then asked the corollary question, "Do any of you know of any reason that you could not give the people of the State of Florida a fair trial in this case? Do any of you know why you can't give either side a fair trial?" *Id.* The group responded, "No." *Id.* The prosecutor rephrased the question, asking:

> Is there anything eating at any of you, bothering you in any way at this point, personal, private, what we've said, anything eating at you in any way that would cause you to be apprehensive in your answer to that question?

> . . . . .

> Now, do any of you, reaching deep down in answering that question, do any of you have any inkling at all that you couldn't be impartial jurors in this case and give both sides a fair trial?

*Id.* at 759, 759–60. The group responded, "No." *Id.* at 760.

Cannon did respond to defense counsel's direct questions that if he felt the defendant was not guilty that he could hold firm to that position, *id.* at 765, and that he would not hold it against the defendant if the defendant chose not to testify in his own behalf, *id.* at 766. Defense counsel also asked the group if they could hold the state to its burden of proving the guilt of the defendant beyond and to the exclusion of every reasonable doubt. *Id.* at 767. The group responded, "Yes." *Id.* Defense counsel chose not to strike Cannon.

The following morning, at side bar, defense counsel, accompanied by the Petitioner, made the following statement on the record:

> I would like to point out for the record that during the course of the jury selection, Mr. Davis and I had the opportunity to consult with each other and that Mr. Davis participated in the decisions that went to preemptory [sic] challenges and Mr. Davis advised me yesterday that he was satisfied with the jury selection, even though there was one preemptory [sic] challenge left and that he was satisfied with the jury selection process.

> Is that correct sir?

*Id.* at 792. Petitioner responded, "Yes, sir." *Id.*

# 1520

██ The Court finds that the trial court allowed both the prosecution and defense counsel ample opportunity to individually examine each of the potential jurors to determine whether they were biased and/or had been so influenced by any pretrial publicity that they could not render a fair and impartial verdict based only on the evidence introduced during the trial. The Court further finds that Petitioner fails to meet his burden of showing that the trial court abused its discretion in the method it selected for conducting voir dire.

██ Petitioner's contention that the trial court's questioning of the potential jurors was too superficial to adequately apprise him of the extent of juror bias based on their possible exposure to pretrial publicity, resulting in his inability to intelligently exercise his peremptory challenges, is without merit. As the Supreme Court recently reiterated, peremptory challenges are not required by the Constitution. *Mu'min,* 500 U.S. at 424, 111 S.Ct. at 1905. The Constitution similarly does not require a trial judge to inquire into the venire's knowledge of the specific contents of pre-trial publicity. *Id.* at 430, 111 S.Ct. at 1908. Rather, what is required is that jurors not have such fixed opinions that they could not judge impartially the guilt of the defendant. *Id.* Petitioner has failed to demonstrate that any of the jurors did not meet this test.

The Court further finds that neither the denial of Petitioner's motion for change of venue, nor the denial of his motion for individual and sequestered voir dire, deprived Petitioner of his right to a fair and impartial jury at the guilt/innocence and sentencing phases of his trial, in violation of the Sixth, Eighth or Fourteenth amendments. Therefore, the Court finds that Claim II is without merit.

## CLAIM III—POTENTIAL JUROR LANE

In Claim III Petitioner contends that the trial court's denial of challenge for cause of venireman Lane, who had expressly admitted to having formed an opinion, denied Petition-er a fair and impartial jury in violation of the Sixth and Fourteenth amendments. This claim originally was raised in Petitioner's direct appeal. The Florida Supreme Court denied this claim on its merits. *Davis,* 461 So.2d at 70. Therefore, the Court finds that Claim III has been exhausted and is properly before the Court.

Petitioner contends that during defense counsel's questioning, venireman Lane indicated that she had knowledge of the case from television, had discussed the case with her husband, had certain emotional feelings about the case, knew in her heart how she felt, and questioned whether or not she should serve on the jury. She further stated that she had made up her mind, "more or less." Pet. at 40. Defense counsel challenged Lane for cause, but the trial court denied the challenge stating that the last time defense counsel questioned her she said she could listen to the evidence and render a verdict based thereon. R6–667. Defense counsel struck Lane peremptorily. *Id.* at 667–68.

Petitioner further contends that even if the judge and prosecutor were correct that Lane said she could be fair and impartial, she was still properly subject to a challenge for cause based on the "obvious incompatibility of her bland assurances of impartiality" in light of her previous statements. Pet. at 41. It is Petitioner's position that the court's error in denying the challenge for cause was not cured or waived by the fact that Davis did not exhaust his peremptory challenges. It would have been futile, Petitioner asserts, to use his last peremptory challenge, because five of the actual jurors had prior knowledge of the case. Pet. at 42.[20]

Respondent avers that this entire issue is "de minimis." Resp. at 18. When the trial court denied Petitioner's challenge of Lane for cause, Petitioner struck her peremptorily. Petitioner subsequently accepted the final jury without using all of his peremptory challenges. Therefore, according to Respondent, no objectionable jurors sat on the jury. Ad-

---

20. Petitioner also contends that if the remaining peremptory is dispositive of the issue, then "defense counsel was ineffective for not exercising his challenge as reasonably competent defense counsel would have under the circumstances." *Id.*

ditionally, Respondent contends that if the juror satisfied the judge that she could be fair, the judge was not required to strike the juror merely because she had "heard about" the case. Finally, Respondent contends that the issue of whether a particular juror was biased is an issue of historical fact, not subject to second-guessing in a § 2254 proceeding. A federal court, Respondent argues, should defer to the state trial judge who was "on the scene and observed the challenged juror." *Id.* Petitioner's "lack of a federal question," the state concludes, is further complicated by the total absence of prejudice: Lane did not serve on the jury, and Petitioner accepted the jury with one peremptory challenge unused. *Id.* at 19.

The partiality of an individual juror is not a mixed question of law and fact, but rather "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton,* 467 U.S. at 1036, 104 S.Ct. at 2891. "A prospective juror must be removed for cause if his or her views ' "would prevent or substantially impair the performance of his [or her] duties as a juror." ' " *Heath,* 941 F.2d at 1132 (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980))).

"A habeas petition will be granted for a state trial court's failure to strike a juror for cause only when there is not fair support in the record for the trial court's determination that the juror was unbiased." *Heath,* 941 F.2d at 1132 (citing *Bundy,* 850 F.2d at 1426). The Eleventh Circuit added in *Heath:*

> However, even if a veniremember should have been struck for cause, the Supreme Court in *Ross v. Oklahoma,* 487 U.S. 81 [108 S.Ct. 2273, 101 L.Ed.2d 80] (1988), held that there is no constitutional violation where the biased veniremember does

not eventually sit on the jury. The Court in *Ross* held that a habeas Petitioner's constitutional rights were not violated when he was forced to waste a peremptory challenge to remove a veniremember whom the court should have removed for cause.

*Heath,* 941 F.2d at 1132–33.

During voir dire examination of the prospective jurors, Lane indicated that she had some knowledge of the case from having watched news accounts on television. R6–644. When asked by defense counsel if that particular knowledge would prevent her from sitting as a fair and impartial juror, she stated: "Well, I have mentioned emotions; I know what I feel about it and not very much." *Id.* She further indicated that she had discussed the case with her husband, and stated, "I don't know whether I should serve or not." *Id.* at 645. When asked if she could set aside any preconceived notions of guilt or innocence and give the Petitioner a fair trial, she stated: "I still have my feelings. I feel that I know in my heart how I feel." *Id.* Defense counsel then specifically recounted the charges against Petitioner and reminded Lane that the State was seeking the death penalty. When he asked Lane again if she could give Petitioner a fair trial, she stated: "Well, I guess I can give him a fair trial but, really, I know how I feel about it." *Id.* at 645–46.

Defense counsel subsequently asked the court to strike Lane for cause because she indicated that she could not render a fair and impartial verdict. *Id.* at 667. The state objected. *Id.* The court responded: "She said that initially but then the last time you inquired of her, she said that she could listen to all of the evidence and render a verdict based on that, so I will deny your motion." *Id.* Defense counsel then chose to strike Lane peremptorily. *Id.* at 667–68. After the entire jury was selected, defense counsel still had one remaining unused peremptory challenge.[21]

---

21. The following day, as previously noted, *supra,* defense counsel made the following statement at side bar:

> Mr. Davis, at this time let me state I think the record should reflect that the State through

Mr. Austin and Mr. Kunz are present and that Mr. Davis is standing beside me and I would like to point out for the record that during the course of the jury selection, Mr. Davis and I had the opportunity to consult with each other

While the Court agrees with Petitioner that the record indicates that Lane had formed an opinion regarding the Petitioner's guilt or innocence, the Court cannot agree that the trial court's denial of defense counsel's challenge for cause was error which requires habeas relief. Despite Lane's statement that she knew how she felt, she did indicate that she could give Petitioner a fair trial. Notwithstanding this, however, Petitioner's argument here is truly moot, for even assuming error in the trial court's refusal to strike Lane for cause, she was peremptorily struck, and thus *never served on the jury*. It is clearly settled that there is no constitutional violation where a biased venireman does not eventually sit on the jury. *Ross*, 487 U.S. at 88, 108 S.Ct. at 2278; *Heath*, 941 F.2d at 1132. Moreover, the loss of a peremptory challenge does not constitute a violation of the constitutional right to an impartial jury. *Ross*, 487 U.S. at 88, 108 S.Ct. at 2278 (peremptory challenges not of constitutional dimension; merely a means to achieve an impartial jury). Therefore, the Court finds that Claim III is without merit.

### CLAIM IV—INEFFECTIVE ASSISTANCE OF COUNSEL: FAILURE TO INVESTIGATE GUILT–INNOCENCE PHASE ISSUES

In Claim IV Petitioner contends that he was denied the effective assistance of counsel during the guilt-innocence phase of the trial, in violation of the Sixth, Eighth, and Fourteenth Amendments, in that defense counsel failed to adequately investigate defenses and issues. The Court finds that this Claim, to which Petitioner devotes only three pages of his 314 page Petition, is merely a generalized introduction to Petitioner's *specific* claims of ineffective assistance of counsel, including the claims related to counsel's performance at the *sentencing* phase. These claims are set forth at greater length and detail in Claims V through XIII, and the Court will defer its resolution of these issues to those analyses, *infra*. One subclaim in Claim IV,

deficient voir dire examination and ineffective exercise of peremptory challenges, is not discussed by Petitioner at greater length elsewhere, although this subclaim is related to the allegations of trial court error in Claim II and III. The Court will address this subclaim after a discussion of the legal standards to be applied in the context of allegations of ineffective assistance of counsel.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, ... and to have the assistance of counsel for his defence." U.S. CONST. amend. VI. Without counsel, the constitutional right to trial "would be of little avail." *United States v. Cronic*, 466 U.S. 648, 653, 104 S.Ct. 2039, 2043, 80 L.Ed.2d 657 (1984). The right to counsel "is meant to assure fairness in the adversary criminal process." *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). While the right to counsel includes the right to *effective* assistance of counsel, *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 n. 14 (1970), the modern meaning of effective assistance was not enunciated until the seminal case *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). There the Supreme Court set forth a two-part test to be applied to all claims of constitutionally deficient representation.

First, a claimant must show that counsel's representation of him "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Significantly, however, the Court eschewed any dictation of specific, detailed guidelines (the existence of which "could distract counsel from the overriding mission of vigorous advocacy" of his client's case, *id.* at 689, 104 S.Ct. at 2065), stating instead that the performance inquiry must be whether counsel's assistance was *"reasonable considering all the circumstances,"* *id.* at 688, 104 S.Ct. at 2064 (emphasis supplied). Any set of particular rules "would interfere with the constitutionally

and that Mr. Davis participated in the decisions that went to preemptory [sic] challenges and Mr. Davis advised me yesterday that he was satisfied with the jury selection, even though there was one preemptory [sic] chal-

lenge left and that he was satisfied with the jury selection process.
 Is that correct, sir?
R7–792. Petitioner replied, "Yes, sir." *Id.*

protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 689, 104 S.Ct. at 2065. In relevant part, the Court added:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and *to evaluate the conduct from counsel's perspective at the time.* Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.* ... There are countless ways to provide assistance in any given case. *Even the best criminal defense attorneys would not defend a particular client in the same way.* ...

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that *counsel is*

*strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.*

*Id.* at 689, 690, 104 S.Ct. at 2065, 2066 (quotations and citations omitted) (emphasis supplied). Thus, a strong presumption exists that counsel rendered adequate assistance. *Yeck v. Goodwin,* 985 F.2d 538, 542 (11th Cir.1993); *Harich v. Dugger,* 844 F.2d 1464, 1469 (11th Cir.1988) (en banc), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989).

 However, an error by counsel, "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. The Court added:

The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, *any deficiencies in counsel's performance must be prejudicial to the defense* in order to constitute ineffective assistance under the Constitution.

*Id.* at 691–92, 104 S.Ct. at 2067 (emphasis supplied). Thus, a defendant must show that particular errors "had an actual effect on the defense," not merely that the errors had "some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067. The defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," a reasonable probability being "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. In determining the prejudice component of an ineffectiveness claim, the court must "consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. at 2069. The court must ask whether the claimant has met the burden of showing that the decision reached by the factfinder "would reasonably likely have been different absent the errors." *Id.* at 696, 104 S.Ct. at 2069.

However, the Supreme Court recently has categorized as "defective" analyses which fo-

cus "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* — U.S. —, —, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993). *Strickland* itself recognized that while the "outcome-determinative standard has several strengths," it is "not quite appropriate," *Strickland,* 466 U.S. at 693, 694, 104 S.Ct. at 2067, 2068, and the Court in *Lockhart* made it clear that it was merely "straightforward[ly]" applying the "rule of law announced in *Strickland,*" *Lockhart,* — U.S. at — n. 3, 113 S.Ct. at 843 n. 3.

■ Furthermore, as opposed to the standard of contemporary assessment to be applied in determining the "conduct" component, the habeas court is not bound by the law existing at the time of trial in its determination of the prejudice element. *See id.* at —, 113 S.Ct. at 844. "Unreliability or unfairness," the Supreme Court held, "does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* Concerns mitigating in favor of contemporary assessment for the "conduct" prong simply are not implicated by the "prejudice" component of the *Strickland* test. *Id.*

Although it discussed the conduct/error component before it discussed the prejudice component, the Court in *Strickland* stated quite clearly that a court need not determine these components in that order. 466 U.S. at 697, 104 S.Ct. at 2069. The object of this inquiry "is not to grade counsel's performance," and if it is "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id. See also Bolender v. Singletary,* 16 F.3d 1547, 1560 n. 17 (11th Cir.1994) (court deciding ineffective assistance claim may elect to address either performance or prejudice prong first).

■ As to the standard of precedence to be given any state court conclusions on effective assistance, only findings of fact made in the course of a state court's evaluation of an ineffectiveness claim are to be given deference. Whether there is ineffec-

tive assistance of counsel, however, is a mixed question of law and fact. *McCoy v. Newsome,* 953 F.2d 1252, 1262 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992). Thus, a state court's *ultimate* findings in this regard are not binding on a federal habeas court. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

■ Returning to the instant case, Petitioner in part claims that trial counsel's performance was ineffective in "failing to adequately question jurors and in exercising peremptory challenges." Pet. at 46. Claims II and III, alleging *trial court* error during this phase of the proceedings, were raised on Petitioner's direct appeal. However, while numerous allegations of ineffective assistance of counsel raised in the instant Petition were raised in Petitioner's previous state 3.850 motions, the instant subclaim was never raised before a state court and, as such, is an unexhausted claim.

■ An application for a writ of habeas corpus shall not be granted unless it appears that the applicant has exhausted available state remedies. 28 U.S.C. § 2254(b). A district court must dismiss habeas petitions containing both unexhausted and exhausted claims. *Castille v. Peoples,* 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). This exhaustion requirement serves the interests of both comity and judicial efficiency. *Granberry v. Greer,* 481 U.S. 129, 133, 107 S.Ct. 1671, 1674, 95 L.Ed.2d 119 (1987); *Rose,* 455 U.S. at 515, 102 S.Ct. at 1201. However, neither of these interests would be served if the Court were to dismiss the instant Petition for failure to previously raise this ineffective assistance/voir dire subclaim. This claim is supported by scant and tangential allegations, and can be easily resolved herein.

■ While Petitioner asserts that counsel was "ineffective in conducting the voir dire process," Pet. at 46, the record, and Petitioner's own arguments, suggest otherwise. Attempting to demonstrate to the trial court that any venire summoned would be improperly prejudiced by widespread media cover-

age of the crime, defense counsel, at a hearing on the ultimately denied change of venue motion, presented testimony from newspaper editors and television station news managers as to the news coverage, and affidavits from area attorneys alleging that Petitioner would be unable to get a fair and impartial jury. R3–126–76; Pet. at 33–34. Claim II asserts that the trial court, after seeing the extensive evidence put forward by Petitioner's attorney concerning the case's publicity, erred by denying a motion for individual and sequestered voir dire. It is clear, then, as argued by Petitioner himself, that counsel in fact *did* attempt to secure a more favorable voir dire method for his client. That the motion was denied does not render its making—and, thus, its preservation for an appeal—ineffective assistance.

Furthermore, as to the questioning of specific individuals, the Court already has examined the voir dire of the five veniremen Petitioner identified in Claim II as having acknowledged exposure to media coverage. The Court previously has found, in its discussion of Claim II, *supra,* that both prosecutor and defense counsel were afforded "ample opportunity to individually examine each of the potential jurors to determine whether they were biased and/or had been so influenced by any pretrial publicity that they could not render a fair and impartial verdict based only on the evidence introduced during the trial."

The Court finds that the voir dire examination conducted by defense counsel Tassone, R6–629–720, R7–761–71, was thorough, competent and productive, and constituted effective assistance of counsel. Where counsel perceived potentially detrimental biases, he attempted to strike for cause. In the case of venireman Lane, *see supra,* counsel at side bar argued that "she indicated she could not give or render a fair and impartial verdict," R6–667, and moved to strike her for cause. The motion was denied, counsel exercised a peremptory challenge, and Lane was excused. Other than the episode involving Lane, Petitioner offers no examples of counsel's voir dire examination which would tend to support his ineffectiveness claim (and even the example of Lane is offered in the context

of Petitioner's allegation of *trial court* voir dire error). The Court finds, therefore, that Petitioner has failed to demonstrate that defense counsel was ineffective either in conducting voir dire or exercising peremptory challenges. This subclaim of Claim IV is without merit.

## CLAIM V—INEFFECTIVE ASSISTANCE OF COUNSEL: HYPNOTICALLY INDUCED RECALL TESTIMONY

In Claim V Petitioner contends that trial counsel's unreasonable failure to attack a key witness's allegedly unreliable hypnotically induced testimony, as well as his failure even to inform the jury of the fundamentally unreliable basis of this testimony, deprived Petitioner of the effective assistance of counsel, in violation of the Sixth, Eighth and Fourteenth Amendments. This claim previously was raised in Petitioner's first 3.850 Motion, filed in the state trial court on September 21, 1986. The trial court denied the claim on September 22, 1986. PC–R5–827. The Florida Supreme Court affirmed the decision, without opinion, on September 23, 1986. *Davis,* 496 So.2d 142. Therefore, the Court finds that this claim has been exhausted and is properly before the Court.

Petitioner contends that the testimony of Ginny Baumgartner was the only evidence offered by the state which firmly connected him to a gun, and thus was central testimony in support of the state's theory that Petitioner committed the acts charged. He contends that defense counsel's failure to challenge this hypnotically induced recall testimony as unreliable, before it came to the jury, was an omission of unconstitutional magnitude. Petitioner further contends that counsel also failed to cross-examine this witness regarding her hypnotically induced recall testimony. Pet. at 50–51.

He argues that if counsel had researched the "voluminous case law and professional treatises," he would have found "*ample* authority," Pet. at 51, for the exclusion of hypnotically induced recall testimony. It is Petitioner's contention that even by 1983, the time of his trial, courts across the country had recognized that hypnotically induced recall testimony was unreliable. Petitioner

contends that experts agree that hypnotized subjects can and occasionally do prevaricate, engage in "confabulation," and are subject to suggestion and influence by the hypnotist. Petitioner further alleges that witnesses who confabulate during hypnosis will become convinced that their post-hypnotic recall is absolutely accurate. Pet. at 53.

In support of his contentions, Petitioner offers the report of Dr. Robert Buckhout, Professor of Psychology at the City University of New York, who reviewed the record and the transcript of Baumgartner's hypnotic sessions and concluded that "the reliability of the accuracy of Mrs. Baumgartner's hypnotically induced testimony is highly questionable." Pet. App. O at 16 (cited in Pet. at 65). Additionally, at the evidentiary hearing Petitioner called as an expert hypnosis witness Justin Anderson, who also had reviewed Baumgartner's testimony. Anderson questioned as dubious many of the techniques used in conducting hypnosis.

█ In conclusion, Petitioner contends that defense counsel was unprepared and, therefore, did not present this issue. He further contends that the result of counsel's inaction was to deprive Petitioner of his constitutional rights to confrontation and to due process. He asserts that if counsel had asserted at trial the fact that this witness's testimony was the product of "the distorting effects of hypnosis," Pet. at 67, this would have made a difference in the outcome of the case.[22]

Respondent contends that hypnotically refreshed testimony was admissible at the time of Petitioner's trial, and counsel thus cannot be faulted for failing to anticipate the change of this law. Respondent argues that Petitioner now opines with hindsight that hypnotic evidence is always open to challenge as unreliable. However, Respondent posits that even if counsel had objected, there is no evidence in the record demonstrating any probability of success, and that absent either attorney error or prejudice, Petitioner cannot prevail.

In the instant case, the police report filed by Detective Kessinger on May 25, 1982, states that Mrs. Baumgartner saw the suspect with a black object in his hand.[23] Pet. App. Q at 3. It was not identified as a gun in the report. *Id.* On May 25, 1982, Mrs. Baumgartner was hypnotized by Lieutenant Mickler. Pet. App. P. While under hypnosis, in reference to Petitioner, she stated:

> He has something in his right hand but nothing in his other one. ... It's something dark. Kind of resembles a ... I mean it's dark like a tool or something or.... It looks like a gun upside down. Like he's holding it by the trigger area is, holding it and swinging it there.

*Id.* at 6. Significantly, Lieutenant Mickler never asked Baumgartner whether she ever saw a gun in the man's hand. Rather, that crucial statement was offered by Baumgartner on her own, in response to Mickler's direction to "look at his arms." *Id.*

On direct examination, Baumgartner testified that on the evening of May 11, 1982, at approximately 8:15 p.m., she rode her bicycle around the neighborhood of Holiday Harbor, the community in which she and the Weilers lived. R10–1337. She testified that she saw a man walking on Castaway Road ("Castaway"), near the sewage treatment plant. *Id.* at 1338. She described the man's physi-

---

**22.** Petitioner also contends that "in a veritable *coup de grace* of fatal ineffectiveness, defense counsel conceded, in effect, that Baumgartner saw Mr. Davis with a gun in his hand." Pet. at 50. ("Being in a residential area with a weapon isn't what Allen Lee Davis is charged with." R12–1658).

The Court finds that Petitioner has taken defense counsel's remark out of context. It was not an admission, but rather a comment on the state's purely circumstantial case. The thrust of his argument was a challenge to the strength of the state's case. He explained to the jury that the state had the burden of proof to show an individual's guilt beyond a reasonable doubt.

Defense counsel argued that the most the state's evidence showed was that the defendant might be guilty. Simply showing that an individual might be guilty was insufficient. As an example, he attempted to distinguish between simply being charged with having a gun in a residential area, and being charged with three counts of first degree murder. *Id.* To this Court, this does not appear to be unreasonable closing argument.

**23.** Detective Kessinger's report is dated May 25, 1982, but the section regarding Mrs. Baumgartner's observations appears to reflect information received from her on May 13, 1982.

cal characteristics, and his clothing. *Id.* at 1341–42. She testified that he had an object in his hand. *Id.* She identified the man as Petitioner. *Id.* at 1345. She was wearing her glasses when she observed Petitioner on Castaway. *Id.* at 1342. Baumgartner stated that to the best of her recollection, the object Petitioner had in his hand was a gun. *Id.* at 1343.

She further testified that she initially identified Petitioner as the man she saw walking on Castaway on the evening of the murders, after seeing Petitioner on an 11:00 p.m. newscast that reported his arrest. *Id.* at 1344. The following morning she contacted the homicide department, and told them that she had seen Petitioner on the evening of the murders. *Id.* at 1345.

On cross examination, Baumgartner was asked to clarify the direction in which she saw Petitioner walking, and to identify, on a map of the area, the point where their paths crossed. *Id.* at 1347–48. She also was questioned about her knowledge of guns. *Id.* at 1349. Defense counsel also attempted to help the witness more accurately define the time she saw Petitioner. *Id.* at 1349–50. She was further questioned about the route she took, and asked whether she had seen another witness, who had testified to be walking in the area at approximately the same time. *Id.* at 1350–51. Defense counsel asked no questions regarding hypnosis, and did not mention that the witness was hypnotized during his closing argument. Thus, the jury never knew that the arguably incriminating portions of Baumgartner's testimony were hypnotically induced.

The Court finds that Petitioner has failed to demonstrate that defense counsel's representation fell below an objective standard of reasonableness because he failed to seek the exclusion of Mrs. Baumgartner's hypnotically refreshed testimony, and failed to apprise the jury of her previous hypnosis. Instead, counsel appears to have made rea-

sonable judgments not outside the "wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. During cross examination by the state at the evidentiary hearing held on the instant Petition on January 25, 1993, Tassone stated that he did not challenge this testimony with an expert or other witness in part because he wanted to retain the right to "open and close" at the end of the trial.[24] In this vein, Anthony Zebouni, the public defender originally assigned to Petitioner's defense, testified at the evidentiary hearing that while he planned to challenge Baumgartner's testimony had he remained in the case,[25] reasonable lawyers could disagree with Tassone's tactical choice to preserve the "open and close" right, and to allow Petitioner to have the last word before the jury in the guilt phase. Robert Link, the former Public Defender who assigned Zebouni to the case and supervised his work, stated at the evidentiary hearing that he "would trade an argument for a witness." Nevertheless, he added, whether to preserve the "open and close" right is a "legitimate, tactical choice." Thus, while Link and Zebouni would have challenged the hypnotically induced testimony, and forfeited the right to "open and close," Tassone's decision otherwise does not render his performance ineffective, for "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

The time of Petitioner's trial is the relevant time in which to evaluate defense counsel's conduct. *Id.* In 1982 and 1983, hypnotically refreshed testimony was admissible in a criminal case. Subsequently, in 1985, the Florida Supreme Court held that hypnotically refreshed testimony is *per se* inadmissible in a criminal trial in Florida. *Bundy v. State,* 471 So.2d 9, 18 (Fla.1985), *cert. denied,* 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986). The rule announced in *Bundy,* how-

24. In a Florida criminal trial, a defendant offering no testimony in his own behalf, except his own, "shall be entitled to the concluding argument before the jury." Fla.R.Crim.P. 3.250. Thus, a defendant who offers no evidence, like Petitioner, preserves the right to the "opening"

argument at the close of trial and a rebuttal to the state's closing argument.

25. Due to a conflict, the public defender's office withdrew from the case before trial, leading to the court's appointment of Mr. Tassone.

ever, was to be applied only *prospectively. Id.*

Petitioner contends that defense counsel's failure to challenge Baumgartner's testimony based on her previous hypnosis could not have been the result of a reasonable decision. The Court disagrees. Defense counsel was aware that Baumgartner had been hypnotized by the police, as evidenced by his questions and her responses at her deposition hearing. He was also aware of what the substance of her trial testimony would be.

What Petitioner fails to consider is that challenging the admission of such testimony, or even alerting the jury to the fact that the witness had been previously hypnotized, was not without danger to Petitioner's case, or any other similarly situated defendant. It would have been reasonable for defense counsel to avoid alerting the jury to the hypnosis, simply to avoid the danger expressed by one Florida appellate court:

> One problem area inheres in the view held by some members of juries that hypnosis is infallible.... [T]here is a generally accepted view that many people believe that hypnosis acts as a form of foolproof truth serum, preventing a witness who has been hypnotized from lying.

*Brown v. State,* 426 So.2d 76, 84–85 (Fla. 1st DCA 1983).[26] The court stated that "this perception is in error," 426 So.2d at 85, but if a Florida appellate court was aware of such juror misconceptions, surely defense lawyers were, too. It is naive for Petitioner now to suggest that defense counsel should have disregarded this "public misconception," Pet. at 53; on the contrary, it was defense counsel's duty to be aware of such tendencies and to tailor his case accordingly. Although in an abstract world it may be juror "error" to assess with significantly greater weight the credibility of hypnotically refreshed testimony, juries are not bodies of scientific reasoning, and are by their very nature prone to such "public misconceptions."[27]

As noted above, the police officer conducting the hypnosis interview did not ask Baumgartner about a gun. Baumgartner offered this crucial statement on her own. At the evidentiary hearing held in this Court, Tassone stated that this fact stood out as he reviewed the tape and transcript of Baumgartner's interview. Tassone noted that Mickler's question was not suggestive, and that he did not want the jury to hear more than once the first mention of the gun coming from Baumgartner. Had Tassone cross-examined her, this reference would have been put before the jury at least twice, instead of once. Also, Tassone stated that he did not want the jury to hear the tape of the interview, as Baumgartner's occasional crying therein might induce sympathy towards this witness.

The Court must emphasize that at no point did the jury know that Baumgartner previously had been hypnotized. Any attempts to impeach her testimony at least would have made the jury aware of this fact, and at worst (for Petitioner) might have led the jury to believe her even more for that very reason. While *Brown* no doubt was decided after Petitioner's trial, it is quite possible that Tassone could have entertained the same reasonable concerns about hypnosis cross-examination alluded to in *Brown.* What is not conceivable, however, is that Tassone somehow could have predicted the *per se* inadmissibility rule announced two years later by the Florida Supreme Court.

Additionally, Petitioner acknowledged on the record that he had discussed both the extent and nature of the cross-examination of the state's witnesses, as well as the possible use of experts on behalf of the defense, including a hypnosis expert. Petitioner acknowledged that counsel acceded to his wishes in both regards.[28] At the eviden-

---

26. *Brown,* which adopted the theory that safeguards could be followed to avoid the dangers of potential improper prejudice resulting from the introduction of this type of testimony, was decided on February 8, 1983, several days after the jury returned its guilty verdicts in this case.

27. Would Petitioner have preferred a jury composed of hypnosis authorities, or a jury of his peers?

28. While at sidebar with the petitioner, trial counsel stated:
 > Mr. Davis and I have conferred fully about each and every one of the depositions taken in

tiary hearing on the instant Petition, counsel for Petitioner asked Tassone whether such contemporaneous acknowledgements and affidavits expressing satisfaction with Tassone's trial choices serve ultimately to contradict any ineffective assistance allegations. While Tassone replied that they do, the Court finds that given the frequency of attempts at post conviction relief—irrespective of how well-founded such attempts may be— a criminal defense lawyer should be expected to obtain such contemporaneous statements of satisfaction. At the very least, an attorney cannot be *faulted* for doing so.

█ Additionally, Petitioner contends that the use of this testimony at trial deprived him of the right to meaningfully confront witnesses against him, in violation of the Sixth and Fourteenth Amendments. The Confrontation Clause is satisfied "where sufficient information is elicited from the witness from which the jury can adequately gauge the witness['] credibility." *United States v. Burke,* 738 F.2d 1225, 1227 (11th Cir.1984). However, the Confrontation Clause guarantees only the *"opportunity* for effective cross-examination." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). *See also Bundy,* 850 F.2d at 1415 (while hypnosis can make effective cross-examination more difficult, *"it does not always make it impossible,* thereby preserving the opportunity for effective cross-examination safeguarded by the Sixth Amendment") (emphasis supplied).

█ Thus, Petitioner was entitled only to an *opportunity* to confront witness Baumgartner, and the record is devoid of any facts or actions by the trial court which would indicate that this right was infringed or denied. Instead, Petitioner merely attempts to restate his allegation of ineffective assistance on this issue, *supra,* under the rubric of the Confrontation Clause. For the reasons discussed above, counsel professionally decided against exercising the opportunity to cross-examine Baumgartner. This decision neither rendered counsel's performance ineffective, nor manifested a violation of any other invoked clause of the Sixth Amendment. Accordingly, this subclaim, as well as the rest of Claim V, is without merit.

## CLAIM VI—INEFFECTIVE ASSISTANCE OF COUNSEL: FAILURE TO INVESTIGATE/PENALTY PHASE

Petitioner alleges in Claim VI that he was denied effective representation by counsel during the penalty phase of his trial. Specifically, Petitioner claims that Mr. Tassone "failed to investigate, develop, and present mitigating evidence, to death qualifify [sic] the jury, to object to improper prosecutorial conduct and insure an individualized sentencing." Pet. at 70.

This claim encompasses five specific claims of deficient performance on the part of the petitioner's trial counsel.[29] First, that trial counsel failed to conduct an adequate investigation into his client's background, including failing to contact a number of witnesses. Pet. at 70–72. Second, counsel did not know Florida law "regarding what constituted relevant mitigation." Pet. at 72. Third, counsel did not insure that the elements of the aggra-

this case, the summary of them and discussed the potential of what those witnesses would say during the course of a trial if called by the State.... Mr. Davis participated in the decisions with me in terms of whether to cross examine, to what extent and I have consulted with Mr. Davis over numerous occasions during the course of the trial to determine if I have not acceded to his wishes.... Mr. Davis has advised me that I have acceded to his wishes after careful and complete examination....
R11–1371–72. Petitioner acknowledged that the above statement was correct. *Id.* at 1372.
On another occasion when Petitioner was at sidebar with defense counsel, defense counsel stated:

Mr. Davis and I discussed at great length on numerous occasions the calling of witnesses to testify in Mr. Davis' behalf, specifically he would call or we spoke at length about the possibility of calling witnesses with fiber match expertise, serology, hypnosis and ballistics and Mr. Davis advised me ... that he felt that it was in his best interest not to call witnesses on his behalf to testify at this trial.
R12–1627.

**29.** Although this claim's title includes a claim that defense counsel failed to object to improper prosecutorial comment, this claim is not included in the body of the argument. Furthermore, the claim was not fairly presented to the state courts.

vating factors were explained to the sentencing jury. Pet. at 72–73, 108. Fourth, counsel failed to "death qualify" the jury. Pet. at 73, 107. Fifth, counsel was ineffective for failing to seek individual voir dire of the jury venire. Pet. at 108.

According to Petitioner, all of these claims were contained in Claim I of his initial Rule 3.850 motion. Petitioner's Supplemental Memorandum (Doc. No. 16) ["Pet. Supp."] at 9. Petitioner also contends that these claims were raised in his second Rule 3.850 motion. *Id.* In fact, only the first of these five claims was raised in the initial Rule 3.850 motion,[30] and none of these claims were contained in Petitioner's second Rule 3.850 motion.[31] Nevertheless, even if these claims had been included in that second motion, the trial court ruled thereon that all of the claims except the *Lockett/Hitchcock* claim were procedurally barred.[32]

Therefore, the Court finds that the only claim which has been fairly presented to the state courts—and which is not procedurally barred—is that Petitioner's trial counsel was ineffective because he failed to adequately investigate his client's background for possible mitigating evidence. As to the other subclaims, Petitioner has presented no argument or evidence of cause for or prejudice from the procedural default. *See Engle*, 456 U.S. at 125–26 n. 28, 102 S.Ct. at 1570–71 n. 28; *Sykes*, 433 U.S. at 87, 97 S.Ct. at 2506. Petitioner's one exhausted claim, therefore, is that his trial counsel was ineffective for failing to adequately investigate his background for possible mitigation.

■■■■ The Sixth Amendment is satisfied if a defense counsel's choice of strategy "was the result of an informed, professional judgment made after reasonable investigation into the facts of a case and the relevant law." *Devier*, 3 F.3d at 1450. Defense counsel have a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Effective assistance of counsel includes adequate pretrial investigation,

*McCoy*, 953 F.2d at 1262, and counsel in a capital case must investigate a defendant's background *prior* to sentencing, *Bush v. Singletary*, 988 F.2d 1082, 1091 (11th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 705, 126 L.Ed.2d 704 (1994).

■■■■ Counsel need not, however, "pursue every path until it bears fruit or until all conceivable hope falters." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir.1980). And even if many reasonable lawyers would not have done as defense counsel did in a particular proceeding, relief cannot be granted on ineffectiveness grounds "unless it is shown that *no reasonable lawyer, in the circumstances, would have done so.*" *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994) (emphasis supplied). When a habeas petitioner claims ineffective assistance due to counsel's failure to present personal history information at sentencing, the relevant inquiry is whether counsel had a " 'reasonable basis for [his] strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty.' " *Devier*, 3 F.3d at 1453 (quoting *Burger v. Kemp*, 483 U.S. 776, 795, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)). In any case, a particular decision *not* to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

■■■■ In any event, the Court must state that it is not Respondent's burden at this stage to prove that defense counsel engaged in adequate investigation of Petitioner's background. Rather, as in all instances where a prisoner is challenging his conviction based on ineffective assistance of counsel, the *burden is on Petitioner* to establish that the degree of investigation performed by counsel fell below all reasonable standards. This burden, which is Petitioner's to bear, "is supposed to be a heavy one." *Rogers*, 13 F.3d at 386.

Petitioner asserts that there was "no investigation regarding the compelling life his-

---

30. *See* PC–R1–131–99.

31. *See* PC2–R1–7–104.

32. *See* PC2–R1–134–35.

tory of Mr. Davis and his mental health problems," Pet. at 72, yet offers no evidence for this bald assertion other than references to affidavits of witnesses, which affidavits contain lengthy discussions of Petitioner's personal and family history. These witnesses—many of whom testified at the evidentiary hearing on the instant Petition—allegedly would have testified at the sentencing phase had defense counsel requested their presence.

Petitioner's brother Bruce Wayne Davis ("Bruce Wayne") stated in his affidavit that he flew over from Germany for the trial; that Tassone never talked to him about testifying; and that he (Bruce Wayne) did not know that the trial was in two parts. At the hearing, Bruce Wayne stated that Tassone made no attempt to inquire about their family's background. Bruce A. Davis ("Bruce A."), Petitioner's other brother, testified at the evidentiary hearing that while he was not in contact with Petitioner at the time of the trial, he would have testified if he had known about the trial. Bruce A. stated that Tassone never contacted him. Tassone, however, testified that he contacted not only *both* brothers, but Petitioner's father as well, and that *all* refused to testify. The Court finds Tassone's testimony in this respect to be more credible than either testimony of the brothers.

Cheryl Caswell VanDine, Petitioner's half-sister, stated at the hearing that she was never contacted by Tassone, but that she would have testified. *See also* VanDine Affidavit, Petitioner's Exhibit 7 ["Pet's Exh."]. VanDine also stated that prior to the date of the hearing on the instant Petition (January 26, 1993) the last time she had seen Petitioner, her half-brother, was in 1981. Petitioner's sister-in-law Angela Davis, in Germany at the time of the trial, also stated at the hearing that she would have testified. She reiterated a statement made in her affidavit that "[i]f I had known that I could testify for Bud [Petitioner] and tell the judge and jury what kind of a person I knew him to be, I would have been glad to fly back to the states and do that." Angela Davis Affidavit,

Pet.'s Exh. 11 at 3. Anna May Mott, Petitioner's maternal aunt, stated that "[i]f anyone had asked me, I would have testified for Buddy." Mott Affidavit, Pet.'s Exh. 4 at 9.

However, Tonya Reese, Petitioner's niece, testified at the evidentiary hearing that her father [33] was physically and sexually abusive towards her when she was growing up. Additionally, Glenda O'Donal VanDine, a cousin of Cheryl VanDine, testified that Donald Davis, Petitioner's father, sexually molested her. Her affidavit, however, reveals molestation by both Bruce A. and Bruce Wayne, as well. Though not admitted into evidence at the evidentiary hearing, the affidavit was made part of the record by its inclusion into Appendix D in the Petition. The affidavit includes the following passages, in which she referred to her childhood visits to Petitioner's home in Medway:

> When I was about 11 or so things began happening to me on our visits to Medway that made me dread going there. My mother tried to keep me away from my grandfather, who was Cheryl's uncle. I later found out that he was child molester and then understood my mother's concern.... One of the uncles would come up behind me and grab my breasts and crotch. A lot of times with people around.... The other uncle, Wayne, would do things even worse than that. He would pull my pants down and put his hands up my crotch or make me give him oral sex.... I felt powerless to do anything about it because I was afraid of making my father angry for saying that his brothers were doing these things to me.

Glenda VanDine Affidavit at 2 (Pet.App. D).

All of these individuals testified to the relatively harsh childhood of Petitioner, and the difficult living conditions he endured while growing up in Medway, Maine. This included numerous references to Petitioner's abusive father, and a substandard physical dwelling in which the family lived. Petitioner also was subject to much taunting from neighboring children due to his large size and his speech impediment. As Mott stated, Petitioner's life "has been one nightmare af-

---

**33.** During direct examination of Reese, reference was made to "Bruce," and the Courts assumes that her father was either Bruce Wayne of Bruce A.

ter another." *Id.* at 8. In spite of these references, however, the witnesses also repeatedly referred to the peacefulness of Petitioner's personal character.

Petitioner also called William J. Trent at the evidentiary hearing. Trent was a close friend of Petitioner's who had worked at the Shell station Petitioner managed in Jacksonville at one time. Pet. at 96. Trent, in fact, had been called as a trial witness in the state's case-in-chief, testifying that Petitioner called him after being arrested, and told Trent that "[t]hey seem to have a pretty good case against me." R10–1355. Trent admitted that he had been convicted of carrying a concealed firearm and grand larceny. *Id.* at 1358. At the hearing on the instant Petition, Trent testified that Petitioner was "unusually honest" and a peaceful and law-abiding person. Trent then added that he and Petitioner had been arrested and convicted for a 1973 armed robbery they jointly committed. It was also Trent's belief that armed robbery is not a violent act, to paraphrase, "so long as no one gets hurt." Given Trent's own criminal past, which included at least one crime he undertook to commit with Petitioner, it is unlikely that Trent would have been a beneficial witness for Petitioner at the sentencing phase.

Some of these individuals noted above were aware of the criminal proceedings being brought against Petitioner, while others were not. As noted above, all stated that they "would have testified" had they been asked to or had they known about the trial. Collateral counsel indeed made great efforts in securing the testimony and affidavits of these individuals, both for the instant proceeding and for Petitioner's first federal habeas action.

Yet Tassone alone, not collateral counsel (or the individuals referred to above), was Petitioner's counsel in the criminal trial. As such, Tassone was the individual responsible for conducting Petitioner's defense, and for putting on evidence and testimony at all phases of the proceeding, including the sentencing phase. Accordingly, the issue is not whether these people were available to testify and/or would have testified. The crucial issue, rather, is whether *no reasonable attor-*

*ney in similar circumstances,* even made aware of the same facts to which these witnesses could testify, *would have declined to put on this testimony at Petitioner's sentencing phase. See Rogers,* 13 F.3d at 386.

Petitioner called attorney Robert Link as a witness at the evidentiary hearing. Link formerly worked in the Public Defender's Office for the Fourth Judicial Circuit, and at one time was responsible for all capital and/or complex cases for that office. Link initially assigned Tony Zebouni to be Petitioner's defense counsel, but stated that he could recollect only "a few aspects" of this particular case. While he testified that he would have wanted to present to a *mental health professional* (see *infra*) the incidents of poverty, sex abuse and alcoholism in Petitioner's childhood, Link agreed that testimony concerning Petitioner's "peaceful" character might "open the door" to rebuttal by the state. Nevertheless, assuming he was the defense counsel, Link stated that if the mitigating background evidence could be presented, he would allow for the possibility that the jury would learn of Petitioner's prior incidents of child molestation, even in light of the facts of the instant crime. Crucially, though, Link believed that *lawyers could disagree about this strategy.*

The Court finds that Link's testimony in this latter respect does not support Petitioner's allegation of ineffectiveness, as it merely demonstrates that reasonable attorneys can disagree about trial tactics in a given case. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 ("[e]ven the best criminal defense attorneys would not defend a particular client in the same way"); *Stevens v. Zant,* 968 F.2d 1076, 1084 (11th Cir.1992) (that other attorneys might dispute propriety of a particular tactic during sentencing phase of a capital case does not render that strategy ineffective assistance), *cert. denied,* —— U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993).

Tassone testified that he chose to not introduce elements of Petitioner's family history because this would have allowed the state to rebut with Petitioner's history of child molestation. Tassone learned of these events from the written report prepared by Dr. Ernest C. Miller, in which report Dr.

Miller related two prior incidents of child molestation by Petitioner, one occurring in Maine, the other in Maryland. Respondent's Exhibit 19 ["Resp.Exh."] at 2. Included in Dr. Miller's concluding "clinical impression" of Petitioner were findings of "psychosexual disorder" and "pedophilia." *Id.* at 5. Tassone was equally aware of Petitioner's *prior criminal record,* which included felony convictions in four different states. Among these were convictions for assault; assault and battery; involuntary manslaughter (twice); and armed robbery. *See* Respondent's Exhibit 20 ("Resp.'s Exh.") at 3.

Tassone stated that he did not want the jury to learn of these incidents during the sentencing phase, particularly since none of this information had been introduced during the guilt phase of the trial. He did not want Miller to testify because Miller's allusion in his report to Petitioner's "pedophilia" would have been revealed under any sentencing phase cross-examination by the state, and, though Petitioner's guilt had already been established by the jury, this would have presented the jury with a motive for Petitioner being in the Weiler residence. With respect to Petitioner's relatives, Tassone stated that calling them as witnesses—in particular the females who had testified to being victims of sexual abuse—would have presented to the jury a history of sexual abuse in Petitioner's family, perpetration as well as victimization. In particular, though, Tassone stated he believed this would have opened the door to the introduction by the state at the sentencing phase of prior incidents of sexual molestation involving Petitioner.

Tassone believed that this information would have come out at sentencing by way of rebuttal had he, in mitigation, emphasized Petitioner's family background and his reputation as a peaceful, law-abiding individual. *See Porter v. Singletary,* 14 F.3d 554, 558 (11th Cir.1994) (counsel not ineffective where he omitted evidence of family background "to keep out extraneous criminal activities which counsel felt would hurt [client]"); *Bush,* 988 F.2d at 1091 (counsel not ineffective where he decided that personal background information not significantly beneficial to client's case; counsel chose not to use it because of belief that state would have rebutted with evidence of client's violent past and facts regarding prior conviction); *Stevens,* 968 F.2d at 1083 (counsel not ineffective in deciding to not introduce evidence from client's past that could generate "appreciable sympathy from a jury"; potential detailed prosecution inquiry into client's acts of sodomy could have been "highly prejudicial").

The issue is whether it was reasonable for trial counsel to limit the scope of his investigation *based upon the facts that were conveyed to him by the experts and by his client.* " 'Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Burger,* 483 U.S. at 794, 107 S.Ct. at 3126 (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066). Indeed, the "reasonableness of counsel's actions *may be determined or substantially influenced by the defendant's own statements or actions." Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 (emphasis supplied).

The record reflects that Petitioner did not provide Tassone with sufficient information which might warrant additional investigation of his personal background. In an affidavit dated January 27, 1983 (just prior to commencement of trial), Petitioner stated:

6. I have advised FRANK J. TASSONE, JR. on numerous occasions that *I am not going to provide him names of witnesses to call on my behalf during the course of any possible sentencing phase of my trial. FRANK J. TASSONE, JR. has, on numerous occasions, for at least a period of sixty (60) days prior to today's date, asked me for the names of witnesses whom he could contact to speak on my behalf in the event of any sentencing portion of my trial. I have steadfastly refused to provide him those names, despite his urging me to do so.*

7. I make these decisions freely and voluntarily, without any duress, threats, or promises having been made to me. I am competent to make this decision and I fully recognize the circumstances and the consequences of my decision.

Resp.'s Exh. 1 (emphasis supplied). Later, in an affidavit dated February 7, 1983 (two days prior to the commencement of the sentencing phase), Petitioner stated:

5. On or about Saturday, January 29, 1983, for the first time, I advised FRANK J. TASSONE, JR. that I had witnesses whom I would like him to contact and to call on my behalf during any sentencing portion of this trial. On Monday, January 31, 1983, I provided FRANK J. TASSONE, JR. the names of those individuals on a sheet of paper and asked if he could contact those individuals for a determination as to whether they would speak on my behalf at any sentencing portion of trial.

6. FRANK J. TASSONE, JR. has on this day advised me that each of the individuals was contacted and that to the best of my knowledge, information, and belief, only Bill and Linda Palmer and Kathy Dickson would be able to speak favorably on my behalf during the sentencing portion of this trial.

7. FRANK J. TASSONE, JR. has advised me that he could not call Donald Hollifield because Donald Hollifield would testify as to a prior act of aggression on my part. FRANK J. TASSONE, JR. has advised me that his [Hollifield's] wife would likewise testify as to prior acts of aggression.

8. FRANK J. TASSONE, JR. has advised me that my father, Donald Davis and step-mother, Pamela Davis have indicated a willingness not to testify on my behalf and, therefore, I advised him not to call those witnesses on my behalf during any sentencing.

*Id.*[34] At a side bar which occurred at the beginning of the sentencing phase, Tassone relayed to the judge and prosecutor what he and his client had discussed concerning potential witnesses:

Also, I advised him as to what the witnesses whose names he gave me would possibly say. After advising Mr. Davis of what those witnesses would say, it was Mr. Davis' opinion and my opinion that three witnesses should be called out of the six names that he gave me and that is Bill and Linda Palmer and Katheryn Dixon who have been subpoenaed and are prepared to testify.

R12–1776. Petitioner himself assented to Tassone's characterization of the events. *Id.* at 1777.

At the sentencing hearing, Tassone called Bill Palmer, who knew Petitioner for two years, from having worked with Petitioner at "the shipyard." *Id.* at 1792. Palmer testified that Petitioner on more than one occasion had dinner at Palmer's home. *Id.* According to Palmer, Petitioner was a "good-hearted man, very gentle, very giving," and that he did not know Petitioner to be aggressive or violent. *Id.* Tassone then called Palmer's wife Linda, who stated she knew Petitioner only through the dinner occasions. She, too, stated that Petitioner was a "very gentle, kind man," and had never known him to be aggressive or violent. *Id.* at 1796. In cross-examining both of these witnesses, the prosecutor was able to bring out the fact that Petitioner previously had been convicted for armed robbery and twice for involuntary manslaughter. Tassone's final witness was Mary Katheryn Dixon, who lived in the same apartment complex as Petitioner. *Id.* at 1799. She would see Petitioner three to four times a week, and characterized him as a "warm, gentle man" and a giving person. *Id.* at 1801. The state did not cross-examine Dixon.

As noted above, the record reflects that counsel discussed sentencing strategy with Petitioner and that Petitioner ultimately did provide counsel with a list of six witnesses who might be called in mitigation. None of

---

**34.** With respect to these and other affidavits concerning Petitioner's satisfaction with defense counsel or Petitioner's version of their consultations, the Court must make a few observations. Tassone told the Court that these were prepared on Tassone's initiative, and were all drafted by Tassone. Tassone stated that this was done to protect Petitioner's rights. Of course, as Tassone admitted, these affidavits may serve to later contradict allegations of ineffective assistance. As noted previously, however, the Court finds nothing improper in this practice, and, given the plethora of allegations of ineffective assistance, an attorney should be expected to memorialize discussions with his client, even including obtaining expressions of satisfaction.

those witnesses, however, knew of Petitioner's family history.

A claim similar to the one brought here was raised in *Funchess v. Wainwright,* 772 F.2d 683 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986). There the habeas petitioner claimed that his trial counsel had failed to adequately investigate his psychological background for use as mitigating evidence at the sentencing proceeding. Finding that the defendant had never told his attorney of his past problems, the Eleventh Circuit declined to hold that trial counsel's investigation was inadequate. Similarly, in *Collins v. Francis,* 728 F.2d 1322 (11th Cir.), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984), the court of appeals rejected an ineffectiveness claim for failure to present character evidence in mitigation, where the defendant had not told his counsel about these witnesses.

In addition to the question of which individuals Tassone should have interviewed and/or called as witnesses, and contrary to Petitioner's assertion, the record includes numerous pre-trial discovery motions, motions for expert psychiatric assistance, and motions for the assistance of a private investigator.[35]

As a result of the appointment of both a psychological expert and a neurological expert, counsel abandoned an insanity defense and a claim of incompetence. The neurological reports contain nothing which would support either defense or the mitigating factors Petitioner asserts here. *See* Resp.Exh. 18 (Report by Dr. Glenn L. Pohlman). As noted above, the psychiatrist's report contains a reference to two acts of pedophilia on the part of Petitioner. Dr. Miller's report further contains a family history, ostensibly based on an interview with Petitioner, which reports no history of mental illness. The report states that Petitioner was not physi-

cally abused but was subject to verbal rebukes by his stepfather. Tassone testified at the hearing that he had no reason to believe that these diagnoses and conclusions were inaccurate, and that he considered this information in forming trial and sentencing strategy. In short, there was nothing in the psychiatric or neurological reports to suggest that counsel should have concentrated his mitigation presentation on Petitioner's family history.

On the other hand, there was plenty of information in these reports which would lead a reasonable attorney in similar circumstances to decline to use Petitioner's past as a basis for mitigation, since this would have allowed the state to rebut with references to less favorable and highly prejudicial incidents from Petitioner's history.

 "Trying cases is no exact science. And, as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that allows for great precision or for a categorical approach." *Rogers,* 13 F.3d at 386. Based upon the instant record, the Court cannot find that counsel was constitutionally ineffective by failing to launch an all-out investigation into his client's family and social background.[36] But, more importantly, counsel's decision to limit the *introduction* of the background information he *did* glean from his investigation was not ineffective, and was a reasonable decision in light of the probability that this would "open the door" for the state to introduce highly *unfavorable* instances from Petitioner's past. Particularly in light of the background information which counsel would reasonably want to preclude the jury from hearing—e.g., incidents of pedophilia, prior arrests and convictions—counsel's decision to limit the amount of mitigating evidence put on at the sentencing phase was not unreasonable. Tassone's strategy, which the

---

**35.** Davis' counsel requested two examinations of Davis by an expert psychiatrist, R1–6, 18; filed a motion for a third expert evaluation, R1–181; filed a motion for the appointment of an investigator, R2–252, which was granted, R2–256; and requested the appointment of a neurological expert, R2–262, which was granted, R2–266,276.

**36.** And, accordingly to *Rogers,* once a court concludes that declining to investigate further was a

"reasonable act," the court should not look to see what a further investigation would have produced. 13 F.3d at 388. Nor does a court need to decide whether the information that would have been acquired from further investigation "would have necessarily been used at trial by every reasonable lawyer who was armed with such information." *Id.*

Court finds to have been not unreasonable, was to keep the jury from knowing this damaging background. Thus, his "presentation of mitigating circumstances—both what was put in and what was left out—in no way undermined the proper functioning of the adversarial process and, therefore, was constitutionally effective." *Atkins v. Singletary,* 965 F.2d 952, 960–61 (11th Cir.1992). Accordingly, Claim VI is without merit.

## CLAIM VII—DENIAL OF DUE PROCESS/INEFFECTIVE ASSISTANCE: INADEQUATE MENTAL HEALTH EVALUATION

Petitioner alleges in Claim VII that he was deprived of due process and equal protection rights because he was not provided adequate mental health assistance, and because counsel failed to provide the mental health examiners with necessary background information and failed to seek a mental health evaluation as to sentencing phase issues. Pet. at 111.

This claim encompasses three separate subclaims: First, that Petitioner's counsel did not adequately investigate Davis' family and social history. Pet. at 114, 134. Secondly, this failure to investigate deprived Petitioner of his due process rights because it prevented the mental health experts from performing an adequate evaluation. Pet. at 135. Finally, Petitioner asserts that his counsel was ineffective for failing to seek a psychiatric evaluation of mitigation issues (so as to "negate aggravation"). Pet. at 140. Petitioner's first subclaim is identical to Claim VI, which has been discussed thoroughly and rejected on its merits, *supra.* Therefore, the Court will not discuss this subclaim further.

In his supplemental memorandum, Petitioner represents that this claim (Claim VII) was presented to the state courts in his initial Rule 3.850 motion, and that Claims VI and VII were pled therein as one claim. *See* Pet.Supp. at 9. Petitioner's initial 3.850 motion does contain the first and second subclaims contained in this claim (Claim VII), but does not raise the third subclaim. Petitioner also asserts that this claim was raised in his second 3.850 motion. *See id.* However-

er, the second 3.850 Motion similarly does not contain the third subclaim raised here.

■ The Court finds that Petitioner has not fairly presented this third subclaim to the state courts, nor has he offered any argument or evidence of cause for or prejudice from this omission. Therefore, the third subclaim—that counsel was ineffective for failing to seek psychiatric assistance on mitigation issues—is not properly before this Court. However, even if it were before the Court, this subclaim is without merit. *See Thompson v. Wainwright,* 787 F.2d 1447, 1459 n. 8 (11th Cir.1986) (counsel's "failure to request psychiatric assistance with respect to mitigating circumstances was not ineffective assistance of counsel"; decision in *Ake v. Oklahoma* [*infra*] was an unforeseeable change in the law, and "defendants are not entitled to an attorney capable of foreseeing the future development of constitutional law") (citing *Proffitt v. Wainwright,* 685 F.2d 1227, 1249 & n. 34 (11th Cir.1982), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983)), *cert. denied sub nom. Thompson v. Dugger,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987).

Accordingly, as the Court already has addressed the first subclaim in its analysis of Claim VI, and the third subclaim has not been presented previously to the state courts (and is without merit, anyway), the Court finds that only the second subclaim of Claim VII is properly before the Court.

■ Petitioner contends that his Fourteenth Amendment rights to due process and equal protection were violated because the mental health examinations were insufficient. "[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, *the State* must, at a minimum, assure the defendant *access to a competent psychiatrist who will conduct an appropriate examination* and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985) (emphasis supplied). Assuming that *Ake* vests criminal defendants with some sort of due process right to mental health assistance, it is unclear to the Court how Petitioner can avail himself

of this right, since it did not explicitly exist at the time of his trial (1983). Petitioner has set forth no argument, nor presented any caselaw, as to how *Ake* retroactively vests Petitioner with this right.

Nevertheless, even assuming that *Ake* could apply to Petitioner's case, it is worth noting the limitations that the Supreme Court there emphasized. First, the defendant must demonstrate to the judge that his sanity is in issue. Logically, if a defendant cannot do so, then no right to mental health assistance would attach under *Ake*. Secondly, where this threshold showing *is* made, a defendant is entitled merely to "an *appropriate* examination," not a psychiatric analysis applying every incident from a defendant's past to the circumstances of the crime of which he is accused. Lastly, a defendant is entitled access to a "competent" psychiatrist, not to a psychiatrist "of his personal liking" or funds to hire his own. *Id.* (although each of the latter appears to be readily available in the realm of collateral attack).

Assuming that *Ake* is applicable, the Court cannot infer from the trial judge's granting of Petitioner's Motion for the appointment of a neurological expert, R5–518, that Petitioner "demonstrated" to that court that his sanity was to be a factor.[37] Nevertheless, even assuming that he *did* make this required showing, Petitioner has failed to demonstrate that Drs. Pohlman and Miller were not "competent," or that they did not perform an "appropriate examination" or render an "appropriate" report.

As noted above, Petitioner essentially claims that the neurologist and psychologist who examined Petitioner prior to trial were provided insufficient information as to Petitioner's background. Specifically, Petitioner alleges that:

> Dr. Miller's evaluation was not conducted with the benefit of proper independent background information as for the purpose

for which it was ultimately used by counsel. The neurologist received no independent information, and performed insufficient tests.

Pet. at 138. There simply is no evidence in the record to support these assertions. Moreover, Petitioner incorrectly describes Dr. Miller's evaluation. Petitioner alleges that Dr. Miller "reported" to Tassone "without conducting any testing or receiving or reviewing any information." Pet. at 136. This is a patently false assertion. In his report, Dr. Miller stated that he performed neurological screening examinations and an electroencephalogram on Petitioner. Resp.'s Exh. 19 at 1. The report from the electroencephalogram was attached as an enclosure to the report. Additionally, as discussed *infra* in Claim X, Dr. Miller conducted an Amytal interview. Utilizing data from these sessions, Dr. Miller prepared his report, and concluded that Petitioner was competent to stand trial. *Id.* at 5. This conclusion directly refutes Petitioner's assertion that Dr. Miller did not evaluate Petitioner "for either competency or sanity." Pet. at 135.

As to Dr. Pohlman's evaluation, Petitioner now contends that Dr. Pohlman "received none of the necessary background information because counsel failed to discover it." Pet. at 136. Petitioner states that Dr. Pohlman received no information "outside of 'self-report' from Mr. Davis." *Id.* at 137. Thus, Petitioner avers, his "conclusions from other testing were flawed." *Id.* Finally, Petitioner concludes that Dr. Pohlman "performed insufficient tests." *Id.*

Dr. Pohlman questioned Petitioner "in detail" about his general health and any particular medical problems, as well as his health history. Petitioner reported that he had an episode of "syncope" while working in the shipyards; that he had experienced mild hypertension, for which he had been treated; and that he has "noted reduced hearing." Resp. Exh. 18 at 1. Pohlman's "detailed"

---

37. The trial court appears to have based its ruling on Fla.R.Crim.P. 3.713(c), which allows the sentencing court, upon motion of the defendant or the state, to order the defendant to submit to a mental or physical examination prior to sentencing. Thus, irrespective of *Ake*, some right to this examination existed at the time of defendant's trial. In 1983, however, this was merely a state right, not one mandated by federal constitutional law. This distinction is significant, as violations only of the latter set of rights are actionable in a federal habeas proceeding.

physical examination of Petitioner yielded "normal" or "regular" results as to all categories, except for his finding that "[h]earing is reduced bilaterally" and the ears contained a large amount of wax. *Id.* at 2. Pohlman's "diagnostic impression" was that Petitioner had a "normal neurological examination, a normal neurological history and ... a normal electroencephalogram." *Id.*

Petitioner provides no evidence tending to support any of the assertions with regard to Dr. Pohlman. Petitioner has failed to demonstrate to this Court that either Dr. Pohlman's or Dr. Miller's examinations were insufficient so as to have denied Petitioner due process. Of course, ten years subsequent to Petitioner's trial, collateral counsel has now provided the Court with the conclusions of two licensed clinical psychologists who have "utilized the independent background information to verify, reject, or explicate testing results." *Id.* at 115. In light of these extensive and allegedly more accurate analyses [discussed at greater length in Claim X, *infra*], it is now Petitioner's opinion that "the evaluations at the time of trial were insufficient in length to permit the adequate assessment of data." *Id.* at 140.

The Petition fails to contain evidence which would allow the Court to adopt this view. While the Court notes that the assistance of psychiatrists and other medical experts may indeed be of great assistance to a court and jury in a criminal trial, the Court must allude to a most telling passage from *Ake:*

> Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party.... In so saying, *we neither approve nor disapprove the widespread reliance on psychiatrists but instead recognize the unfairness of a con-*

> *trary holding in light of the evolving practice.*

470 U.S. at 81, 82, 105 S.Ct. at 1095, 1096 (emphasis supplied). As reasonable *lawyers* may disagree on a strategy for any given case, so may reasonable psychiatrists—*to whose professional judgment the Court must give great deference*—and subsequent diagnoses more favorable to Petitioner's current legal status do not render unreliable those supplied at the time of trial.

Assuming that Petitioner at the time of trial possessed a due process right to be afforded an "appropriate" mental health examination, the Court finds that the state of Florida—by the provision of the examinations performed by the neurologist and psychologist—satisfied its obligation to Petitioner in this respect. Accordingly, Claim VII is without merit.

### CLAIM VIII—INEFFECTIVE ASSISTANCE OF COUNSEL: USE OF NON–RECORD PSYCHIATRIC VISITS BY SENTENCING JUDGE

In Claim VIII Petitioner claims that trial counsel was ineffective for allowing the sentencing judge to use alleged non-record confidential psychiatric visits and a neurological examination in his sentencing determination, and that appellate counsel was ineffective for failing to raise this fundamental error, all in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments.

The claim concerning trial counsel was raised in Petitioner's first 3.850 Motion, PC–R1–167–70, and rejected on the merits, PC–R8–827. The claim concerning appellate counsel has been raised before the Florida Supreme Court, and rejected on the merits. *See Davis,* 498 So.2d at 858–59. Accordingly, Claim VIII is properly before the Court.

■ Nevertheless, Claim VIII is devoid of merit. The only arguable "use" of either the psychiatric or neurological reports by the sentencing judge was his reference in the sentencing order that Petitioner had been transported twice for psychiatric evaluations, and that the neurological report yielded normal results. This reference occurred in the Court's analysis of whether the "extreme

mental or emotional disturbance" at time of offense factor was present in this case:

> This mitigating factor is not present in this case. There is no evidence or inference that the Defendant was under extreme mental of emotional disturbance. The record reflects that the Defendant was transported to a psychiatrist on two occasions shortly after his arrest. In addition, a complete neurological examination was performed on the Defendant and the report indicated no abnormalities of any sort.

R2–324. There is no discussion in the sentencing order of the substance or medical conclusions of the psychiatric evaluations; only the neurologist's findings are referred to directly. *See id.* In any event, that Petitioner visited a psychiatrist (Dr. Miller) already was part of the record for the simple reason that *orders for Petitioner's transportation to the examiner were signed by the trial judge and entered in the record* (otherwise, there would have been no psychiatric evaluations at all). Moreover, that the record is "crystal clear that the two psychiatric visits referred to were conducted exclusively for use by the defense and were to be absolutely confidential," Pet. at 143, likely is an irrelevant assertion. Dr. Miller's report was addressed to defense counsel Tassone, and there is no evidence to suggest that the substance of Dr. Miller's report was revealed either to the trial judge or prosecutor. In any event, Petitioner himself has stated that the trial court "was not privy to the results [of the psychiatric visits]"; that "[n]o results of these interviews appeared in the record" and that "the evaluation was not for consideration of whether mitigation was present." Pet. at 143, 144–45.

Moreover, the sentencing judge's statements concerning the psychiatric visits were not material to his finding that there was no evidence to support the mitigating factor that the crime was committed "while the defendant was under the influence of extreme mental or emotional disturbance." R2–324. From the face of the sentencing judge's order it is clear that his comment that "the

Defendant was transported to a psychiatrist" was at best peripheral to his holding that there was no evidence of this mitigating factor. *See id.* Moreover, Petitioner does not suggest that defense counsel was ineffective because he failed to present evidence from those visits to support mitigation. In fact, Petitioner does not contend that these psychiatric visits would support mitigation.

■ Instead, the crux of Petitioner's argument appears to be that the *neurological* report was improperly disclosed to the trial court. On December 30, 1982, Tassone filed a Motion for Appointment of Neurological Expert to Assist Counsel in Preparation of a Defense. *Id.* at 262.[38] The Court heard argument on the Motion for the neurological expert on January 7, 1983. R5–517–19. The prosecutor stated that he was unaware of any specific authority "that permits the defendant appointment of a neurological expert for the defense." *Id.* at 517. However, the prosecutor stated that he was aware of Fla. R.Crim.P. 3.713, which allows for a defendant to be physically or mentally examined prior to *sentencing,* upon motion of the defendant or the state.

The prosecutor stated that he "would have no opposition to the Court granting this particular motion" if the motion were granted on the premise of this rule. R5–517. The prosecutor then stated that this rule required that any report by such neurologist be made available to both Petitioner and the state. *Id.* The Court then stated it would grant the Motion. *Id.* at 518. That same day, the Court entered an Order granting the Motion, stating that a "specific doctor will be appointed at a later time." R2–266. On January 12, 1983, the Court entered an "Order Appointing Neurological Expert," and named Dr. Glen Pohlman "to conduct a complete neurological examination of the defendant." *Id.* at 276.

The preamble to the Order specifically stated that it appeared "that pursuant to Rule 3.713(c) of the Florida Rules of Criminal Procedure a neurological examination of the defendant would be *relevant for the sen-*

---

**38.** The Court previously had granted Petitioner's requests to be evaluated by a psychiatrist, and the two psychiatric examinations by Dr. Miller had already been performed by this time. *See* discussion of Claim VII.

*tencing phase"* of this matter. *Id.* (emphasis supplied).[39] Thus, there was no confusion that this appointment was made for sentencing purposes, pursuant to that rule. The text of the Rule 3.713, which has not changed since the time of Petitioner's trial, reads in pertinent part as follows:

> (c) On motion of the defendant or the prosecutor or on its own motion, the sentencing court may order the defendant to submit to a mental or physical examination that would be relevant to the sentencing decision. Copies of the examination or any other examination to be considered for the purpose of sentencing shall be disclosed to counsel subject to the limitation of rule 3.713(b) [providing for disclosure by a "reasonable time" prior to sentencing].

Fla.R.Crim.P. 3.713(c). Accordingly, as Dr. Pohlman was appointed because "a neurological examination of the defendant would be relevant for the sentencing phase," the state—as well as Petitioner—was entitled to receive a copy of Dr. Pohlman's report. Indeed, under this rule the trial court itself gets the report, since it is prepared by order of the court for the purpose of imposing sentence. In this vein, it is immaterial that Dr. Pohlman addressed his report to "Judge Harding"—and sent it directly to the judge—rather than to Tassone. R2–279. Under the Florida rule, the report is to be made for the judge, and to be made available for *all* the parties. Confidentiality, therefore, is not contemplated. It is equally irrelevant that Dr. Pohlman's report (dated January 14, 1983) was not filed in the official records until March 10, 1983 (eight days after the judge's sentencing findings were filed).[40] The Court concurs with the Florida Supreme

Court's finding that this was "merely 'housekeeping.'" *Davis,* 498 So.2d at 858. Additionally, Petitioner himself has noted the requirements of Rule 3.713(c) concerning the provision of these results to "counsel for the parties." Pet. at 136. While the record itself may not contain a specific reference to copies being sent to counsel, there is nothing in the record, or in Petitioner's instant submission, to suggest that Rule 3.713(c) was not followed.[41]

As with the challenged psychiatric reports, the neurological report—which, as noted previously, found nothing other than a "normal" or "regular" neurological condition, *supra*—was not necessary to the sentencing judge's findings. The relevant finding was that there was no mitigating evidence, and there was absolutely nothing in Dr. Pohlman's upon which any mitigation could have been based. Specifically, with or without the neurological report, there was no evidence to support the mental or emotional disturbance mitigating factor.

For the reasons set forth above, the Court fails to discern how either trial or appellate counsel committed error under *Strickland.* Since the trial judge neither improperly received nor used the neurologist and psychiatric examinations in the course of the trial or in the final "Judgment and Sentence," there was nothing in this regard to which counsel should have objected or argued on appeal. Thus, even assuming, arguendo, that there was error on the part of either trial or appellate counsel, Petitioner has failed to show that the sentencing decision—or the state appellate court's review—"would reasonably

---

39. Although Tassone moved for the appointment of a neurological expert for the relatively broad purpose of assisting Tassone "in the preparation of his defense," R2–262, Petitioner had no *constitutional* right to a neurological examination, which is medical—rather than psychiatric—in nature. The court, therefore, properly appointed of Dr. Pohlman under a specific rule of *Florida* procedure, which required disclosure of the findings to the state and the court. These findings were to be used for the more limited purpose of *sentencing.* Thus, this appointment was considerably different than the *psychiatric* evaluation by Dr. Miller, which was for the significantly distinct purpose of providing Petitioner with information he might use in the "preparation of his

defense," in the manner specifically contemplated by the Supreme Court in *Ake,* discussed *supra.*

40. The Court assumes that by his references to "May 2, 1983" and "May 10, 1983," Petitioner actually meant to write "March." *See* Pet. at 143. The Court makes this assumption despite the Florida Supreme Court having alerted Petitioner of this *same error* six years prior to the filing of the instant Petition. *See Davis,* 498 So.2d at 858.

41. Indeed, the provision to parties by a court or its clerk of copies of a particular document generally is not evidenced by any separate entry into the record.

likely have been different absent the errors." *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. Accordingly, Claim VIII is without merit.

### CLAIM IX—INEFFECTIVE ASSISTANCE OF COUNSEL: VICTIM IMPACT STATEMENTS

In Claim IX Petitioner claims that trial counsel rendered ineffective assistance by failing to object to the sentencing court's consideration of "inflammatory, irrelevant and prejudicial information, provided by the state through the mail." Pet. at 148. Furthermore, appellate counsel was ineffective for not arguing on appeal that the sentencing court improperly considered this material. *Id.* at 153. Petitioner alleges that these omissions by counsel—and the actions by the sentencing court itself—violated the Sixth, Eighth and Fourteenth Amendments.

The claim relating to trial counsel was raised in Petitioner's first 3.850 Motion, PC–R1–170–72, and rejected on the merits by the trial court, PC–R8–827. The claim concerning appellate counsel was rejected on the merits by the Florida Supreme Court. *See Davis,* 498 So.2d at 858. Accordingly, Claim IX is properly before the Court.

 As noted in a previous section of this Opinion, the relevant inquiry in an ineffective assistance claim is whether the decision of counsel was reasonable *in light of standards existing at the time of counsel's decision* (e.g., a law existing at the time of the decision). The substantive argument underlying Claim IX is that Petitioner's rights were violated by the introduction of "victim impact statements." However, the introduction of these statements was not considered unconstitutional until *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *Booth* in fact was overruled four years later in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Therefore, Petitioner's claim that the sentencing judge improperly relied on this information is "foreclosed" by *Payne. Porter,* 14 F.3d at 562. For the same reason, Petitioner's related claim of ineffective assistance of counsel similarly is without merit, as *Payne* essentially prevents any potential finding of "prejudice" in this regard. *See Lockhart,*

—— U.S. at ——, 113 S.Ct. at 844 (federal habeas court may consider subsequent change in law in making assessment of prejudice component).

 Nevertheless, even if this claim were not "foreclosed" by subsequent caselaw, it has no validity. In *Payne,* the Supreme Court held that the Eighth Amendment presents no bar to the admission of victim impact evidence and prosecutorial argument on that subject. However, if "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608 (citing *Darden v. Wainwright,* 477 U.S. 168, 179–183, 106 S.Ct. 2464, 2470–2473, 91 L.Ed.2d 144 (1986)). As stated in *Darden,* the question is whether the evidence introduced "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

In the present case, the prosecutor forwarded to the sentencing judge nine letters from eight family members and one close friend of the victims. R12–1856. Although these letters allegedly are emotionally charged, there is absolutely no evidence in the sentencing transcripts or the court's final judgment which refers to these letters. There simply is no evidence that these letters were even considered in the process of sentencing. Prior to sentencing, as Petitioner notes, the court observed that there were "other victims" who had been hurt by the crime, and that it was "the prayer of this Court that those who have been so grievously hurt will be able to come to peace with themselves and with God." *Id.* at 1867. There is nothing to suggest, however, that the court's comments were in any way prompted by outside correspondence, or that these comments were in any way connected to the sentence subsequently imposed. Nearly every crime creates indirect victims irrespective of the existence of "victim impact" letters or statements. In any event,

even if the letters *had* been considered by the court as it fashioned its sentence, *Payne* simply does not forbid the consideration of such material.

Furthermore, the court found six statutory aggravating circumstances, none of which related to the letters it received. The Court finds that even if the sentencing judge had considered these nine letters, their introduction was not "so unduly prejudicial," *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608, that it violated Petitioner's right to due process. Accordingly, Claim IX is without merit.

### CLAIM X—INCOMPETENT TO STAND TRIAL/IMPROPER ELEVATION TO STATUS OF CO-COUNSEL

In Claim X Petitioner asserts that he was "tried while incompetent," and that defense counsel and the trial court's "elevation of Mr. Davis to status of co-counsel" violated the Sixth, Eight and Fourteenth Amendments.

■ Although Respondent claims that this question is procedurally barred, the claim was first presented—in nearly identical wording—in Petitioner's original Rule 3.850 motion, PC–R1–179–84, and was denied by the trial court without reference to any procedural bar, PC–R5–827. The Florida Supreme Court summarily affirmed the trial court's ruling without reference to either the merits or procedural default. *Davis,* 496 So.2d 142. "Looking through" this unexplained, subsequent order of the Florida Supreme Court, and giving it no effect, *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 2595, 115 L.Ed.2d 706 (1991), the Court finds that the instant claim is not procedurally barred, and is properly before the Court.

Judge Black previously found that Petitioner was entitled to an evidentiary hearing on three issues, including "whether the Petitioner was competent to stand trial." Order of June 19, 1992 (Doc. No. 20) at 2. The Court heard evidence on this issue at the evidentiary hearing.

■ The Court must make a some initial observations concerning the divergence of the arguments and evidence set forth at the hearing from the *allegations contained within the Petition.* Only a minor portion of Claim X is devoted to Petitioner's claim that he was not competent to stand trial. The rest of the Claim is centered on the proposition that, by frequently seeking affirmation for the record from Petitioner concerning trial strategy, defense counsel Tassone and the trial judge (by countenancing this activity) elevated Petitioner to the status of co-counsel. Pet at 155–64. It is Petitioner's belief that by seeking such affirmations, Tassone ceased to function as defense counsel, and that Petitioner acted "as his own attorney, or at least as co-counsel, without any of the waiver of counsel prerequisites required by *Faretta v. California,* 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975)." *Id.* at 162. By failing to ascertain whether such a waiver had occurred, the trial judge committed error. *Id.* at 165–66.

The Court already has addressed the propriety of the side bars in which Tassone elicited affirmations from Petitioner to Tassone's strategic decisions, and has concluded that Tassone did not render ineffective assistance in so doing. As to the instant Claim, the Court has reviewed the passages cited in the instant Claim, e.g., R7–792; R8–1084–85; R11–1371,1373; R12–1627; R12–1776–77; R12–1866. The Court finds that these side bars did not have the effect of elevating Petitioner to the status of counsel or co-counsel.[42] By assenting to his counsel's characterizations of the selection of trial strategy, Petitioner did not "waive" assistance of counsel and Tassone did not cease to act as the *sole* defense counsel. Thus, the trial judge did not err in failing to conduct a *Faretta* inquiry because neither Petitioner nor Tassone ever expressed any intent whatsoever for Petitioner to conduct his own defense. Accordingly, this portion of Claim X is without any discernible merit.

■ Returning to the evidentiary hearing, it was Petitioner's contention that he was entitled to be heard on both a procedural

---

**42.** As noted *infra,* if these cited passages demonstrate anything, they tend to show that Petitioner on numerous occasions was able to discuss trial strategy and defense tactics with his attorney, thus directly refuting Petitioner's own claim that he was not competent to stand trial.

*Pate* claim, as well as a *substantive* claim of incompetency.[43] However, nowhere in the Petition is *Pate* even mentioned and, accordingly, the Court finds that no *Pate* claim is before the Court.[44] As no *Pate* claim properly has been raised, none will be discussed.

Despite the relative lack of discussion by Petitioner in Claim X, the Court finds that a *substantive claim of incompetency to stand trial* is indeed before the Court. This is the only issue within Claim X which the Court will address.

■■■ The Fourteenth Amendment prohibits states from denying defendants due process by trying them while they are incompetent. *James*, 957 F.2d at 1572–73. An individual is considered competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). *Accord Godinez v. Moran*, ── U.S. ──, ──, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (citing *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975) (court may not subject to trial a person "whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense")); *Adams v. Wainwright*, 764 F.2d 1356, 1359–60 (11th Cir.1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986).

■■■ Although "mental illness" and competency to stand trial are distinct issues, the Court must nonetheless state that "not every manifestation of mental illness demonstrates incompetence to stand trial." *Card v. Singletary*, 981 F.2d 481, 487 (11th Cir.1992) (citations and quotations omitted), *cert. denied*, ── U.S. ──, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993). Rather, a petitioner presenting a substantive incompetency claim must present evidence indicating a "present inability to assist counsel or understand the charges." *Id.*[45] Minor defects in cognitive abilities do not per se render a defendant "incapable of providing rational assistance to his attorney." *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir.1993). While a perfectly competent defendant often does not fully comprehend the intricacies of counsel's defense theories, this level of comprehension is not required. *Id.* All that is required is that the *Dusky* standard be satisfied. *See id.*

■■■ At an evidentiary hearing in a federal district court, the petitioner bears the burden of proving incompetency by a preponderance of the evidence. *Bundy*, 850 F.2d at 1407; *Price v. Wainwright*, 759 F.2d 1549, 1553 (11th Cir.1985). For the reasons discussed below, the Court finds that Petitioner has failed to meet this burden.

■■■ Dr. Harry Krop, who did not testify at the hearing, examined Petitioner on September 19, 1986, more than three and one-half years *subsequent* to Petitioner's conviction. Dr. Krop stated that Petitioner was "overpower[ed]" by "internal turmoil between what he was told he did and what he could remember doing." Krop Report, Pet. App. A at 11.

In all likelihood, the state of psycho-emotional shock caused by the totally extra-

---

43. A *Pate [v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966),] claim is an allegation that the trial court denied the defendant due process by failing to hold a competency *hearing*. This is distinct from a claim that a defendant was denied due process by being tried and convicted while incompetent. For a scholarly and highly instructive discussion on the differences between these two types of claims—and their respective burdens of proof—see *James v. Singletary*, 957 F.2d 1562, 1569–72 (11th Cir.1992), *cert. denied*, ── U.S. ──, 114 S.Ct. 262, 126 L.Ed.2d 214 (1993).

44. Since counsel for Petitioner was indeed aware of the concept of a *Pate* claim—by attempting to argue such on behalf of Petitioner at the hearing—the Court is inclined to conclude that a *Pate* claim *could* have been raised, but was not. Nevertheless, the Court passes no judgment as to *why* Petitioner did not raise a *Pate* claim.

45. By "present ability" is meant ability *at the time of trial*, not at the time the challenge to the conviction is made on competency grounds, nor at the time of a *subsequent* mental health evaluation.

character aggression he was led to believe he committed so debilitated him that he was not capable of acting in his own best interests during the ensuing legal proceedings.

. . . . .

The emotional shock engendered by his gradual realization of the possibility of guilt combined with his life's pattern of passivity effectively destroyed any internal motivation Mr. Davis might have had to help himself.

. . . . .

Thus, in addition to being unable to disclose pertinent facts regarding the alleged offense because of the psychomotor seizure, Mr. Davis was certainly unable to relate to or assist his attorney in planning a defense, and lacked any motivation to help himself in the legal process.

*Id.*

Krop's statement that Petitioner was "unable to disclose pertinent facts" to defense counsel is at once suspect, as Krop had no basis of knowing what Petitioner told his counsel or what the two discussed concerning trial strategy. In any event, this finding is directly refuted by Tassone's testimony at the evidentiary hearing.

During cross-examination by Respondent, Tassone attempted to invoke the attorney-client privilege when he was asked about what facts Petitioner had told him. The Court, having previously denied Tassone's Motion to Quash Subpoena (Doc. No. 25), informed Tassone that Petitioner, by challenging his conviction on ineffective assistance grounds, had waived any attorney-client privilege, and the Court then instructed Tassone to respond to Respondent's inquiries.[46] Tassone then stated what Petitioner

told him about the day the murders occurred. Petitioner told him that he had committed the acts with which he had been charged, and also told Tassone where he hid the camera missing from the Weiler residence and the gun used to commit the murders. Thus, despite Dr. Krop's conclusion to the contrary, it appears Petitioner did indeed impart "pertinent facts" to his attorney. Moreover, Petitioner's concealment of evidence tends to show that he was aware that those items could be used to incriminate him, rendering suspect Krop's belief that Petitioner was unable to "help himself." The Court finds Tassone's testimony at the evidentiary hearing to be more credible than the findings contained within Krop's report.

Krop's conclusion that Petitioner was unable to assist in his defense is further undercut by a review of Petitioner's Exhibit 35, which is an excerpt from a notepad shared by Tassone and Petitioner at the trial. Again, the Court must reiterate that Petitioner must introduce evidence indicating a "present inability to assist counsel or understand the charges." *Card*, 981 F.2d at 487. The Court emphasizes that the notes in Exhibit 35 appear to be only from one portion of the trial. Additionally, there are times when Petitioner or Tassone has written a question to the other, but no response is written. Since many of these were "yes/no" questions, either may have responded with a non-written gesture. Nevertheless, and understanding these conditions, the pertinent excerpts are as follows:

Petitioner ("P"): WILL THE STATE BE ABLE TO REBUTTLE AFTER YOU?

Tassone ("T"): No

. . . . .

---

**46.** The Court was mindful of the ethical quandary in which Tassone's former client now had placed him, but the fact remains that in Florida—as elsewhere—the attorney-client privilege is *possessed by the client*. In this instance, by challenging the conviction on ineffective assistance grounds and by calling Tassone as a witness on those claims, Petitioner chose to and did waive the privilege. *See Laughner v. United States*, 373 F.2d 326, 327 (5th Cir.1967) (where client, in a collateral proceeding, alleges breach of a duty owed him by attorney, "we have not the slightest

scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue"); *Crutchfield v. Wainwright*, 803 F.2d 1103, 1121 (11th Cir.1986) (Edmondson, J., concurring) (when defendant has challenged conviction by asserting issue that makes privileged communications relevant, he waives privilege with respect to those communications); *see also Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888) (if client has voluntarily waived privilege, "it cannot be insisted on to close the mouth of the attorney").

P: GIVE THIS TO MY BROUTHER RICHARD CHAN YOU GET HIM POWER OF ATTERN FROM THE CORTE—TONE HAS GOT HIM POWER OF ATTEN THE FIRST TIME HE WAS DOWN

. . . . .

T: Who is Don [last name illegible]

P: I DO NOT KNOW THE *NAME*

. . . . .

P: IS HE SAYING I WAS GOING TO J.W. HOUSE ? IF SO NO

T: He's not, he said you were going to the Strand house.

. . . . .

T: she will hurt—she is the fiber and rope expert

fBI man who is going to say that bullets found at the Weiler's are from the box of bullets your dad bought with the gun.

P: WOULD I BE ABLE TO TALK TO YOU BEFORE YOU LEAVE TONIGHT ?

P: IS HE GOING TO CALL ANY MO WITNESSES ?

T: No

. . . . .

P: CAN HE USE THE QUS. HE ASKED ON THE LIE TEST ?

T: yes

. . . . .

P: I USE ALL TIPS OF KNOTS IN SHIPYARDS

T: yeah but what can I

. . . . .

P: DID THE NAIL SCRAPING OR THE TEST ON THE HAND SHOW ANYTHING ?

T: showed some Blood but they couldn't tell whether it was or was not human blood.

T: Do you want to talk before or after I give my opening statement

P: TONIE WHENT IN TO THE HOUSE TO LOOK IT OVER, AND WAS AQUSED OF TAKEING THE CAMER

T: Do you want me to stipulate that he is an expert medical examiner ? he's testified about 5,000 times

. . . . .

P: I DID NOT SAY I LET THE HOUSE GOT IN MY TRUCK OR LIGHT A CIGER

I SAID I LEFT HOUSE AND GOT IN TRUCK THE ROOM I WAS IN WAS KEEPTED LOCKET AT ALL TIMES

Pet.'s Exh. 35. The notes also contain four instances where Petitioner wrote to Tassone that he was having difficulty hearing. *Id.*

These excerpts tend to show that Petitioner was alerting his attorney to witness testimony or contentions of the prosecutor with which he disagreed, and that Petitioner became aware that certain evidence would or could be used against him. The first note refers to the defense's right to "open and close," discussed in Claim V, *supra*, and shows that Petitioner at least was aware of the concept of rebuttal. As to the reference to the "knots," part of the state's evidence was rope found in Petitioner's truck which matched the rope used to tie up one of the Weiler girls. By writing to Tassone that he used all types of knots at the shipyards, Petitioner may have been attempting to offer Tassone some exculpatory excuse, even though the expert's finding of a match would make that a futile argument (e.g., Tassone's "yeah but what can I [do]" response). Moreover, Petitioner's asking Tassone about giving power of attorney to his brother does not appear to indicate an inability to communicate with counsel.

As noted above, the Court is aware of the limits of any interpretation of these notes. Nevertheless, some insight can be gained concerning both the communication between client and attorney and Petitioner's appreciation of the charges. The court finds that although *Petitioner* introduced these notes in support of his claim of incompetence, this evidence tends to indicate that the *Dusky* standard was met, rather than the opposite.

Tassone's testimony at the evidentiary hearing also tends to demonstrate that the *Dusky* standard was met. Tassone stated that Petitioner understood the charges

against him and the possible consequences of a conviction, and that Petitioner wanted him to plea bargain for a non-capital conviction. Tassone testified that Petitioner conferred with him both before and during the trial, as noted above. According to Tassone, Petitioner understood what was going on, and helped Tassone in the preparation of his defense. Tassone also stated that Petitioner knew he had the ability to testify in his defense, but that Petitioner had agreed with Tassone that he should not take the stand.

Tony Zebouni's testimony also lends support to a finding that *Dusky* was satisfied. Zebouni, who testified on behalf of Petitioner at the evidentiary hearing, represented Petitioner until he had to withdraw from the case. Zebouni stated that even though he filed a notice of an insanity defense (a matter wholly distinct from the question of competence to stand trial), Petitioner was able to communicate "appropriately" with Zebouni.

The Court's finding that the *Dusky* standard was satisfied and, thus, that Petitioner was competent to stand trial, is further based on a review of the written reports and testimony of the two mental health experts who testified at the evidentiary hearing. Dr. Patricia Fleming testified on behalf of Petitioner, having concluded in her prior written evaluation that Petitioner "would be unlikely to question, demand, or insist" and "would be unable to provide adequate assistance to his counsel during the trial." Pet.App. S at 9. Respondent called Dr. Miller, who reiterated his opinion that Petitioner was competent to stand trial. For the reasons discussed below, the Court finds that Dr. Miller's testimony was the more credible of the two.

Dr. Fleming, whose practice is based in Cheyenne, Wyoming, specializes in "psychological and consultation services." Pet.Exh. 42. She has testified as an expert for the public defender offices in Wyoming and Mis-

souri; for the Capitol Collateral Counsel in Florida; and for the state of Wyoming.[47] Dr. Fleming examined Petitioner in 1989, some six and one-half years *subsequent* to his trial, and also in February 1992, prior to the filing of the instant Petition.[48]

In her written report, submitted as an appendix to the Petition, Dr. Fleming states that Petitioner was incapable of appreciating the gravity of the decisions he (through counsel) was making at trial. Dr. Fleming noted Petitioner's occasional inability to hear witness statements and the trial judge's admonitions to witnesses to speak louder. Additionally, Petitioner's "functioning *as measured by the present evaluation* [in 1989], supports his inability to problem solve and conceptualize." Pet.App. S at 9 (emphasis supplied). Furthermore, Petitioner lacks the ability to gather facts and draw conclusions; is a passive and conforming individual; and "would go along with suggestions of those he perceived to be in power, i.e. attorneys, judges." *Id.*

During Respondent's voir dire of Dr. Fleming, she stated that a change in Petitioner's mental status over six years *could* occur. Based on this concession alone the Court finds it particularly difficult to link her 1989 diagnosis of Petitioner (whose functioning, as noted in the preceding paragraph, was measured by the "present [1989] evaluation") to Petitioner's level of competency in 1982 and 1983.

Dr. Fleming stated that she relied on several different sources in formulating her opinions, including the trial record, Dr. Miller's report, Petitioner's past medical history, and communications between Petitioner and defense counsel at trial. Dr. Fleming also was aware of Petitioner's childhood and family history. Based on her discussions with some other witnesses, *see supra* note 48, some of whom had testified to having been sexually abused, Dr. Fleming concluded that

---

47. Dr. Fleming stated that *all* of her testimony in the state of Florida has been on behalf of death row inmates.

48. Dr. Fleming also interviewed several of the family members who testified at the hearing *before* those individuals offered their testimony. By separate Order the Court found that Dr. Fleming's contact and discussions with the other

witnesses constituted a "direct violation of the [Exclusion Witness] Rule." Order of February 1, 1993 (Doc. No. 58) at 2. However, while admonishing counsel for having failed to prevent this violation, the Court also found that her professional conclusions "were not tainted by these contacts," and, accordingly, denied Respondent's Motion to exclude her testimony.

Petitioner must have been sexually abused, too. However, she stated that this was only an assumption by her, and not based on anything Petitioner himself had admitted to her during their interviews.

When asked by collateral counsel on direct examination as to whether Petitioner had a capacity for "premeditation," Dr. Fleming responded that he has "difficulty in long term planning." However, Petitioner's prior conviction for armed robbery, complemented with William Trent's testimony concerning his association with Petitioner for that prior criminal act, tends to refute Dr. Fleming's contention in this regard. Similarly, Trent's testimony concerning Petitioner's stint as manager of a gas station undercuts any contention that Petitioner could not "plan."

During cross-examination, counsel for Respondent asked Dr. Fleming whether she could state to a "reasonable, scientific certainty" that Petitioner was incompetent to stand trial at the time he was tried. She responded, "no," adding that there was a "probability" he was incompetent. Dr. Fleming was questioned as to Petitioner's note to counsel suggesting his realization that a piece of rope would be used against him. She responded that this was not a complex thought process, and that Petitioner would be able to assist his attorney in this regard. As to Petitioner's note concerning whether the state could rebut, Dr. Fleming stated that this showed an awareness of rebuttal. As to Petitioner's note mentioning the admissibility of the lie detector test, Dr. Fleming responded that this shows that Petitioner had an awareness of the concept of evidence.

Finally, with respect to Petitioner's IQ level, Dr. Fleming noted that prison officials found a higher IQ (108) than her own tests revealed. However, she said that she disregarded these prison tests as "not reliable," without stating to the Court any discernible basis that the Court is willing to accept for her so concluding.

At the time of the evidentiary hearing, Dr. Miller was Professor of Medicine and Associate Chair in Psychology at the University of Florida. He stated that he has performed 30,000 forensic evaluations, 1,000 of which were for a court of law, 150 of that subset being murder cases. At the request of public defender Zebouni, Dr. Miller met with Petitioner on May 20, 1982, and again on May 28, 1982. Dr. Miller conducted mental status and neurologic screening examinations at the first meeting, followed by an electroencephalogram. At the second meeting an Amytal interview was performed for two hours. In response to Tassone's request, Dr. Miller memorialized the details from the interviews, and his conclusions, in a written report dated November 23, 1982 (Resp.'s Exh. 19).

As opposed to Dr. Fleming's interviews, which did not occur until well into the collateral phases of this matter (1989 and 1992, respectively), Dr. Miller's examinations occurred at the behest of defense counsel *prior to and in preparation for the trial,* which occurred only eight months after the commission of the offenses.

During the initial interview Petitioner stated that he had been in the Weiler home that day to help undo a stuck bathroom door. He indicated to Dr. Miller that a detective told him that he (Petitioner) was the one who did the crime, but that Petitioner did not remember "anything of that sort." Resp.Exh. 19 at 2. Petitioner admitted that he had access to one of his father's missing pistols. Petitioner told Dr. Miller he was "extremely surprised" when his father told him the next day of the deaths of the Weilers.

During the Amytal interview, at which Link and Zebouni also were present, "[e]lements of past history were initially reviewed, focusing on certain aspects of his sexual maturation." *Id.* at 4–5. Later, when incidents of the alleged crime were raised, "certain revelations were made by Mr. Davis indicating his actions in perpetrating a robbery, tying up the victims, becoming excited when one of them was screaming and discharging the firearm." *Id.* at 5. Dr. Miller's concluding clinical impression diagnosed "[a]nti-social personality disorder; psychosexual disorder, pedophilia." *Id.* However, Dr. Miller's opinion was that *"the patient merits adjudication of competence for trial with respect to his instant status." Id.* (emphasis supplied).

At the evidentiary hearing, Dr. Miller reiterated his findings from the prior interviews, including his conclusion that Petitioner was competent to stand trial. Petitioner manifested what Dr. Miller described as a "facultative manner of behavior," doing actions when convenient, in an opportunistic fashion. When asked by counsel for Respondent whether his opinion would change if he knew that in 1986 Petitioner was alleged to have remembered nothing about the crime, Dr. Miller said it would not, and that the fact that Petitioner's story changes over time probably reflects mendacity, rather than a medical disorder. In fact, Dr. Miller added, this likely suggests an ability to "plan" for a crime. As to Dr. Fleming's diagnosis of "organic brain syndrome," Dr. Miller stated that such diagnosed persons, who differ from anti-social individuals, "do not characteristically engage in planned dis-social conduct," although he did acknowledge that crossover between medical disorders *is* possible.

During cross-examination by Petitioner, Dr. Miller stated that even had he learned of the incidents of physical abuse from Petitioner's past, he would not have substantially altered his diagnosis. This information simply would have made for some "enlightenment as to the genesis of this man's character." And, with respect to the family members who offered this information, Dr. Miller noted his concern with such informants generally, and the problems associated with the medical examiner not knowing why they offered information that the patient did not, or different information than that provided by the patient. Without a thorough experience with the informants, Dr. Miller stated, he would not know what to make of the information offered, other than perhaps asking the patient to explain the discrepancies. Significantly, though, Dr. Miller testified that *the additional family background information—* including the allegations of Petitioner having been the victim of sexual abuse—*would have had no bearing on his opinion of Petitioner's competency to stand trial.* In response to the Court's inquiry whether his opinion on competency would change, assuming that *all* the childhood facts were as Petitioner was presently representing them to be, Dr. Miller responded it would not. And, assuming that

Petitioner actually was an "organic brain" individual, this, too, would not have altered his finding of competency, Dr. Miller stated.

As noted above, "[p]sychiatry is not ... an exact science," and psychiatrists "disagree widely and frequently on ... the appropriate diagnosis to be attached to given behavior and symptoms." *Ake,* 470 U.S. at 81, 105 S.Ct. at 1095. Indeed, "psychologists and psychiatrists will often disagree in courts of law." *Bertolotti,* 883 F.2d at 1518. The Court finds that Dr. Miller's testimony and opinions concerning whether Petitioner was competent to stand trial are more credible than Dr. Fleming's. On the basis of the expert testimony alone, then, the Court is not persuaded by a preponderance of the evidence that Petitioner was not competent to stand trial.

In summary, the record reflects that Petitioner was competent to stand trial under the standard set forth in *Dusky.* Based on Tassone's testimony, and Petitioner's own written communication to defense counsel during trial, it is evident that Petitioner appreciated the significance of the proceedings occurring before him, and that he was able to assist Tassone in his defense. At the evidentiary hearing, Dr. Fleming could not state to a reasonable, scientific certainty that Petitioner was incompetent (the very conclusion for which she presumably was called to testify), and Dr. Miller's opinion was the more believable of the two testimonies.

The Court finds that the *Dusky* standard was satisfied, that Petitioner was tried while competent, and that this portion of Claim X is without merit.

### CLAIM XI—INEFFECTIVE APPELLATE COUNSEL: FAILURE TO CHALLENGE DEATH SENTENCE ON DIRECT APPEAL

In Claim XI Petitioner claims that his counsel on direct appeal rendered ineffective assistance by failing to challenge Petitioner's death sentence, in violation of the Sixth, Eighth and Fourteenth Amendments. Pet. at 166. Respondent argues that this claim previously has been rejected by the Florida Supreme Court on its merits, and that in any

event Petitioner cannot demonstrate either error or prejudice resulting from this omission. As noted by Respondent, this claim was raised before the Florida Supreme Court in a petition for a state writ of habeas corpus, *Davis,* 498 So.2d 857, and thus the Court finds that the issue is properly before the Court.

Petitioner claims that he received *"no representation ... regarding the appeal of his sentence of death."* Pet. at 166. In particular, Petitioner finds fault in appellate counsel's alleged concession before the Florida Supreme Court that death was the appropriate penalty for his client, and then finds fault in counsel's attempt, in a motion for a rehearing, to correct what he perceived to be that court's improper characterization of his position. *Id.* at 167–69. Thus, it is alleged that "counsel chose to defend himself rather than his client." *Id.* at 169. Additionally, Petitioner has incorporated by reference certain claims raised elsewhere within the instant Petition, essentially arguing that these were all meritorious claims that should have been raised on direct appeal.

 The Sixth Amendment right to effective assistance of counsel includes the right to effective appellate counsel. *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985). However, appellate counsel need not advance every possible argument, even those that are non-frivolous, and should instead concentrate his advocacy on "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). The two-part *Strickland* test, which the Court has used in evaluating claims of ineffective assistance of trial counsel, *supra,* also guides an analysis of claims of ineffective assistance of appellate counsel. *See Orazio v. Dugger,* 876 F.2d 1508, 1513 (11th Cir.1989).

 Thus, Petitioner must show not only that his appellate counsel's performance was deficient, but also that this performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Heath,* 941 F.2d at 1130. In order to determine the prejudice prong of this test, the Court must first per-

form "a review of the merits of the [omitted] claim." *Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). If the Court finds that the omitted claim "would have a reasonable probability of success on appeal, then according to *Cross* it is necessary to find 'appellate counsel's performance prejudicial because it affected the outcome of the appeal.'" *Heath,* 941 F.2d at 1132 (quoting *Cross,* 893 F.2d at 1290).

Petitioner was represented on appeal by Steven L. Bolotin, an Assistant Public Defender for the Second Judicial Circuit, Tallahassee, Florida. Bolotin filed a 78–page brief in the Florida Supreme Court on or about July 25, 1983. R14–Brief of Appellant. After the state served its 41–page brief, Bolotin filed a 12–page reply brief.

The initial brief raised five separate issues: (1) abuse of discretion by trial court in denying motion for change of venue; (2) abuse of discretion by trial court in denying motion for individual and sequestered voir dire; (3) trial court error in denying challenge to potential juror Lane; (4) abuse of discretion by trial court in denying motion for mistrial, when state's witness on re-direct examination referred to Petitioner's polygraph examination; and (5) the prosecutor's "inflammatory, emotional and thoroughly improper argument" to jury.

Petitioner presently does not contend that Bolotin erred in raising the above-listed issues. Indeed, the Court must infer that Petitioner deems these five issues to be meritorious, as Petitioner now has raised these same arguments within the instant Petition. Rather, Petitioner asserts that by failing to specifically challenge the sentence of death, Bolotin's failed to act as a "zealous advocate," thus depriving Petitioner of effective appellate assistance.

As the Supreme Court noted in *Strickland,* it is not necessary for a court reviewing a claim of ineffective assistance of counsel to make a detailed inquiry into the conduct/error component before discussing the prejudice component. In fact, as noted in the discussion of Claim IV, *supra,* if it is "easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. *See also Bolender,* 16 F.3d at 1560 n. 17. The Court finds that the instant claim is better suited towards an analysis which focuses on the prejudice component. For the reasons discussed below, the Court finds that Petitioner cannot demonstrate any prejudice resulting from the alleged omissions by appellate counsel.

In addition to appellate counsel's failure to challenge the sentence of death on direct appeal, Petitioner alleges that appellate counsel should have raised as additional issues the arguments contained within Claims VIII, IX, X, XII, XIV, XX, XXI, XXII, XXIII, XXIV and XXV in the instant Petition. Pet. at 171. According to Petitioner, a review of these issues "demonstrates that counsel's performance was deficient and that the deficiencies prejudiced Mr. Davis." *Id.* Having thoroughly reviewed all aspects of the record relating to each of the above-listed claims, and having analyzed their merits—or lack thereof—at great length, the Court, *supra* and *infra,* has rejected each of these claims.[49] Accordingly, assuming that Bolotin had raised every one of the claims Petitioner now says he should have, the lack of merit contained within these claims would have precluded the reviewing appellate court (in this case the Florida Supreme Court) from granting relief on any of these grounds. Thus, there was no prejudice resulting from Bolotin's decision not to raise those claims on appeal.

■ Additionally, there was no prejudice resulting from appellate counsel's choice to not challenge the death sentence. In its Order affirming Petitioner's conviction and sentence, the Florida Supreme Court specifically noted that appellate counsel had not challenged the death sentence:

> Davis' appellate attorney has not challenged the death sentences. In response to a question asked at oral argument he stated that he had made a tactical decision not to do so and gave several reasons for this decision. First, he said that, in all candor, only the cold, calculated, and premeditated and avoid or prevent arrest aggravating circumstances could be argued against. Moreover, because no mitigating circumstances existed and because the jury had recommended the death sentence, the sentence could be sustained even if this Court found those aggravating circumstances improper. *Elledge v. State,* 346 So.2d 998 (Fla.1977). Finally, defense counsel stated that, taking the above into consideration, he had decided to use his brief to attack the convictions rather than the sentences, even though he disagrees with the sentences.

*Davis,* 461 So.2d at 71. Nevertheless, in the very next sentence of the opinion, the Florida Supreme Court noted that section 921.141 of the Florida Statutes required that court to review both the conviction and sentence in a death case, *"and we will do so here on our own motion." Id.* (emphasis supplied). The court then reviewed and upheld the sentence.

■ It is abundantly clear that the Florida Supreme Court reviewed the sentencing phase of Petitioner's trial, and the merits of the death sentence imposed. *See id.* at 71–72. *Under Florida law, this was a mandatory procedure.*[50] That the court conducted this review on its "own motion," rather than in the form of a response to a particular

---

**49.** In the case of Claims XXI through XXIII and Claim XXV, discussed *infra,* the Court has denied relief on the basis of procedural bar, and will not now improperly delve into the merits of these arguments through the "backdoor" of an ineffective assistance of appellate counsel claim. As to the other claims, all of which are properly before the Court, relief has been denied on the merits.

**50.** Even where a defendant has waived trial counsel and, following conviction, does not actively oppose the state's presentation of aggravating evidence during the sentencing phase, the Florida Supreme Court will not allow the "courts of this state [to] administer the death penalty by default." *Hamblen v. State,* 527 So.2d 800, 804 (Fla.1988). As the court stated, a Florida defendant "cannot be executed unless his guilt and the propriety of his sentence have been established according to law." *Id.* Thus, even in a case as Petitioner's, where counsel does not raise the imposed sentence of death as a distinct claim for appellate review, the Florida Supreme Court will not shirk its duty—and did not in the instant case—to automatically review the propriety of that sentence.

appellate argument, can be of no import, because *the sentence was reviewed as if it had been raised as a claim on appeal.* Therefore, since the Florida Supreme Court itself analyzed the death sentence, there can be no prejudice—and Petitioner in the instant claim has set forth no discernible bases for prejudice—from Bolotin's failure to raise the death sentence as an issue on appeal.[51]

The Court finding that Petitioner has failed to establish prejudice resulting from appellate counsel's failure to challenge the sentence of death on appeal, it is not necessary to analyze whether appellate counsel committed error in this regard. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.[52] There being no prejudice, Petitioner cannot satisfy the *Strickland* standard. Accordingly, Claim XI is without merit.

## CLAIM XII—INEFFECTIVE ASSISTANCE OF COUNSEL: MOTION TO SUPPRESS

In Claim XII Petitioner contends that trial counsel was prejudicially ineffective in presenting a motion to suppress statements elicited by law enforcement officers when counsel was unprepared to do so, and that trial counsel was ineffective in failing to challenge illegal searches and resulting evidence. Additionally, Petitioner alleges that appellate counsel was ineffective for failing to challenge the trial court's denial of this motion. Petitioner argues that these were errors in violation of the Fifth, Sixth and Fourteenth Amendments. Pet. at 172.

The portion of the claim dealing with the alleged ineffective assistance of trial counsel was previously raised in Petitioner's first 3.850 Motion, filed in the state trial court on September 21, 1986. PC–R1–186–91. As previously noted, the trial court denied the claim on September 22, 1986. PC–R5–827. The Florida Supreme Court affirmed the decision, without opinion, on September 23, 1986. *Davis,* 496 So.2d 142. The ineffective assistance of appellate counsel claim was raised in the Petitioner's state petition for a writ of habeas corpus. The Florida Supreme Court denied relief. *Davis,* 498 So.2d 857. Therefore, the Court finds that the entirety of this claim has been exhausted and is properly before the Court. The Court first will address that portion of the claim relating to trial counsel, and then address the claim as it relates to appellate counsel.

Petitioner contends that trial counsel entered the case in November, 1982, and one week later a hearing was conducted on the previously filed motion to suppress. Petitioner contends that trial counsel was unprepared to argue the law or to "marshall [sic] the facts." Pet. at 172. At issue in that motion were statements made by Petitioner to law enforcement officials prior to his arrest, and subsequent to his indication that he wished to terminate all questioning. Petitioner contends that trial counsel only argued the Fifth Amendment issue, asserting that Petitioner was in custody when the investigation "focused upon him at approximately 7:00 p.m. on May 12, 1986." Furthermore, the rights contained in the polygraph consent allegedly were insufficient to comply with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Petitioner allegedly was not read his rights until 1:45 a.m. on May 13, 1982.[53] Thus, Petitioner argues, all statements made by him prior to his arrest and *Miranda* warnings were obtained in violation of *Miranda.* Pet. at 178–

---

**51.** Indeed, the Florida Supreme Court struck one of the aggravating factors (avoid or prevent arrest in aggravation of the younger Weiler child's murder) that appellate counsel stated he would have raised, thus manifestly precluding this Court from finding any prejudice resulting from counsel's not raising that claim. While counsel obviously would have succeeded had he argued that claim, the Florida Supreme Court still upheld five valid aggravating circumstances for each count, "with nothing in mitigation." *Davis,* 461 So.2d at 72. Thus, even assuming counsel actually had made that argument, the result of the appeal would have been no different.

**52.** Because of the lack of prejudice, Petitioner's argument would fail even if the Court, *arguendo,* were to assume that appellate counsel did commit error.

**53.** Although Petitioner refers to "1:45 a.m. on May 13, 1986," the Court assumes Petitioner to have erred with respect to the year.

'79.[54]

Respondent contends that Petitioner's allegation that trial counsel was ineffective in presenting his case at the suppression hearing is predicated on an incomplete view of the facts and the "recently procured 'opinion' of Dr. Krop." Resp. at 46. According to Respondent, this claim is insufficient under *Strickland,* as there was ample evidence to support the trial court's conclusions. In support of its position, Respondent argues that the trial court heard testimony that Petitioner received his *Miranda* warnings, as well as notice of his right to allow the police to search his truck and apartment. At no time did Petitioner request counsel or ask the police to cease their questioning. Resp. at 47 (alluding to testimony from the suppression hearing, R5–379,388,425,459). Respondent suggests that Petitioner apparently resented the polygrapher's comment that he lied and, therefore, refused to speak with the examiner. When Detective Kessinger returned and the polygrapher left, Petitioner began speaking again. Respondent further argues that Petitioner made primarily exculpatory statements (other than agreeing with the detectives that he visited the victims' home), and that Petitioner did not confess. Resp. at 46–47.

On September 17, 1982, Tony Zebouni filed a Motion to Suppress Statements, Admissions and Confessions. R2–237. The motion alleged that Petitioner made statements to officers of the Jacksonville Sheriff's Office ("JSO") regarding the following: his whereabouts on May 11, 1982; his personal beliefs regarding the salvation of his soul; and occurrences at the Weiler household on May 11, 1982. *Id.* Zebouni further alleged that the oral and written statements from Petitioner were obtained in violation of his right to counsel, his privilege against self-incrimination guaranteed by the Fifth and Sixth Amendments, and the Due Process Clause of the Fourteenth Amendment. *Id.* Counsel argued that the statements were not freely and voluntarily given, *id.,* and also alleged that the oral statements obtained from Petitioner violated his rights guaranteed by the Fourth Amendment, *id.* at 238.

The trial court heard testimony on the motion on November 8 and 9, 1982. R5–363–468. Attorney Tassone argued the motion, having been appointed to represent Petitioner subsequent to the filing of the Motion.[55] *Id.* at 470–507. At the hearing, the state presented testimony from Detectives Charles M. Kessinger, Ray Smith, J.W. Terry and Leroy Starling of the JSO, and Lieutenant Derry W. Dedmon of the Clay County Sheriff's Office. R5–363–467. Defense counsel cross-examined each of the state's witnesses. *Id.* at 390–411,427–32,441–45,449–53,463–66. On November 9, 1982, at the close of the testimony phase of the hearing, defense counsel asked the court for a one week recess in which to prepare his legal arguments on the motion. *Id.* at 468. The court granted that request and the hearing was recom-

---

54. Petitioner further contends that no evaluation ever was made of his mental condition at the time of the interrogation. Based on a subsequent evaluation by Dr. Krop—of which evaluation this Court already has raised serious doubts—Petitioner contends that his purported consents to searches were void of any voluntary and knowing element.

In Claim 7 of his first 3.850 Motion, Petitioner offered portions of the report of Dr. Krop as "demonstrat[ing] counsel's gross lack of preparation" regarding his handling of the motion to suppress. PC–R1–186. The motion further stated: "This information was critical for a reliable determination of waiver, and voluntariness of waivers of constitutional rights. Mr. Davis' purported consents to searches are void of any voluntary and knowing element." *Id.* at 187.

The instant Petition states: "[T]he coercive nature of the questioning and the attendant circumstances of the inability to understand rendered his statements involuntary. The trial court's failure to suppress such statements was error depriving Mr. Davis of his rights under the fifth, sixth, and fourteenth amendments." Pet. at 181.

Insofar as the instant claim and its Rule 3.850 predecessor both are styled as ineffective assistance of counsel claims regarding trial counsel's presentation of the motion to suppress, the Court finds that the issue of the trial *court's* failure to suppress Petitioner's statements as error is not properly before this Court, and will not be addressed.

55. As noted previously, Petitioner initially was represented by the Office of the Public Defender. On October 19, 1982, the trial court entered an Order Appointing Attorney, allowing that office to withdraw its representation due to a conflict in interest, and appointing Frank Tassone, Jr., in its place. R1–244.

menced on November 22, 1982. *Id.* at 469. The hearing subsequently was postponed for one additional day. *Id.*

Defense counsel began his argument to the court by identifying the issues, and setting out the principles outlined in *Miranda.* He addressed the threshold issue of whether Petitioner was "in custody," particularly in light of the nature of the interrogation. *Id.* at 478. He argued that Petitioner was a suspect in the homicides as early as 7:00 p.m. on May 12, 1982, and by their own admission, the police officers did not advise him of his rights as to any statement until approximately 1:45 a.m.[56] *Id.* at 479. Defense counsel also responded in the negative to the court's question of whether the warnings given before the polygraph examination was administered advised of rights "to the nature of *Miranda* warnings." *Id.* 480–81.[57] Tassone provided the trial court with citation to numerous cases in support of his position. *Id.* at 480.

On December 3, 1982, the trial court denied Petitioner's Motion to Suppress. R2–259. At the request of counsel, the trial court set out its findings to support its order denying the motion to suppress statements of Petitioner: (1) Petitioner was not in custody until after the polygraph test was administered to him on the date of his arrest; (2) Petitioner was adequately advised of and understood his rights prior to being administered the polygraph test; and (3) Petitioner knowingly and voluntarily waived his rights to remain silent. *Id.* at 268.

Petitioner essentially asks the Court to find trial counsel's representation at the suppression to be outside the "wide range of professionally competent assistance," *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, because he failed to specifically argue that *all* of Petitioner's statements made after his forty-minute period of silence were inadmissible.[58] According to Tassone, this period of silence was within a period of custodial interrogation occurring without the benefit of *Miranda* warnings.[59]

**56.** Petitioner signed the authorization form for the polygraph examination shortly after 9:00 p.m. R5–420. The test itself took approximately thirty minutes. *Id.* at 422. It was administered approximately one hour and fifteen minutes after the polygraph officer first met the petitioner. *Id.* at 426. Detective Dedmon estimated that he completed his polygraph examination and interview with Petitioner between approximately 11:45 p.m. and midnight. *Id.*

**57.** Lt. Dedmon testified that prior to administering the polygraph examination, Petitioner signed a standard polygraph examination consent form used by the JSO. *Id.* at 417. The signed consent form was identified as state's exhibit C.

Lt. Dedmon further testified that the form states, *inter alia,* that the test is being taken voluntarily, that the participant's constitutional rights include the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to an attorney, without cost if he cannot afford an attorney, and that he has the right to have his attorney present before any questions are asked of him. *Id.* at 418. Lt. Dedmon testified that Petitioner told him that he understood his rights, that he could read and write, that he was not an epileptic or a heart patient, and that Petitioner voluntarily signed the form in Lt. Dedmon's presence. *Id.* at 418–20.

**58.** After completing the polygraph examination, Lt. Dedmon concluded that Petitioner was lying in his response to the questions, and shared his opinion with Detective Kessinger. R5–429. Lt.

Dedmon subsequently told Petitioner that, in his opinion, the petitioner was lying with respect to the pertinent questions involving the three murders. *Id.* at 424. Lt. Dedmon testified that "from the moment I told him that he in my opinion was lying, the man never spoke another word to me." *Id.*

Lt. Dedmon further testified that he spoke with Petitioner for approximately another twenty minutes, asking questions such as "Do you want me to stop talking to you?", "Do you want an attorney?", "Do you want me to leave?" *Id.* at 425. Petitioner gave no response. Id.

After Lt. Dedmon left the room, Detective Pavelka went into the examination room and attempted to speak with Petitioner. Deposition of Patricia A. Pavelka at 46, taken on July 29, 1982 (filed on June 8, 1992). Petitioner did not speak to Detective Pavelka. *Id.* at 48–49.

Detective Kessinger subsequently returned, but Petitioner refused to speak about the murders. Detective Kessinger did engage Petitioner in conversation about his work as a welder. *Id.* at 50–51. Petitioner subsequently answered Detective Kessinger's questions about the murder. *Id.* at 51.

**59.** If an individual held for interrogation by police "indicates *in any manner,* at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Jacobs v. Singletary,* 952 F.2d 1282, 1291 (11th Cir.1992) (quoting *Lightborne v. Dugger,* 829 F.2d 1012, 1018 (11th Cir.1987) (quoting *Miranda,*

As the Supreme Court set forth in *Miranda:*

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

■ Petitioner has failed to demonstrate that counsel's representation at the suppression hearing fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. In his oral argument, defense counsel chose to focus on the custodial nature of the interrogation of Petitioner, virtually from the moment there was evidence that the law enforcement officials considered Petitioner a suspect, i.e., when Detective Ray Smith was summoned at home, and told to come to the police station to administer the polygraph examination to the petitioner, a suspect in the homicides. R5-442. Counsel aggressively argued that Petitioner was not given his *Miranda* warnings until many hours later, after he had made numerous statements to various law enforcement officials regarding his whereabouts and activities. "[C]ourts will not find that an attorney is incompetent for using a particular approach to a case so long as that approach was reasonable." *Harich,* 844 F.2d at 1469. Tassone's approach appears to have been eminently reasonable.

In addition to argument by both sides, the trial court also had the benefit of the written motion to suppress, as well as the testimony of numerous law enforcement officers. The fact that defense counsel chose to present certain arguments on the record—and not others—is not controlling. Counsel was free to chose which arguments to make at the

hearing, and committed no *Strickland* error in so doing. Therefore, the Court finds that Claim XII, as it relates to trial counsel, is without merit.

■ With regard to the performance of appellate counsel, Petitioner contends that counsel Bolotin failed to brief, argue or even mention the trial court's denial of the motion to suppress. Petitioner contends that he "was thus denied the opportunity for careful partisan scrutiny by an effective appellate advocate." Pet. at 179. Respondent points out that this issue was raised in Petitioner's state habeas petition, and was rejected as meritless. Resp. at 47.

In the instant case, appellate counsel chose to raise five issues on direct appeal. *See Davis,* 461 So.2d at 68. The trial court's denial of the motion to suppress was not among the issues raised. Subsequently, the Florida Supreme Court rejected Petitioner's contention, raised in his state petition for a writ of habeas corpus, that his appellate counsel was ineffective for failing to challenge the denial of the motion to suppress. *See Davis,* 498 So.2d at 859.

In addressing this latter issue, the Florida Supreme Court acknowledged that appellate counsel made tactical choices in what to present on appeal. The court stated: "That counsel could have, but did not, challenge the voluntariness of a statement 'does not constitute a deficiency falling below prevailing professional norms.' *Ruffin [v. Wainwright,* 461 So.2d 109, 111 (Fla.1984)]. Counsel need not raise every conceivable claim, *id.,* and appellate counsel could have reasonably concluded that the point had no merit." *Davis,* 498 So.2d at 859.

The Court agrees with the Florida Supreme Court's findings. The Court finds that appellate counsel's failure to raise on appeal the trial court's denial of Petitioner's motion to suppress was not unreasonable, nor indicative of a performance falling below

384 U.S. at 473–74, 86 S.Ct. at 1628), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988)). Thus, law enforcement officials must cease an interrogation if the suspect provides merely an 'equivocal' or 'ambiguous' indication of a desire to remain silent. *Delap v.*

*Dugger,* 890 F.2d 285, 290 (11th Cir.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). The suspect "must only in some manner 'evidence[ ] a refusal to talk further.'" *Jacobs,* 952 F.2d at 1292 (quoting *Moore v. Dugger,* 856 F.2d 129, 134 (11th Cir.1988)).

prevailing professional norms. Appellate counsel could have made a reasonable strategic choice to "winnow out" less meritorious arguments, *Jones,* 463 U.S. at 751–52, 103 S.Ct. at 3312, and focus the court's attention on the strongest and most viable claims for the appeal. Therefore, as it relates to appellate counsel, Claim XII is without merit.

## CLAIM XIII—IMPROPER DILUTION OF JURY RESPONSIBILITY

In Claim XIII Petitioner alleges that his sentencing jury was misled and misinformed as to its function, responsibility, and discretion in imposing sentence, and that his death sentence was the product of a fundamentally unreliable proceeding, contrary to the holding of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and in violation of the Eighth and Fourteenth Amendments. Pet. at 172.

■■■ This claim was presented as Claim XIV in Petitioner's original 3.850 Motion. PC–R1–226–30. The claim was not unambiguously rejected on procedural grounds by either the trial court, PC–R5–827, R7–67, or by the Florida Supreme Court, *Davis,* 496 So.2d 142. Under the plain statement rule announced in *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." 489 U.S. at 263, 109 S.Ct. at 1043 (quoting *Caldwell,* 472 U.S. at 327, 105 S.Ct. at 2638 (quoting *Michigan v. Long,*

463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983))).[60]

Respondent is incorrect in its assertion, Resp. at 48, that this claim is procedurally barred and, as it is not, the Court may reach the merits of this claim.

In *Caldwell,* the petitioner challenged his sentence of death imposed pursuant to the Mississippi capital sentencing scheme. After a bifurcated trial and sentencing proceeding, a verdict of guilt and a sentence of death are automatically reviewed by the Supreme Court of Mississippi. In conducting that review, the Mississippi Supreme Court applies a presumption of correctness and can overturn that sentence only under limited circumstances. In *Caldwell,* the sentencing jury had been told that its sentence was automatically reviewable. The Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–29, 105 S.Ct. at 2639. This lessening of the responsibility felt by the sentencing jury in that case rendered the sentence unreliable and thereby violated the Eighth Amendment. *Id.* at 341, 105 S.Ct. at 2646.

■■■ The Eleventh Circuit squarely faced *Caldwell* challenges in the context of the Florida capital sentencing scheme in a pair of en banc decisions rendered on the same day. *See Harich,* 844 F.2d 1464; *Mann v. Dugger,* 844 F.2d 1446 (en banc), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989). Florida employs a trifurcated capital

---

**60.** Clarifying *Harris* in a later opinion, the Supreme Court stated that where a federal claim is denied without explicit reliance on state procedural grounds, a court should not presume that the merits of the federal claim was the basis for the judgment. *See Ylst,* 501 U.S. at ——, 111 S.Ct. at 2594. In *Ylst,* however, the Court considered the situation where there has been "one reasoned state judgment rejecting a federal claim" and where later orders were unexplained. *Id.*

In the instant case, at the conclusion of the hearing on the 3.850 Motion, the court stated that it had reviewed and considered the motion and appendix, as well as the arguments made at the hearing, and found that Petitioner was not

entitled to relief. PC–R7–67. The court's written Order referenced its statement made at the conclusion of the hearing. PC–R5–827. Thus, this Court concludes that the trial court made a "reasoned judgment" on the merits of this claim—not a rejection based on a procedural bar—which was the "last" and only such judgment on this claim.

"Looking through" the unexplained subsequent order of the Florida Supreme Court, and giving it no effect, as *Ylst* requires, 501 U.S. at ——, 111 S.Ct. at 2595, the last reasoned judgment—that of the trial court in denying relief on the first 3.850 Motion—was a decision on the merits.

trial scheme. Pursuant to that scheme the guilt or innocence of a capital defendant is determined by a jury. The court then holds a sentencing proceeding before that same jury. The jury renders an "advisory" sentence of either life imprisonment or death. The trial judge ultimately pronounces sentence. Although the jury's sentence is advisory, it carries great weight and the trial judge's authority to override a recommendation of life imprisonment is severely limited. *See Messer v. State,* 330 So.2d 137, 142 (Fla. 1976), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982); *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975). Although there are significant differences between the Mississippi and Florida capital sentencing procedures, the Eleventh Circuit held that "the concerns voiced in *Caldwell* are triggered when a Florida sentencing jury is misled into believing that its role is unimportant.... Such a sentence, because it results from a factor that is tainted by an impermissible bias in favor of death, necessarily violates the eighth amendment requirement of reliability in capital sentencing." *Mann,* 844 F.2d at 1454 (footnote omitted), 1455.

Although the court of appeals reached different conclusions on the respective *Caldwell* claims presented in *Mann* and *Harich,* a majority of the court in both cases endorsed the methodology outlined by Judge Tjoflat in the opinion of the court in *Mann:*

> In reviewing *Caldwell* claims, our task is twofold. First, we must determine whether the prosecutor's comments to the jury were such that they would "minimize the jury's sense of responsibility for determining the appropriateness of death." *Caldwell,* 472 U.S. at 341 [105 S.Ct. at 2646]. Second, if the comments would have such effect, we must determine "whether the trial judge in this case sufficiently corrected the impression left by the prosecutor." *McCorquodale v. Kemp,* 829 F.2d 1035, 1037 (11th Cir.1987).

*Mann,* 844 F.2d at 1456.

After reviewing the particular comments made by the prosecutor, which were similar to those made in *Caldwell,* the *Mann* court stated that "the danger exists that the jurors ... were misinformed as to the importance of their judgment call." *Id.* at 1457. The "danger" [of a *Caldwell* violation] was "particularly strong" in that case, since "nothing in the common meaning of the term 'advisory' would suggest to the layman that the trial judge would in any way be bound by the recommendation; indeed, the common meaning would suggest precisely the contrary." *Id.*

Despite some factual distinctions between the statements made by prosecutor and judge to the juries in these two cases, in both the trial judge stated that the final decision rested "solely" with the judge of the court. *Harich,* 844 F.2d at 1474; *Mann,* 844 F.2d at 1458. Nevertheless, the opinion of the court in *Harich* saw no such "danger"—as that expressed in *Mann*—associated with the trial judge's emphasis on the advisory nature of the jury's role:

> [E]mphasizing the "advisory" role of the jury, or the fact that the jury is making a "recommendation" to the judge, does not support the *Caldwell* claim. Such statements are neither inaccurate nor misleading.

*Harich,* 844 F.2d at 1473–74 (footnote omitted). In the concluding paragraph in that opinion, the court of appeals noted its agreement with the Florida Supreme Court that "comments which accurately explain the respective functions of the judge and jury are permissible under *Caldwell* 'as long as the significance of [the jury's] recommendation is adequately stressed.'" *Id.* at 1475 (citing *Pope v. Wainwright,* 496 So.2d 798, 805 (Fla. 1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987)).

■ In the instant case, Petitioner asserts that the venire members were misled from the very moment they entered the courtroom. Pet. at 182. Petitioner points to four discrete statements, two by the prosecutor and two by the judge, which allegedly violated *Caldwell.* The trial judge informed the entire venire prior to voir dire that they would render an advisory opinion and that "the Judge is not required to follow the advice of the jury." R6–539. The prosecutor made two statements during voir dire to the effect that "the Judge makes the final decision on the penalty," *id.* at 583, and that

"the Judge is the one who does the actual sentencing and he could either follow the jurors' recommendation or ignore it," *id.* at 694–95. Finally, Petitioner cites one statement made during the court's instructions to the sentencing jury that:

> the final decision as to what punishment should be imposed is the responsibility of the Judge; however, it is your duty to follow the law that will be given to you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

R12–1840.

Certain other statements, not cited by Petitioner, also are significant for the purposes of this analysis. The trial court additionally stated in its explanation to the sentencing jury when it began the sentencing proceeding that "[t]he final decision as to what punishment shall be imposed rests solely with the Judge of the Court; however, the law requires that you, the jury, render to the Court an advisory sentence as to what punishment should be imposed upon the defendant." *Id.* at 1780. Also, during closing argument the prosecutor told the jury that its decision was very important:

> The law won't ask you to come in here and do something trivial or important and to merely advise the Judge. What you do under the law has heavy weight and I ask you to keep that in mind and not make it less important because it's considered and named advisory because the advice you give has heavy, heavy significance in the law and please remember that.

*Id.* at 1810.

In *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), the Supreme Court held that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by the local law." 489 U.S. at 407, 109 S.Ct. at 1215. The Court finds that Petitioner has failed to meet his burden with respect to his *Caldwell* claim. Based on a review of the statements in dispute, as well as the entire trial transcript of this matter, the Court finds that neither the trial court nor the prosecutor improperly described the jury's role in the sentencing process. To borrow the holding of *Harich,* which is applicable to the instant claim:

> [The Court does] not believe that the challenged comments misled the jury as to the importance of its advisory role. These statements did not create the intolerable danger that the advisory jury's recommendation of the death sentence was unreliable. The statements explained to the jury their role with respect to the judge. The judge also instructed the jury to listen to the evidence, weigh the aggravating and mitigating circumstances, and render an advisory opinion as to the applicability of the death penalty in this case. Neither the prosecutor nor the trial judge implied that the jury's recommendation was superfluous. The fact that the jury knew they were making a recommendation did not detract from the importance of their decision.

844 F.2d at 1475. *See also Mann,* 844 F.2d at 1464 (Fay, J., dissenting) ("In cases involving a question of whether or not the death penalty should be imposed, great concern and seriousness of purpose literally permeates the courtroom. Jurors, like judges, lose sleep and are totally preoccupied with doing what is right and correct under the law. We, as judges, should be slow to assume that such men and women have somehow been led astray.")

Accordingly, for the reasons expressed above, the Court finds Claim XIII to be without merit.

### CLAIM XIV—IMPROPER PROSECUTORIAL COMMENT ON PETITIONER'S SILENCE

In Claim XIV Petitioner contends that the prosecutor's pervasive and unchecked commentary on Petitioner's failure to testify in his own behalf or fully cross-examine state witnesses deprived him of a fair trial and a fair and impartial jury, in violation of the

Fifth, Sixth, Eighth and Fourteenth amendments.

This claim originally was raised in Petitioner's first 3.850 Motion. The trial court denied the claim on September 22, 1986. PC–R5–827, R7–67. The Florida Supreme Court affirmed that decision, without opinion, on September 23, 1986. *Davis,* 496 So.2d 142. Therefore, the Court finds that this claim has been exhausted, is not procedurally barred and is properly before the Court.[61]

Petitioner contends that the prosecutor's reference during closing argument to the uncontradicted nature of the police officers' testimony was designed to bring attention to the fact that Petitioner did not testify. Pet. at 191. Specifically, Petitioner challenges two comments by the prosecutor allegedly referring to Petitioner's out of court statements: (1) "But what is important here is the cross examination as to the statements from most of the police officers that they obtained from the defendant was very little, very marginal or non-existent, which indicates that the defendant said these statements," R12–1667, and (2) "[the law enforcement witnesses] were unchallenged with respect to the nature and substance of the statements by the defendant. He said all of those statements, ladies and gentlemen," *id.* at 1693. Petitioner contends that by virtue of these comments, "[t]he jury was thus effectively informed ... that because the defendant did not refute these statements at trial, the fact that the statements were made and were true must be taken as established beyond a reasonable doubt." Pet. at 190–91. Petitioner argues that virtually all of his purported statements were made while he was alone with an officer. Therefore, the only way the statements could be challenged was by Petitioner's testimony. *Id.* at 192.

Petitioner also challenges certain comments by the prosecution regarding the testimony of Ginny Baumgartner, William Trent, and Richard Padon, namely, that their testimony was "unimpeached" because "it's the

truth," R12–1725; rang "with the resolution of truth," *id.* at 1729; and "not impeached," *id.* at 1735, respectively. Petitioner contends that the prosecutor's comments on the testimony being unrefuted can only be interpreted as unconstitutional comment on Petitioner's failure to testify, and constituted impermissible comment on Petitioner's invocation of his constitutional rights. As with Claim XIII, Respondent is incorrect in its assertion, Resp. at 49, that this claim was identified by the trial court as being procedurally barred. As to the merits of Claim XIV, Respondent contends that these statements were not comments on Petitioner's silence. Rather, Respondent contends that the comments have been taken out of context, and are not improper. Specifically, Respondent argues that the first comment dealt with defense counsel's request that attention be given to the cross-examination of the police officers and the issue of whether the Petitioner actually made the statements attributed to him, and that the second comment was in reply to defense counsel's arguments regarding the credibility of certain police officers and the simple reference "to the evidence at bar (or lack thereof)." Resp. at 49, 50. Respondent alleges that these arguments were invited by the defense, and were fair rebuttal.

"The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'." *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. at 1871). As the Eleventh Circuit has stated:

> The *Donnelly* decision provides important guidelines for reviewing allegedly improper prosecutorial argument. Of primary importance is the need to examine the entire context of the judicial proceeding. Thus, it is not our duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair. ... [E]rrors, even serious errors, will not require reversal on a petition for writ of habeas corpus unless their

---

61. As noted in the discussion of Claim XIII, *supra,* the trial court denied the first 3.850 Motion without a plain statement that the denial was based on a state procedural bar. The Court previously has found that the denial of that Mo-

tion was based on the merits of the claims therein. Therefore, Claim XIV in the instant Petition, previously raised in the first 3.850 Motion, is not procedurally barred.

absence would have, in reasonable probability, changed the outcome. ... A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional. Thus a precondition to examining the probable effect of improper closing argument on the jury is an understanding of the scope of permissible prosecutorial argument.

*Brooks v. Kemp,* 762 F.2d 1383, 1400, 1401, 1403 (11th Cir.1985) (en banc).[62] The propriety of prosecutorial argument rests primarily in the relation of its content to issues relevant to the jury's concern. *Id.* at 1405.

"It is settled law that the government may not comment on a defendant's failure to testify, either directly or indirectly." *United States v. Bright,* 630 F.2d 804, 825 (5th Cir. 1980) (citations omitted).

Although this general rule is clear that the prosecution must refrain from specific comment on a defendant's exercise of his fifth amendment right, the prohibition is not absolute. '[N]ot every statement that under some conceivable interpretation might draw attention to a defendant's decision not to testify is a comment on silence.'

*United States v. Griggs,* 735 F.2d 1318, 1321 (11th Cir.1984) (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1136 (5th Cir. Unit B 1981)[63]); *United States v. LeQuire,* 943 F.2d 1554, 1565 (11th Cir.1991),[64] *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992).

■ *LeQuire* cited with approval the court of appeals' earlier decision in *United States v. Stuart–Caballero,* 686 F.2d 890, 892 (11th Cir.1982), *cert. denied,* 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983). 943 F.2d at 1565. In *Stuart–Caballero,* the Eleventh Circuit adopted the following test to evaluate comment on the defendant's failure to testify in instances where he alone could provide contradictory evidence. Prosecutorial comment is improper if the defense can demonstrate either that: (1) the prosecutor manifestly intended to comment on the defendant's silence, or (2) the character of the comment was such that a jury would naturally and necessarily construe it as a comment on the defendant's silence. *Stuart–Caballero,* 686 F.2d at 892 (citing *United States v. Harbin,* 601 F.2d 773, 777 (5th Cir.), *cert. denied,* 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979)).

With respect to the first prong of the *Stuart–Caballero* test, no manifest intent to comment on Petitioner's failure to testify can be demonstrated if there exists another, equally plausible explanation for the remark. *LeQuire,* 943 F.2d at 1565. In the instant case, Petitioner does not allege that the prosecutor made any direct comment on Petitioner's failure to testify. Rather, Petitioner objects to the following comments of the prosecutor regarding the testimony of law enforcement officers: (1) "But what is important here is the cross examination as to the statements from most of the police officers that they obtained from the defendant was very little, very marginal or nonexistent, which indicates that the defendant said these statements," R12–1667, and (2) the law enforcement witnesses "were unchallenged with respect to the nature and substance of the defendant's statements. He said all of those statements," *id.* at 1693.

■ With respect to the above-mentioned comments, the Court finds that the prosecutor did not manifestly intend to comment on Petitioner's silence. Rather, there exists another, equally plausible explanation for the

---

**62.** This en banc opinion was vacated and remanded by the United States Supreme Court *on other grounds. Kemp v. Brooks,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986). Subsequently, the court of appeals reinstated the opinion. *Brooks v. Kemp,* 809 F.2d 700 (11th Cir.), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987).

**63.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

**64.** In *LeQuire,* the court of appeals declined to follow *Griggs* to the extent that *Griggs* did not consider the harmless error rule. *LeQuire,* 943 at 1566. "In declaring a constitutional error to be harmless, however, this court must be able to declare a belief that it was harmless *beyond a reasonable doubt." Id.* at 1566–67. In the instant case, the Court need not reach this question, because, as stated *infra,* there was no constitutional error.

remarks. Like all others, these remarks are understood best in the context in which they were made. *See LeQuire*, 943 F.2d at 1565. In his closing remarks, the prosecutor focused, *inter alia*, on the fact that none of the police officers testified that Petitioner confessed to committing the homicides. In any event, the statements Petitioner made to the law enforcement officers were rather indirect and limited.

As to the second prong of the *Stuart–Caballero* test, the Court finds that the character of the comments was not such that a jury would naturally and necessarily construe them as comments on Petitioner's silence. *See id.* The most likely inference to be drawn from these comments is that if the officers intended to fabricate or enhance Petitioner's comments, their testimony would have been much more substantial.

Petitioner also takes exception to the prosecutor's characterization of the testimony of three non-police officer witnesses—Baumgartner, Trent, and Padon—as "unimpeached" or uncontradicted.

 With respect to Baumgartner, she did not testify to any conversation with Petitioner. Rather she testified to having seen him in the neighborhood on the evening of the murders. R10–1336–52.

 As to Trent, he testified, *inter alia*, that in a telephone conversation with Petitioner several days after his arrest, when he asked Petitioner, "What … is going on?", Petitioner replied, "I don't know. They seem to have a pretty good case against me. I don't remember. I either blacked out or I don't remember." *Id.* at 1355–56. The prosecutor characterized that testimony in a manner similar to the characterization of the officers' testimony—that Trent's testimony is credible, if for no other reason than fabricated testimony probably would be more substantial and explicit. R12–1729.

 As to Padon, defense counsel, in his closing statement, questioned Padon's veracity based on his previous contradictory statements, and his personal interest in the outcome of the case. *Id.* at 1657. In response, the prosecutor stated, "[Padon's] statements were not impeached with respect to what the defendant told him." *Id.* at 1735.

In response to an attack on the government and the conduct of its case, a prosecutor may present what even amounts to a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon the government or its witnesses.

*LeQuire*, 943 F.2d at 1565. Thus, the prosecutor's response to defense counsel's questioning Padon's veracity was not improper.

In addition, Petitioner was not the only witness who could challenge Padon's testimony. Padon's wife, who was separated from him at the time of the trial, also testified. R12–1560–69. The prosecutor recounted not only the testimony of Mr. Padon regarding Petitioner's statements, but he also recounted the testimony of Padon's wife. *Id.* at 1736–38. Mrs. Padon testified that she and her husband discussed Padon's encounter with Petitioner on the evening of the murders. *Id.* at 1565. Mrs. Padon also testified that she was present when Petitioner asked Mr. Padon for his help in executing the burglary. *Id.* at 1562. Mr. Padon had also told his wife about the Nikon camera. *Id.* at 1567.

During its charge to the jury, the trial court instructed that the jury "must presume the defendant is innocent" and that this presumption stays with the defendant "until it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt." *Id.* at 1759. The trial court also instructed the jury that "the defendant is not required to prove anything." *Id.* at 1760. It further instructed that "[i]t is not necessary for the defendant to disprove anything nor is the defendant required to prove his innocence; it is up to the State to prove the defendant's guilt by evidence." *Id.* at 1762. Finally, the court stated that "[n]o juror should ever be concerned that the defendant did or did not take the witness stand to give testimony in this case." *Id.*

The Court finds that none of the prosecutorial comments challenged herein by Petitioner manifested either an attempt to comment on Petitioner's silence, or were such

that the jury would naturally and necessarily construe them as comments on Petitioner's silence. *Stuart–Caballero,* 686 F.2d at 892. Accordingly, and for the reasons expressed above, Claim XIV is without merit.

### CLAIM XV—IMPROPER PROS-ECUTORIAL COMMENT ON THE EVIDENCE

In Claim XV, Petitioner contends that the prosecutor's interjection of personal beliefs, repeated misrepresentation of the record, and references to extra-record evidence during closing arguments of the guilt/innocence phase deprived Petitioner of a fair and impartial jury and rendered his trial fundamentally unfair, in violation of the Sixth and Fourteenth amendments. Pet. at 194.

This claim originally was raised in Petitioner's first 3.850 Motion. The trial court denied the claim on September 22, 1986. PC–R5–827, R7–67. The Florida Supreme Court affirmed the decision the next day, without opinion. *Davis,* 496 So.2d 142. Therefore, and as noted previously with respect to certain other claims within this Petition, the Court finds that Claim XV has been exhausted, is not procedurally barred and is properly before the Court.

Petitioner contends that there are three broad categories of misdeeds and improper conduct attributable to the prosecutor. Each of the allegations pertain to the prosecutor's closing argument. First, the prosecutor made reference to non-record evidence. Second, the prosecutor repeatedly misrepresented the testimony of the state's witnesses. Finally, the prosecutor expressed his personal beliefs and opinions as to the veracity of the state's witnesses. Pet. at 196.

With respect to the non-record evidence, Petitioner challenges two pieces of evidence which he contends were never introduced but were referred to by the prosecutor. First, the prosecutor argued that there was duct tape on the ends of the rope which bound Kristina Weiler and that this tape matched the duct tape found in petitioner's truck. According to Petitioner, no mention was made of this duct tape in the government's case-in-chief. Secondly, Petitioner contends that the prosecutor "testified" that a little over a hundred dollars was missing from the victims' house. Petitioner contends that there was no evidence introduced that anything other than the Nikon camera was missing. Petitioner further contends that the state emphasized burglary as a motive for the crime and the underlying basis for its alternative felony murder argument.

With respect to the misrepresented testimony of state witnesses, Petitioner contends that Detective Ray Smith testified that Petitioner had told him he could not remember taking his father's gun off the refrigerator. Petitioner contends that the prosecutor's closing argument misstated Smith's testimony to be that Petitioner remembered taking the gun off the refrigerator. Petitioner also alleges that the prosecutor argued that the defense admitted during its closing argument that Petitioner had a firearm in his possession after the murders.[65] Petitioner further contends that the prosecutor misrepresented the testimony of Detective Kessinger concerning the clothing Petitioner was wearing on the night of the murders. Petitioner alleges that the prosecutor, in recalling Detective Kessinger's testimony, stated that Petitioner said he was wearing a light blue shirt, dark pants and maybe a tee shirt. Petitioner contends that Detective Kessinger's actual testimony was that Petitioner told him he was wearing a light blue work shirt and light blue work pants. Pet. at 201.

Finally, Petitioner argues that the prosecutor improperly injected expressions of his personal beliefs about the evidence. It is alleged that the prosecutor continually expressed his opinion as to the credibility of the state's witnesses. In addition to that substantive aspect of his claim, Petitioner also alleges that his counsel was ineffective for

---

65. The Court notes with interest that in Claim V, Petitioner contends that his trial counsel was ineffective for conceding during closing argument that Petitioner had a gun in his hand when he was observed by Ginny Baumgartner. How-ever, in Claim XV, the instant claim, Petitioner contends that defense counsel *made no such admission* during his argument. *See* Pet. at 50 and 200.

failing to object to the alleged prosecutorial misconduct. Pet. at 202–06.

Respondent contends that the duct tape to which the prosecutor referred was not in evidence, but that photographs of Petitioner's truck showed the duct tape and similar tape wrapped around the incriminating rope. Respondent alleges that since the photographs were in evidence, the prosecutor's comments went to admitted evidence. With regard to the prosecutor's comments regarding Detective Smith's testimony, Respondent contends that the prosecutor argued that Petitioner was equivocal about taking the gun. In addition, Respondent contends that the prosecutor's comments went to the "minute point" that Petitioner had contact with the gun, knowing how it was holstered atop the refrigerator. With regard to defense counsel's comment on the gun, Respondent contends that defense counsel said that at most, in his opinion, the evidence showed that Petitioner had a gun. Lastly, Respondent argues that the accusation that the prosecutor interpreted inconsistent testimony regarding Petitioner's attire in its favor is not objectionable. Finally, Respondent contends that the prosecutor properly defended attacks on the credibility of the state's witnesses. Resp. at 50–51.

As noted previously, the relevant question is "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. at 1871). "Moreover, the appropriate standard of review for such a claim on [a petition for a] writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly,* 416 U.S. at 642, 94 S.Ct. at 1871).

█ Several factors should be considered in evaluating prosecutorial misconduct in a habeas case: (1) the degree to which the challenged remarks have a tendency to mislead the jury and prejudice the accused; (2) whether the action was isolated or extensive; (3) whether the comments were deliberately or accidentally placed before the jury; and, except in the sentencing phase of capital murder trials, (4) the strength of the competent proof to establish the guilt of the accused. *Hance v. Zant,* 696 F.2d 940, 950 n. 7 (11th Cir.1983).

█ For a court to find prosecutorial misconduct, a prosecutor's remark must be both improper and prejudicial to a substantial right of a defendant. *United States v. Thomas,* 8 F.3d 1552, 1561 (11th Cir.1993); *United States v. Eyster,* 948 F.2d 1196, 1206 (11th Cir.1991). "'"Attempts to bolster a witness by vouching for his credibility are *normally* improper and error."'" *Eyster,* 948 F.2d at 1206 (quoting *United States v. Sims,* 719 F.2d 375, 377 (11th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984) (quoting *United States v. Ellis,* 547 F.2d 863, 869 (5th Cir.1977))). "Such attempts are *indeed* improper if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility." *Eyster,* 948 F.2d at 1206. "[T]he government cannot argue the credibility of a witness based on the government's reputation or allude to evidence not formally before the jury." *Id.*

█ "As to the second prong of the test for prosecutorial misconduct, remarks prejudicially affect the substantial rights of the defendant when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. at 1871). Improper argument rises to the level of a denial of due process when "there is a 'reasonable probability' that, but for the prosecutor's offending remarks, the outcome of the ... [proceeding] would have been different." *Kennedy v. Dugger,* 933 F.2d 905, 914 (11th Cir.1991) (quoting *Williams v. Kemp,* 846 F.2d 1276, 1283 (11th Cir.1988), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990)), *cert. denied,* — U.S. ——, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Williams,* 846 F.2d at 1283.

█ "The prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on

the reputation of the government office or on evidence not before the jury." *Eyster,* 948 F.2d at 1207 (quoting *United States v. Hernandez,* 921 F.2d 1569, 1573 (11th Cir.), *cert. denied sub nom. Tape v. United States,* 500 U.S. 958, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991)). In addition, implying the existence of additional evidence not formally before the jury severely impairs the likelihood of a fair trial. *Eyster,* 948 F.2d at 1207. Evidence comes from the witness stand, not from an attorney's mouth. *Id.*

However, "a prejudicial remark may be rendered harmless by curative instructions to the jury." *United States v. Simon,* 964 F.2d 1082, 1087 (11th Cir.1992) (quoting *United States v. Weinstein,* 762 F.2d 1522, 1542 (11th Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1854, 123 L.Ed.2d 476 (1993). Such a curative instruction "purges the taint of a prejudicial remark because 'a jury is presumed to follow jury instructions.'" *Simon,* 964 F.2d at 1087 (quoting *Adams v. Wainwright,* 709 F.2d 1443, 1447 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984)).

Before addressing Petitioner's specific allegations, the Court notes that prior to closing argument, the trial court instructed the jury that "the attorneys will now have the opportunity to present their final arguments to you. Please remember that what the attorneys say is not evidence." R12–1631. During its charge to the jury, the trial court stated: "It is to the evidence introduced upon this trial and to it alone that you are to look for that proof. A reasonable doubt as to the guilt of the defendant may arise from the evidence, a conflict in the evidence of the lack of evidence." *Id.* at 1760.

■ Petitioner contends that the prosecutor improperly referred to non-record evidence, namely duct tape and $100.00 missing from the victims' home. In reviewing photographs in evidence during closing argument, the prosecutor stated: "Notice on that front

seat, there is a shirt and there's some duct tape lying there, some gray duct tape and then if you look at the exhibit that is tied in with the hands of young Kristina, you look at Exhibit 36, the photograph, look what is around that rope; duck tape." R12–1705.

The Court finds that the photographs admitted into evidence of Petitioner's truck clearly show a roll of duct tape on the front seat. *See* State's Exhibit 30 (filed on June 8, 1992).[66] In addition, another photograph of Petitioner's truck shows a wooden box in the rear bed of the truck. The box contains rope with duck tape wrapped around a portion of it. *See* State's Exhibit 36 (filed on June 8, 1992). Although the duct tape itself was not introduced, the jury learned of its existence when the photographs were introduced into evidence. Therefore, the prosecutor's comments about the duct tape were not improper.

■ With respect to the missing $100.00, the Court finds that the prosecutor's statement was at best ambiguous, not improper. In recalling the testimony of John Weiler, the prosecutor stated: "He searched for the camera, he purchased the camera if you recall a little over a hundred dollars that is missing and do you know why that camera is significant? Because how would Richard Padon know about the home being burglarized had he not seen this camera?" R12–1731. The $100.00 mentioned appears to refer to the value of the camera, rather than some additional item (or cash) missing from the victims' home.[67]

■ As to Petitioner's attire, the Court similarly finds that the prosecutor's comments were not improper. The witnesses who testified that they saw Petitioner on the night of the murders each described Petitioner's attire slightly differently. The prosecutor stated: "[W]e know that's what he was wearing that night [a light blue shirt], ladies and gentlemen, because that's what those witnesses testified he was wearing when they saw him." R12–1687. The Court finds that

66. At the hearing held on April 27, 1992, Judge Black directed that photos of the evidence presented at trial be mailed directly to the Court.

67. The Court makes this finding despite John Weiler's testimony that he purchased the missing camera for approximately $220.00. R7–840.

**1564**

the prosecutor's remarks were not blatantly inaccurate, and that the jury had the capacity to remember the testimony for itself.

■ With regard to Petitioner's comments regarding his father's gun, the prosecutor stated:

> Use your common sense. If they wanted to lie about statements that Allen Lee Davis made, if they are exaggerating, why not say he admitted to committing the murders? But no, they were forthright with you, they were straightforward, they told you exactly what the defendant said. Yes, I remember taking the gun down off my father's refrigerator but I don't think I took it over there. I could have but my dad says it's missing but I just don't remember.

*Id.* at 1666. The prosecutor later stated:

> You listened to what Detective Ray Smith testified, the statement, and he said I took that gun down off of that refrigerator, I remember doing that. He took the gun. His dad's gun, that .357 Ruger Blackhawk off of the refrigerator and, furthermore, he said it was in a holster, which Detective Smith indicated he didn't know it had been in a holster, in a box or what-have-you on top of the refrigerator.

*Id.* at 1688–89. For a third time the prosecutor told the jury that Petitioner had taken the gun off of his dad's refrigerator. *Id.* at 1725. In his final reference to the gun, the prosecutor stated:

> It's also undisputed that Allen Lee Davis had access to his house, that, in fact, he was over there the night of the murders and I think, based on Detective Smith's testimony, ladies and gentlemen, and the lack of cross examination as to that specific statement, the defendant admits to taking that firearm off of that refrigerator and taking it over, he doesn't remember taking it over to the house but he took it over there.

*Id.* at 1738. Detective Smith testified that Petitioner responded to his question about the gun on top of the refrigerator in a box by stating: "[T]he gun was in a holster on top of the refrigerator at my father's house." R10–1215. When asked if he took it to the vic-

tims' house, Petitioner responded, "I don't remember. I could have. My father says it's missing." *Id.*

The Court finds that the prosecutor's statements regarding the gun were not improper. Although it initially appears as if the prosecutor, in his final statement about the gun, indicates that Petitioner admitted taking the gun to the victims' house, he did clarify his comment by stating that Petitioner stated he did not remember taking it over to the victims' house. The prosecutor simply argued to the jury that Petitioner took the gun over to the victims' house. The Court finds that the prosecutor's remarks were not inaccurate or improper.

With respect to the prosecutor's alleged comments regarding the veracity of the state's witnesses, the Court finds that the comments were in response to defense counsel's prior statement to the jury. Defense counsel told the jury that in considering whether the evidence presented is reliable, they should consider nine factors: (1) how the witness acted as well as what he or she said; (2) did the witness have an opportunity to see and know about the things which he or she is testifying about; (3) did the witness have an accurate memory; (4) was the witness honest and straightforward in answering the attorney's questions; (5) did the witness have an interest in the case; (6) did the witness' testimony agree with the testimony of other witnesses or established facts; (7) has the witness been offered or received any preferential treatment; (8) did the witness at some other time make a statement that is inconsistent with his testimony in court; and (9) has the witness ever been convicted of a crime. R12–1640–41.

■ The Court finds that the prosecutor's comments regarding the veracity of the State's witnesses, although enthusiastic, did not cross the bounds of impropriety. Even if the Court found that the prosecutor's remarks were improper, the Court cannot find that the remarks had a prejudicial affect on the substantial rights of Petitioner. *See Thomas,* 8 F.3d at 1561; *Eyster,* 948 F.2d at 1206. The trial court carefully instructed the jury that the attorneys' arguments were not evidence, but were simply intended to aid the

jurors in their understanding of the case. R12–1631.[68]

Accordingly, and for the reasons expressed above, the Court finds that Claim XV is without merit.

### CLAIM XVI—VIOLATION OF BRADY v. MARYLAND

In Claim XVI Petitioner claims that he was deprived of due process when the state suppressed material evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). His conviction, therefore, is alleged to be in violation of the Sixth, Eighth and Fourteenth Amendments. Pet. at 207. Respondent alleges that the suppression accusation is not true, and that the material in dispute was not *Brady* material. Resp. at 51, 52.

This claim originally was raised in Petitioner's first 3.850 Motion, all claims in which Motion were denied by the trial court on September 22, 1986. PC–R5–827, R7–67. The Florida Supreme Court affirmed the decision the next day, without opinion. *Davis*, 496 So.2d 142. Therefore, the Court finds that Claim XVI has been exhausted, is not procedurally barred and is properly before the Court.

■■■ In *Brady* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197. The purpose of this rule is "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). In a footnote to that quote, cited by Petitioner, the Court further articulated the rationale for the rule:

By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). See *Brady v. Maryland*, 373 U.S. at 87–88, 83 S.Ct. at 1197.

*Bagley*, 473 U.S. at 675 n. 6, 105 S.Ct. at 3380 n. 6. Thus, to establish a *Brady* claim, Petitioner must prove all of the following elements: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to Petitioner or exculpatory; and (3) that the evidence was material to the issues at trial. *Nelson v. Nagle*, 995 F.2d 1549, 1555 (11th Cir.1993); *Aldridge v. Dugger*, 925 F.2d 1320, 1325 (11th Cir.1991).

■■■ Petitioner claims that the prosecution withheld exculpatory evidence from defense counsel which could have been used to impeach a key prosecution witness, in violation of the *Brady* rule requiring disclosure of such information. The evidence which Petitioner claims was suppressed was a police report prepared by Detective Kessinger, purporting to be a verbatim description of a conversation between Detective Starling and Davis, which report states:

DETECTIVE STARLING: "If Allen wanted to conceal a pistol on his person, where would he have concealed it, assuming it was a .357?"

ALLEN DAVIS: "It would be too big to put in your pocket, so probably under your t-shirt in your waist band."

Pet.App. at 2.

Contrary to the account of the discussion contained in the report, Detective Starling testified at trial:

---

**68.** During its charge to the jury, the court reminded the jurors to rely upon their own conclusions about the witnesses. *Id.* at 1761. The court also told the jurors that "this case must be decided only upon the evidence that you have heard from the answers of the witnesses and

have seen in the form of exhibits in evidence and these instructions.... Your verdict must be based on your views of the evidence and on the law contained in these instructions" *Id.* at 1763, 1764.

I said, 'Mr. Davis, assuming you were going to carry a pistol on your person, where would you carry it?'

He said, 'Assuming it was a .357, it would be too big to stick in my pocket. I would probably put it in my waistband underneath my T-shirt,' and at no time had I mentioned any particular caliber of gun to him. I just referred to it as a pistol. He replied .357, assuming it was a .357. R10–1234.

In any event, and contrary to the assertions made in the Petition, the prosecution did not withhold the above-referenced report (App.Q) from Petitioner. Prior to trial, Detective Kessinger was deposed by Davis' defense counsel. In that deposition, Kessinger read—verbatim—the portions of his report which Petitioner now claims were withheld in violation of *Brady*. *See* Deposition of Charles Kessinger at 116 (filed June 8, 1992 as exhibit to Petition). Thus, this alleged *Brady* material was available to defense counsel prior to trial.

While Petitioner has dutifully and accurately set forth the law applicable to such a claim, the facts clearly do not make out any violation of *Brady v. Maryland*. There is, therefore, no merit to Claim XVI.

### CLAIM XVII—USE OF FALSE TESTIMONY AT TRIAL

In Claim XVII Petitioner contends that he was deprived of due process when the state presented false testimony at his trial, resulting in a conviction in violation the Sixth, Eighth and Fourteenth amendments. Pet. at 215.

This claim originally was raised in Petitioner's first 3.850 Motion, which was denied by the trial court on September 22, 1986. The Florida Supreme Court affirmed this decision. *Davis*, 496 So.2d 142. As noted previously with respect to other claims, the Court finds that this claim has been exhausted, is not procedurally barred and is properly before the Court.

Petitioner contends that his conviction was obtained through the use of false testimony, which testimony played a critical part in his conviction and death sentence. He alleges that the state introduced the testimony of Detective Starling in an effort to bolster the testimony of Ginny Baumgartner, who testified to having seen Petitioner in the neighborhood on the evening of the murder with a gun in his hand. Petitioner contends that Detective Starling's testimony was false. Petitioner supports this contention by pointing to an investigative report prepared by Detective Kessinger on May 25, 1982 (App.Q), which contains a different account of Detective Starling's conversation with Petitioner.

It is further alleged that during discovery the state provided the defense only with portions of Detective Kessinger's report, and chose not to provide those portions of the report that contain the alleged exculpatory statements. The state allegedly failed to alert the defense to the contradiction between Detective Starling's deposition testimony and Detective Kessinger's report. Petitioner alleges that the state's failure to correct the patent falsehood renders the conviction a violation of due process.

Respondent contends that the "suborned perjury" is nothing more than the existence of an inconsistency in two police reports. The state argues that Detective Kessinger's report is merely a hearsay account of a conversation between Detective Starling and Petitioner. Detective Kessinger was not a witness to the conversation, and his report does not prove that Detective Starling's testimony was false. Respondent further contends that Petitioner has failed to demonstrate how the prosecution should have known that Detective Kessinger's report was correct and Detective Starling's account was incorrect.

Finally, Respondent argues that defense counsel took the deposition of Detective Kessinger prior to trial. During that deposition, Detective Kessinger's report, as it relates to Petitioner's conversation with Detective Starling, was discussed. Therefore, the alleged contradiction was known to Petitioner prior to trial. Resp. at 52–53.

█ A conviction obtained by the "knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judg-

ment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The knowing use of false testimony to obtain a conviction violates due process "regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared." *Bagley,* 473 U.S. at 679 n. 8, 105 S.Ct. at 3382 n. 8 (construing *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The principle that a state may not use false testimony to convict an individual is "implicit in any concept of ordered liberty." *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177.

Detective Starling testified in his deposition that during his conversation with Petitioner the following dialogue occurred:

> I said, 'Where is the pistol?' He said, 'I don't have any pistol.' I said, 'Assuming you were going to carry a pistol on your person, where would you carry it?' He said, 'Assuming it was a .357—' I did not suggest to him a .357. He said, 'Assuming it was a .357, it would be too big to go in my pocket, so I'd probably carry it under my T-shirt in the waistband.'

Deposition of David Leroy Starling at 26 (filed on June 8, 1992 as exhibit to Petition). Detective Starling's testimony at trial was practically identical to the testimony he gave at the deposition regarding his conversation with Petitioner and the caliber of the gun. *See* R10–1234 and the discussion of Claim XIV, *supra.*

During his deposition, Detective Kessinger quoted nearly verbatim from the police report (App.Q):

> Detective Starling: "If Allen had wanted to conceal a pistol in [sic] his person, where would he have concealed it, assuming it was a .357?"
>
> Allen Davis: "It would probably [sic] be too big to put in your pocket, so probably under your [t]-shirt, in your waistband."

Deposition of Kessinger at 116.

■■■ The Court finds that Petitioner has failed to substantiate his allegation that his conviction was obtained through the use of false testimony. Detective Starling's courtroom testimony was consistent with his deposition testimony. The fact that Detective Kessinger's recantation of a conversation between Detective Starling and Petitioner was "at odds" with Detective Starling's sworn testimony regarding the conversation does not prove that Detective Starling's testimony was false. Furthermore, as noted previously, the Court finds that defense counsel was aware of Detective Kessinger's version of the conversation in question prior to trial. Petitioner has failed to establish that the state presented false testimony at trial. Claim XVII is without merit.

### CLAIM XVIII—IMPROPER REFERENCE TO POLYGRAPH

In Claim XVIII Petitioner contends that a reference by a state witness to a polygraph examination of Petitioner deprived him of the presumption of innocence to which he was constitutionally entitled by the Due Process Clause of the Fourteenth Amendment. This claim originally was raised in Petitioner's direct appeal. The Florida Supreme Court denied the claim, on its merits, on October 4, 1984. *Davis,* 461 So.2d at 70. Therefore, Claim XVIII has been exhausted and is properly before the Court.

Petitioner refers herein to the testimony of the state's witness Donald Davis, Petitioner's father. In the course of his testimony, the elder Davis was asked by the prosecutor whether Petitioner left to go to the police station "freely or voluntarily." The witness responded:

> Yes he did.... I heard him tell Kessinger, "Let's go take a lie detector test and get it over with."

R10–1271. Defense counsel immediately moved for a sidebar. *Id.* At sidebar, defense counsel objected to the introduction of that statement. The court did not find that this constituted grounds for a mistrial, but subsequently instructed the jury to "disregard the last statement of the witness on regard to a lie detector." R10–1275.

Petitioner contends that the fact that a sidebar conference was held at the request of defense counsel "could only *reinforce* the inference that Mr. Davis must have failed the

test." Pet. at 226. In addition, the judge's admonition to the jury was "completely ineffectual to cure the prejudice" to Petitioner's case, since there was a strong implication from the father's testimony that the subject of a lie detector test had been discussed, and that the suggestion to take one also had been made by Detective Kessinger, who had previously testified. Petitioner further contends that the jury could have inferred that after Petitioner failed the test and the officers made it clear they did not believe him, that Petitioner "kept digging himself in deeper and deeper." Pet. at 228–29.

Petitioner also revisits his earlier arguments regarding pretrial publicity and the manner in which voir dire was conducted. He contends that it is possible that at least one of the jurors knew that he had failed the polygraph, and if that fact had been forgotten, the juror's memory now was refreshed. Petitioner contends that under the circumstances of this case, there is a strong likelihood that members of the jury either: (1) reasonably inferred from Donald Davis' reference to a lie detector test, (2) recalled, as a result of the witness' reference, coupled with their exposure to media coverage, or (3) knew all along from the media, that Petitioner failed a polygraph test, thus depriving Petitioner of the presumption of innocence to which he was constitutionally entitled. Pet. at 23–32.

Respondent contends that it did not introduce any evidence that Petitioner took, passed, or failed any polygraph examination, and that no witness introduced the results of any polygraph test or ever told the jury that such a test was administered to Petitioner. All the jury heard was that Petitioner offered to take a test. If anything, Respondent argues, the testimony was exculpatory since it

manifested innocence rather than guilt. In addition, Respondent contends that the federal constitution does not prohibit the use of polygraph evidence, and that there is some disparity about its use among the circuits.[69]

Respondent also submits that this claim does not present a federal question subject to habeas review, citing *Estelle v. McGuire*, —— U.S. ——, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), for the proposition that federal courts are not interested, or able, to rule on issues relative to the admission of evidence under state law. *Estelle* reiterated the well established principle that habeas review by a federal court is limited to "whether a conviction violated the Constitution, laws or treaties of the United States." —— U.S. at ——, 112 S.Ct. at 480.

■■ *Estelle* does not bar consideration of the instant claim. Petitioner is not making an objection to an evidentiary ruling by the trial court, but is alleging a claim of federal constitutional dimension, in that the reference to the lie detector test purportedly stripped him of his constitutionally guaranteed presumption of innocence. Virtually no state court evidentiary ruling can form the basis for a claim cognizable in a section 2254 proceeding. However, where a state court's action is alleged to have violated the federal constitution—and this is precisely what Petitioner alleges—a federal court conducting habeas review clearly is not precluded from considering such a claim.

■■ Nevertheless, having independently reviewed all relevant portions of the trial transcript, the Court cannot conclude that there was any violation of federal constitutional magnitude. The Court is inclined to agree most strongly with the findings and conclusion of the Florida Supreme Court that

---

**69.** In the en banc decision *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir.1989), the Eleventh Circuit reexamined its per se rule of exclusion, and fashioned new principles to govern admissibility of polygraph evidence. While recognizing that polygraphy is a developing and inexact science, and its admission inappropriate in some situations, the court of appeals also recognized that in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable tool. *Id.* at 1535. In determining the appropriate guidelines for its

admission, the court balanced the need to admit all relevant evidence, with the danger that the admission of the evidence will be unfairly prejudicial. *Id.*

Though highly enlightening, *Piccinonna* has no applicability to the instant case. That court of appeals decision, which dealt with the admissibility of polygraph evidence under Fed.R.Evid. 702, has no bearing on the admissibility of such evidence in state court, even state courts within this federal judicial circuit.

the "mere mention of the possibility of a polygraph examination does not compel the granting of a new trial." *Davis*, 461 So.2d at 70. This Court would add that the mere mention of a polygraph examination does not compel a finding that the Constitution was violated. Furthermore, even assuming some violation occurred, the trial court's admonitory instruction "cured any problem with this witness' inadvertent reference to a polygraph examination." *Id.*

The Court also agrees with Respondent that the witness' reference to Petitioner's voluntary offer to take a polygraph examination is more exculpatory in its impact than inculpatory. Moreover, the simple fact is that the state's witness overheard Petitioner *offering* to take a lie detector test. There was no indicia placed before the jury at that time—not even by virtue of defense counsel's moving for a sidebar—which indicated that such a test ever occurred.

Petitioner's constitutional guarantee of a presumption of innocence was not violated by the facts contained within Petitioner's allegations in Claim XVIII, which, accordingly, is without merit.

### CLAIM XIX—IMPROPER SENTENCING ARGUMENT

In Claim XIX Petitioner alleges that the prosecutor's "inflammatory, emotional, and thoroughly improper argument to the jury at sentencing" rendered Petitioner's sentencing proceeding and resultant death sentences fundamentally unfair and unreliable, and that trial counsel was ineffective for allowing the argument, all in violation of the Sixth, Eighth and Fourteenth amendments. Pet. at 232.

This claim originally was raised in Petitioner's first 3.850 Motion. The trial court denied the claim on September 22, 1986, PC–R5–827, R7–67, and the Florida Supreme Court affirmed the decision the next day, without opinion. *Davis*, 496 So.2d 142. Therefore, the Court finds that Claim XIX has been exhausted, is not procedurally barred and is properly before the Court.[70]

Petitioner argues that "this case presents an egregious example of prosecutorial overreaching in an attempt to obtain a death sentence." Pet. at 232. Essentially, it is alleged that the prosecutor's improper closing argument during the penalty phase resulted in a death sentence that was unreliable, in violation of the Eighth Amendment, and deprived Petitioner of a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment. Furthermore, defense counsel's failure to object to the prosecutorial misconduct allegedly deprived Petitioner of the effective assistance of counsel, in violation of the Sixth Amendment. Respondent contends that the prosecutor's penalty phase argument was "perfectly proper"; that defense counsel did object to certain argument by the prosecutor; and that defense counsel's own argument was "highly improper." Resp. at 56.

 As discussed above with respect to other related claims of Petitioner, the relevant question is whether the prosecutor's closing argument "rendered the sentencing phase of [his] trial 'so fundamentally unfair as to deny him due process.'" *Nelson*, 995 F.2d at 1555 (quoting *Wilson v. Kemp*, 777 F.2d 621, 623 (11th Cir.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986)). It is not the duty of the federal habeas court "to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair." *Brooks*, 762 F.2d at 1400. "[E]rrors, even serious errors, will not require reversal on a petition for writ of habeas corpus unless their absence would have, in *reasonable probability*, changed the outcome." *Id.* at 1401 (emphasis added); *see also Bowen v. Kemp*, 769 F.2d 672, 679 (11th Cir.1985) ("law is clear that habeas relief will not be given for improper prosecutorial arguments unless those arguments rendered the sentencing proceeding 'fundamentally unfair'") (citations omitted), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).

---

**70.** For reasons unknown to the Court, Petitioner has included Claim XIX twice in the Petition, first at pp. 232–48, and then at pp. 248–66. The arguments set forth in each, however, are the same, and contain nearly identical wording. There are some discrepancies, and the Court has considered *all* arguments raised therein.

"A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional. Thus, a precondition to examining the probable effect of improper closing argument on the jury is an understanding of the scope of permissible prosecutorial argument." *Brooks,* 762 F.2d at 1403. "The propriety of argument rests primarily in the relation of its content to issues relevant to the sentencing jury's [or judge'] concern." *Id.* at 1405.

A prosecutor may argue matters relevant to the capital sentencing decision. "The subject most relevant to the choice of punishment is the broad class of information about the defendant, his character, and the circumstances of his offense made known to the jury throughout the bifurcated trial." *Brooks,* 762 F.2d at 1406. "A line of cases has also made clear that the sentencing body may consider the future dangerousness of a particular defendant." *Id.* Another area of consideration is the "accepted penological justifications for the use of death as a punishment. These general justifications are retribution and deterrence." *Id.* at 1407.

In addition to these general areas of appropriate argument, a Florida prosecutor may also argue the specific considerations relevant to the Florida capital punishment decision. In a Florida sentencing hearing, "[e]vidence may be presented on any matter the judge deems relevant to sentencing and must include matters relating to certain legislatively specified aggravating and mitigating circumstances." *Proffitt v. Florida,* 428 U.S. 242, 248, 96 S.Ct. 2960, 2965, 49 L.Ed.2d 913 (1976). "Both the prosecution and the defense may present argument on whether the death penalty shall be imposed." *Id.*

The Court will examine each of the challenged arguments to determine whether they were improper and, if so, whether they "so infected the trial with unfairness as to make the resulting [sentence] a denial of due process." *Donnelly,* 416 U.S. at 643, 94 S.Ct. at 1871.

■ Petitioner claims that the prosecutor improperly applied the "imprimatur" of the legislature and the courts to the application of the death penalty in this case. The prosecutor asserted that the Florida legislature had enacted the death penalty and that the courts have held this punishment to be constitutional. R12–1810–11. These two arguments simply were statements of fact, i.e., that the death penalty was sanctioned by the State of Florida and by the United States Constitution. There was no intimation in these arguments that the legislature or the courts had passed on the merits of the particular case before the jury, namely, Petitioner's case. There is nothing improper with a prosecutor describing to a jury the means by which laws are enacted, and there certainly is nothing improper in informing a capital sentencing jury that one of their options for punishment comports with the Constitution.

■ More critically, Petitioner challenges the prosecutor's alleged assertion that the Florida legislature specifically designed the death penalty for this *kind* of case. The challenged argument is as follows:

They all—the legislature in the course of their duties selected carefully for the kind of a crime that they wanted jurors to consider the death penalty for and they picked words that you can identify with in defining this crime and they picked the perfect words in this case because absolutely we have proved beyond and to the exclusion of every reasonable doubt that this crime was wicked, evil, atrocious and cruel.

*Id.* at 1817–18.

Understood in the context of the overall argument—as this and most such comments should be analyzed—the challenged argument occurred as the prosecutor was defining and applying to the case each of the statutorily defined aggravating circumstances. As such, the argument did no more than explain the *concept* of aggravating circumstances, and that they applied to the instant case. This argument clearly was relevant to the sentencing jury's decision and was not presented in an improper manner to the jury.

■ Petitioner also challenges the following "melodramatic passage":

We have reached a new level of criminality. We are at a different level in this case,

a new low in the barbaric senseless murder of a mother and two innocent children in their own home, in their own nest, not bothering a soul, going about their business and being senselessly murdered. Children of tender years. It's a base new low kind of criminality. It's unique in criminality. It's that horrible, it's that horrible.

R12–1809. The prosecutor also argued that "[i]f you don't exact the death penalty in this case, there's no case where it will ever be," since there had "never been a more horrible crime in Duval County or anywhere else." *Id.* at 1829.

This claim is similar to a challenge made in both *Brooks,* 762 F.2d at 1410, and *Tucker v. Kemp,* 762 F.2d 1480, 1484 (11th Cir.1985), although Petitioner does not allude to either case in this respect. In those cases Georgia prosecutors had argued to their respective juries that the death penalty was very rarely sought by the district attorney. In each instance, the en banc court of appeals held such an argument to be improper. "Such comments, made by an experienced prosecutor, may alter the jury's exercise of complete discretion by suggesting that a more authoritative source has already decided the appropriate punishment." *Tucker,* 762 F.2d at 1484. The argument here clearly does not rise to the level of the *Tucker* or *Brooks* arguments in that it did not directly compare this crime to other crimes in which some "more authoritative source"—i.e., the State Attorney for the Fourth Judicial Circuit— has determined the efficacy or propriety of the death penalty. Arguing that the crime in this case was particularly deserving of the death penalty is not equal to a discussion of a prosecutor's infrequency of seeking death, and is not improper argument.

■ Petitioner also claims that the prosecutor improperly argued that the death penalty was the only way society could "express its indignation and outrage." R12–1828. How could society otherwise do so "if it doesn't do it in a case like this by demanding death?" the prosecutor asked. The United States Supreme Court and the Eleventh Circuit have held that "jury consideration of the appropriateness of retribution in the particu-

lar case is both proper and inevitable." *Brooks,* 762 F.2d at 1407 (citing *Gregg v. Georgia,* 428 U.S. 153, 184–87, 96 S.Ct. 2909, 2930–32, 49 L.Ed.2d 859 (1976)). The Court finds that this challenged argument is an appropriate reminder to the jury of one of the penological justifications for the death penalty, and that this argument was not improper. Such argument is "logically relevant to the jury's proper task." *Brooks,* 762 F.2d at 1407.

■ Petitioner further claims that the prosecutor, at differing times, referred to him as a "monster," "three-hundred-and-fifty-pound bully" or "creature," R12–1807,-1817,1828,1829,1830, and compared him to the "beautiful bodies" of the victims. Though perhaps insensitive to Petitioner's feelings or apparent obesity, this was not improper argument.

■ Petitioner also claims that the prosecutor interjected his "personal opinion" concerning the credibility of the state's witnesses. The prosecutor, referring to the testimony of witnesses Kessinger, Smith, Miller, Warniment and Henson, stated that "they have done their duty and done it very, very well. As a matter of fact, brilliantly. Brilliantly." *Id.* at 1826. The prosecutor was not setting forth personal beliefs, but merely arguing to the jury that if they considered all this testimony, there would be "no doubt the way the pieces fit that that was the gun, the type of gun that was used." *Id.* It is not improper for a prosecutor to urge the jury to accept the testimony of the state's witnesses. Similarly, it is not improper for a prosecutor to allude during closing argument to "pieces" of the prosecutor's burden, and that the testimony of the witnesses—considered together—shows that the pieces now "fit."

■ Petitioner also claims that the prosecutor implied that defense counsel "did not believe in his client's innocence or human worth any more than does the prosecutor." Pet. at 239. The prosecutor stated that following:

[Defense counsel] didn't have too much to work with; as a matter of fact, when it comes down to the bottom line, he didn't have anything to work with but he did his

duty to defend his client under our system of justice. He did it very ably and he did it the best he could.

R12–1827. It is unclear to the Court how this statement could have created in the jury the impression that defense counsel did not believe his client was innocent. Mere allusion to another lawyer's "duty"—even when that lawyer is an appointed criminal defense attorney—is not a prompt to the jury to disbelieve any notion that the other lawyer believes in his client's cause. In any event, the prosecutor simply was arguing that Petitioner had no case, but that his attorney nevertheless performed "the best he could" on his client's behalf. This was not improper argument.

■■■ Petitioner also objects to the prosecutor's "blatant appeals to the jury's societal duty, as citizens, to maintain law and order," and the "passion ignited by [this] emotional diatribe." Pet. at 239. The fact that an argument by a prosecutor "has emotional overtones does not independently indict it as improper." *Brooks,* 762 F.2d at 1405. Specifically, though, "deterrence is a valid rationale for the imposition of the death penalty." *Drake v. Kemp,* 762 F.2d 1449, 1460 (11th Cir.1985) (en banc) (citing *Gregg,* 428 U.S. at 184–87, 96 S.Ct. at 2930–32), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986).

■■■ The prosecutor stated that "every society has to have the ability to police, ability to control the lawlessness, to maintain order." R12–1810. This quote—cited by Petitioner—was part of the prosecutor's discussion about the enactment of the death penalty, and the legislature's goal of deterring the crimes to which that punishment would apply. The Court already has concluded that those remarks were not improper.

Later, as Petitioner notes, the prosecutor stated that "death is an awful subject," but "we live in a society that says that an American citizen, citizens of Florida, citizens of Jacksonville, have a right to be in their homes, have a right to be secured, to be safe." *Id.* at 1828. Similarly, there is nothing improper in those remarks.

■■■ In a less relevant subclaim, referring to the fact that the closing argument was performed by Ed Austin, then "the" State Attorney for the Fourth Judicial Circuit, Petitioner alleges that Austin's position as chief prosecutor was improperly stressed during voir dire, and that his argument "was deliberately, powerfully, and admittedly aimed at getting the jury" to vote for death. Pet. at 240–41. Essentially, Austin "was not satisfied with a recommendation based on reasoned and rational deliberation." *Id.* at 241.

This claim is meritless and warrants little discussion. Austin's position was alluded to by both defense counsel and prosecutor during voir dire to elicit from prospective jurors whether they would approach the case the same way knowing that Austin would be participating. There was nothing wrong with such questions. Insofar as Petitioner appears to be griping—ten years later—about the fact that the chief prosecuting officer participated in his prosecution, this is not a claim a federal court can or should entertain in a Petition for a Writ of Habeas Corpus. In any event, the Court declines to delve into the policies of the Fourth Judicial Circuit concerning the State Attorney's personal participation in that office's prosecutions.

Returning generally to the substantive claims concerning the sentencing arguments, Petitioner appears to not grasp the plain fact that the above-cited passages were *argument* made at the close of the sentencing phase. In any court, argument is not a "free pass" for an attorney to spew forth bombast or rhetoric wholly unrelated to the evidence and testimony introduced in the just-completed proceeding. Indeed, in the context of a criminal prosecution, and in particular a capital case, the Supreme Court and the Eleventh Circuit have set forth explicit standards which attempt to define the limits of such argument and, where necessary, provide remedy for prosecutorial misconduct in that regard.

This Court has considered all such relevant guidelines in formulating its decision herein. Nonetheless, it must be stated that closing argument—in the sentencing phase there is

only one set of statements made to the jury, namely, the argument at the close of evidence—is the only opportunity the defense attorney or prosecutor has in which he fairly may "argue," that is, demonstratively attempt to influence, convince and inspire the jury to reach a particular result, in light of the evidence received and the applicable law. This is an elementary and fundamental component of any adversary proceeding. In a criminal case, where there has been no violation of the stated norms of propriety, the closing argument will not serve as a basis for habeas relief. As noted above, none of the instant argument to which Petitioner alludes demonstrates improper closing argument.

Accordingly, those portions of Claim XIX asserting improper sentencing argument by the prosecutor are without merit.

 As to the conduct of defense counsel, who is alleged to have "tacitly approv[ed]" of the prosecutor's remarks, Petitioner has failed to demonstrate either error or prejudice. As Petitioner himself notes, defense counsel did make the following objection, after the jury retired to begin its penalty phase deliberations:

I object, Your Honor, that during the course of argument of the State, that there was comment made that I would submit, Your Honor, is in violation of the Golden Rule and that is there was comment as best I can remember, can you imagine the fear ... can anyone imagine the fear and then going on as to Nancy Weiler and I submit, Your Honor, I object to those comments.

R12–1847. The trial court denied the objection. Defense counsel made no other objections concerning the prosecutor's closing argument, and none had been made during the argument.

What defense counsel did do, however, was present his own argument to the jury. While argument is not immune from contemporaneous objection, an attorney may in the exercise of trial strategy choose to wait until his turn to argue to let the jury know of his disapproval of the other attorney's argument. After all, while generally made in the presence of the jury, an objection is made to the trial *court*, not to the jury itself. Argument, on the other hand, is an attorney's *direct communication with the jury*, indeed the only time during the sentencing phase of a capital case an attorney may so communicate.[71] As noted above, given that the prosecutor's remarks cannot fairly be interpreted as being objectionable, the Court finds that it was not unreasonable for defense counsel to not object during the prosecutor's argument, and to instead wait his turn to argue.

Considering the entirety of defense counsel's argument, *id.* at 1831–39, it is clear that defense counsel made efforts to counter the assertions made the prosecutor. Tassone stated, inter alia, that "bias, prejudice or sympathy have no place in your deliberations," *id.* at 1831;[72] that "emotion has no place in your deliberations," *id.* at 1833; that "putting Allen Lee Davis to death cannot replace [the Weilers] lives nor could it ever begin to compensate for the loss of those lives," *id.*; that "no amount of punishment, no pretense of justice, flag-waving, could ever replace those lives," *id.* at 1834; that the actions "are not indicative of an individual who understands the difference between right and wrong," *id.* at 1835; that "there's nothing that we human beings can do to erase that grief [of the family and friends]," *id.* at 1836; that the punishment Petitioner should receive "is that he should live in a eight-foot-by-six-foot cell for the remainder of his natural life and to relive his past actions every moment that he is in that cage," *id.* at 1838; that "there is very little good that can be found in death," *id.*; that "you have an opportunity to tell this community that taking the life of Allen Lee Davis is neither moral nor just," *id.* at 1838–39; and

---

71. In the sentencing phase, there is no opening statement, as compared to the guilt phase of a Florida capital trial—indeed, in any Florida criminal case—where defense counsel potentially has *three* opportunities to speak directly to the jury.

72. Tassone's statement in this respect echoed the court's earlier admonition to the jury that "feelings of bias, prejudice or sympathy ... should not be discussed by any of you in any way." *Id.* at 1763–64.

that "sufficient circumstances do not exist to justify his being put to death," *id.* at 1839.

Considering "all the circumstances," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065, the Court finds that Tassone's failure to object to the state's argument at the sentencing phase was not unreasonable or unprofessional conduct. Even assuming that the Court were to conclude that Tassone rendered ineffective assistance in this regard, Petitioner is unable to demonstrate prejudice resulting therefrom. As the Court previously has reviewed Petitioner's substantive claims of impropriety in the prosecutor's argument and found each of these claims to be sufficiently wanting in merit, Petitioner has failed to establish that the result of the sentencing proceeding would have been different had Tassone objected to that argument.

Accordingly, that portion of Claim XIX asserting ineffective assistance of defense counsel is without merit.

### CLAIM XX—VIOLATION OF HITCHCOCK AND PRE-DECESSOR CASES

In Claim XX Petitioner alleges that his death sentence violates *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and related cases, in that the sentence "resulted from the constitutionally improper restriction on the consideration of nonstatutory mitigating factors, and a constrained interpretation of the statute employed by the participants ... in these proceedings." Pet. at 266. In particular, the trial court allegedly "constrained itself from considering matters which mitigated against a sentence of death but which were not 'enumerated' in the restrictive statutory list." *Id.*

Following the remand from the court of appeals, *Davis*, 829 F.2d 1513, Petitioner's first Petition for a Writ of Habeas Corpus was dismissed without prejudice because the Court found that the *Hitchcock* claim "was not fairly presented to the state courts." *Davis v. Dugger*, 703 F.Supp. 916, 920 (M.D.Fla.1988). In that Order, Judge Black specifically found that dismissing the claim for exhaustion in state court was appropriate because of the "possibility that judicial find-ings of fact would be required to dispose of the *Hitchcock* claim." *Id.* at 921.

Petitioner subsequently filed his second 3.850 Motion in the state trial court. Claim I in that Motion was the *Hitchcock* claim. PC2–R1–7–15. Following oral argument, the trial court issued a summary order denying the Motion in its entirety, specifically stating that "Claim I (the "Hitchcock" Claim), is denied on the merits." *Id.* at 134–35. In a slightly lengthier memorandum order, the Florida Supreme Court affirmed the trial court's order, finding that "the *Hitchcock* issue has no merit and that the other issues are procedurally barred." *Davis*, 589 So.2d at 898 (footnote omitted). Accordingly, Claim XX of the instant Petition has been exhausted in the state courts, is not procedurally barred and is properly before the Court for a disposition on its merits.

### A. HITCHCOCK CLAIM

 Under the Eighth and Fourteenth Amendments, a sentencing body "may not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); *see also Hitchcock*, 481 U.S. at 398–99, 107 S.Ct. at 1824; *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113–14, 102 S.Ct. 869, 876, 71 L.Ed.2d 1 (1982). A *Hitchcock* violation "is based upon a *Lockett* violation." *Bolender*, 16 F.3d at 1567. *Hitchcock*, in turn, has breathed "new vitality" into claims based on exclusion of nonstatutory mitigating factors in Florida capital cases. *Id.* (quoting *Hargrave v. Dugger*, 832 F.2d 1528, 1533 (11th Cir.1987) (en banc), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989)).

" '*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentenc-

ing decision at all.'" *Johnson v. Texas,* —— U.S. ——, ——, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (quoting *McKoy v. North Carolina,* 494 U.S. 433, 456, 110 S.Ct. 1227, 1240, 108 L.Ed.2d 369 (1990) (Kennedy, J., concurring)).

It is not enough "simply to allow the defendant to present mitigating evidence to the sentencer." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989). The jury "must be *able* to consider and give effect to any mitigating evidence *relevant* to a defendant's background, character, or the circumstances of the crime." *Id.* at 328, 109 S.Ct. at 2951 (emphasis supplied). This is to "ensure 'reliability in the determination that death is the appropriate punishment in a specific case.'" *Id.* (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)).

Nevertheless, the Court must state from the outset exactly what these cases do *not* require the sentencer to do. As Justice Kennedy noted in *McKoy, supra,* there are limits to what *Lockett* and its progeny require. These cases require that a defendant be allowed to present all mitigating evidence and that the sentencer not be precluded from *considering* this evidence. However, they "do not require that the sentencing body *accept* the conclusion that the evidence constitutes a mitigating circumstance or that the mitigating circumstances outweigh the aggravating circumstances." *Harich v. Wainright,* 813 F.2d 1082, 1101 (11th Cir.1987), *incorporated by reference, Harich,* 844 F.2d at 1468–69.[73] In other words, the Constitution requires only that the sentencer *consider* nonstatutory factors, not that he accept them. *Atkins v. Singletary,* 965 F.2d 952, 962 (11th Cir.1992). Consideration of such factors is "sufficient to satisfy the dictates of the Eighth Amendment." *Blystone v. Penn-*

sylvania, 494 U.S. 299, 308, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990).

Therefore, in the instant case, Petitioner must establish by a preponderance of the evidence either that the jury was instructed not to consider—and therefore could not consider—nonstatutory mitigating evidence, *or* that the trial court limited itself solely to a consideration of statutory factors in fashioning its sentence.

▇▇▇▇ To determine whether or not the advisory jury or sentencing judge has failed to consider mitigating evidence offered by the defendant, the Court must analyze the entire sentencing proceeding, including the arguments of counsel, the court's instructions to the jury, and the sentencing judge's written findings. *See, e.g., Hargrave,* 832 F.2d at 1534; *Messer v. State of Florida,* 834 F.2d 890, 893 (11th Cir.1987). A brief overview of Florida's capital sentencing procedure, however, is necessary to fully understand the context from which the instant claim arises.

The Florida death penalty statute in effect at the time of Petitioner's sentencing essentially is the same as it is today (with at least one current amendment which the Court will discuss *infra* ). Upon conviction of a defendant of a capital felony, the trial court conducts a separate sentencing proceeding to determine solely whether the defendant should be sentenced to death or life imprisonment. Fla.Stat. § 921.141(1) (1981).[74] Evidence may be presented "as to *any matter* that the court deems relevant to the nature of the crime and the character of the defendant and shall *include* matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6)." *Id.* (emphasis supplied).[75] After hearing all the evidence, the jury is to render an "advisory verdict" to the court, based upon:

---

**73.** The subsequent en banc opinion substantively discussed only that petitioner's ineffective assistance and *Caldwell* claims, adopting the remainder of Judge Clark's panel opinion, including that portion discussing the *Hitchcock* issue.

**74.** The version cited herein, unless otherwise noted, is the version in effect at the time of Petitioner's sentencing (February, 1983), which

was the 1981 version of section 921, no relevant amendments thereto having been made by the 1982 legislature.

**75.** The enumerated circumstances are not set forth here, as they are recited *infra* in the Court's discussion of the sentencing court's jury instructions and sentencing order.

(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5) [and]

(b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist.

*Id.* at § 921.141(2). It is notable, from a reading of this plain language, that while the statute contemplates that the jury examine only those aggravating circumstances enumerated in the statute, the jury is not so limited in its consideration of mitigating factors.

 Notwithstanding the jury's recommendation, the court then weighs the aggravating and mitigating circumstances, and if it imposes a sentence of death it must set forth in writing that there exist sufficient aggravating factors as enumerated in the statute, and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances. *Id.* at § 921.141(3). However, the "specific written findings of facts" are to be based on the *enumerated* aggravating and mitigating factors. *Id.* Thus, the statute does not direct the court to set forth in writing any *other* factors, i.e., nonstatutory mitigating factors. While it is clear from the above-cited cases that the court cannot preclude itself from *considering* such factors, Florida law does not require the state court to *memorialize* findings concerning nonstatutory mitigating factors.

A review of Petitioner's sentencing proceeding illustrates that he did introduce some—albeit scant—evidence of nonstatutory mitigating aspects of his character. Petitioner called three witnesses to testify. William Palmer testified he had known Petitioner for two years, through work at "the shipyard." R12–1792. He stated that Petitioner at times came over to his home to share dinner with Palmer and his family. Asked as to how he would characterize Petitioner, Palmer replied, "Just a good-hearted man, very gentle, very giving." *Id.* at 1793. In response to the next question, Palmer stated

that he never knew Petitioner to be aggressive or violent. *Id.* During cross-examination, Palmer stated that his opinion would not change even in light of Petitioner's conviction for the murder of the Weilers. *Id.* at 1794.

Petitioner next called Linda Palmer, William Palmer's wife. She stated that she knew Petitioner only socially, from the times he would come over for dinner. She described Petitioner as a "very gentle, kind man," and had never known him to be violent or aggressive. *Id.* at 1796. Mrs. Palmer responded to the state's cross-examination as her husband had responded, namely, that Petitioner's instant conviction would not change her mind.

Petitioner's final witness at the sentencing proceeding was Mary Katheryn Dixon, who managed the apartment complex at which Petitioner resided prior to his arrest. She characterized Petitioner as a "warm, gentle man," and answered "Yes" to the question, "Was he a giving person?" *Id.* at 1800. Dixon related an incident in which the husband of another tenant family had been injured and could not work, and that Petitioner "really took care of those people, he fed them, he paid their rent, Christmas he did all of their Christmas [sic], he was just more or less [sic] took care of them and he loved the children." *Id.* Dixon had never observed a time when Petitioner was violent or aggressive. *Id.* at 1801.

Additionally, with respect to the evidence introduced at the guilt phase, Petitioner emphasizes the fact that he was highly cooperative with law enforcement officers. For example, Detective Kessinger testified that Petitioner cooperated in the investigation of the murder.[76] Detective Kessinger also testified to Petitioner's inability to remember the events of the night of the murder, R8–1076, which testimony, Petitioner argues, supports the existence of "mental mitigating circumstances." Pet. at 270.

---

**76.** For example, Petitioner consented to the detective's search of his truck, R8–1064; he consented to the search of his apartment, *id.* at 1072; he consented to having a neutron activation test performed on his hands, *id.* at 1079; he consent-

ed to having a finger nail scraping performed, *id.* at 1092; and he consented to an interview with the detective concerning the events of the night of the murders, *id.* at 1068–69.

"This complete and total passive acquiescence on the part of Mr. Davis, particularly when contrasted with the seriousness of the offense, also suggests psychological problems rising to the level of mitigating factors." *Id.* at 272. Petitioner asserts that this "passive, almost childlike acquiescence, suggests either innocence or a genuine episode of memory loss, indicative of mental difficulties." *Id.* at 273.

On February 9, 1983, the sentencing phase of Petitioner's trial commenced. The court gave the jury the following preliminary instruction:

Ladies and gentlemen, by your verdict rendered in this cause last Friday, you have found the defendant guilty of three counts of murder in the first degree. Punishment for these crimes is either death or life imprisonment without the possibility of parole for twenty-five years. The final decision as to what punishment shall be imposed rests solely with the Judge of the Court; however, the law requires that you, the jury, render to the Court an advisory sentence as to what punishment should be imposed upon the defendant.

The State and the defendant will now present evidence relative to the nature of the crime and the character of the defendant and you are instructed that this evidence when considered with the evidence you have already heard, is presented in order that you might determine first, whether sufficient aggravating circumstances exist that would justify the imposition of the death penalty.

And, second, whether there are mitigating circumstances sufficient to outweigh the aggravating circumstances, if any.

At the conclusion of the taking of the evidence and after arguments of counsel, you will be instructed on the factors in aggravation and mitigation that you may consider.

R12–1780.

In his argument to the jury after the penalty phase evidence had been presented, the prosecutor discussed the enactment of the death penalty by the state legislature, and the scheme by which mitigating and aggravating factors were to be considered. With respect to the instant case, the prosecutor stated the following:

Ladies and gentlemen, there is not a single solitary mitigating factor before you in this case that you can weigh against the aggravating factors. I ask you and just imply on you to remember when you go back to listen to what Judge Harding tells you that the aggravating factors you can consider, the mitigating factors that you can consider, the order in which you can consider them which outweighs the other and then what is the proper recommendation based on your conclusions on the evidence and I ask you to listen very carefully to the Judge and I submit to you that you will have to find that there are no mitigating factors to offset, and that's the way the verdict form will read....

*Id.* at 1825.

Petitioner's lawyer argued that the three witnesses presented during the sentencing phase supported a nonstatutory mitigating aspect of petitioner's character:

The jury instructions that Judge Harding is going to read to you are fairly short. It's going to last ten or fifteen minutes and not lengthy instructions and I wanted to point out two portions of the instructions that I submit you will hear and primarily they deal with aggravating factors and mitigating factors and the first is that before you ballot and begin, it must be a ballot of the majority and not a unanimous ballot.

. . . . .

You should carefully weigh, sift and consider the evidence, all of it, realizing that human life is at stake and bring to bear your best judgment in reaching your advisory sentence.

. . . . .

I submit to you that Allen Lee Davis is thirty-six years old and would die in prison. The witnesses, the Palmers and Mrs. Dixon who were called to you and presented to you today, were presented not to show that Allen Lee Davis was a good human being, they were presented to show to you that to those individuals that the

actions that he performed on May 11, 1982, were uncharacteristic. To them, I submit, the death of the Weilers is beyond understanding.

*Id.* at 1836–37.

Contrary to Petitioner's assertion, neither the prosecutor nor defense counsel "misled" the jury concerning what factors it could or could not consider in rendering its advisory verdict. Additionally, the record does not establish that either defense counsel or the prosecutor believed that the law limited consideration of mitigating circumstances to those factors enumerated in the statute. In any event, each attorney cautioned the jury that the instructions in this regard would come from the *court*, not from them. Indeed, the essence of a *Lockett/Hitchcock* claim is the manner in which the court instructs the jury, and the manner in which the court itself reviews the applicable factors.

In relevant part, the court instructed the jury as follows:

As you have been told, the final decision as to what punishment should be imposed is the responsibility of the Judge; however, it is your duty to follow the law that will be given to you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and *whether sufficient mitigating circumstances exist* to outweigh any aggravating circumstances found to exist.

Your advisory sentence should be based upon *the evidence you have heard while trying the guilt or innocence of the defendant and evidence that has been presented to you in these proceedings.*

The aggravating circumstances that you may consider are limited to any of the following that are established by the evidence: [listing each the enumerated aggravating circumstances from ch. 921.-141(5) ] [77]

. . . . .

Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances. *Among the mitigating circumstances you may consider, if established by the evidence, are:* [ (6)(a) ] One, the defendant has no significant history of prior criminal activity.

. . . . .

[ (6)(b) ] Two, the crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance.

[ (6)(c) ] Three, the victim was a participant in the defendant's conduct and/or consented to the act.

[ (6)(d) ] Four, the defendant was an accomplice in the offense for which he is to be sentenced but the offense was committed by another person and the defendant's participation was relatively minor.

[ (6)(e) ] Five, the defendant acted under extreme duress or under the substantial domination of another person.

[ (6)(f) ] Six, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

[ (6)(g) ] Seven, the age of the defendant at the time of the crime. *And eight, any other aspect of the defendant's character or record and any other circumstance of the offense.*

. . . . .

Before you ballot, *you should carefully weigh, sift and consider the evidence and all of it,* realizing that human life is at stake. . . .

*Id.* at 1840–44 (emphasis supplied). As to the verdict forms, the judge instructed the jury that each form would include the following option for the jury to find:

---

77. The court's rendition of the aggravating factors is not in dispute. Those factors, therefore, will not be listed herein.

(a) That *sufficient mitigating circumstances do or do not exist* which outweigh any aggravating circumstances....

*Id.* at 1845.

■ A review of the court's instructions to the jury indicates that there was no *Lockett* or *Hitchcock* error in the jury's advisory verdict. The judge told the jury what mitigating circumstances it could consider, and all but one of these were near verbatim recitations from section 921.141(6). Of particular significance, however, is the "eighth" factor, *which was not listed in the Florida Statutes at the time Judge Harding issued these instructions.* This factor was "any other aspect of the defendant's character or record and any other circumstances of the offense." Mitigating circumstances normally are "factors which go to the character of the individual defendant," *Bolender,* 16 F.3d at 1565 n. 27. Thus, that the court included this most definitely *un*-enumerated factor suggests—indeed, mandates a finding—that the jury was not instructed that it was limited in its deliberations to only those mitigating factors set forth in the statute. Rather, the jury also was at liberty to consider—in addition to the statutory factors—"any other aspect" of Petitioner's character, based on any of the evidence the jury had seen either at the guilt or sentencing phase.[78]

Therefore, the jury was not prevented from *considering* nonstatutory mitigating evidence. The Constitution requires only that the jury be permitted to consider such evidence. That it did not *accept* this evidence does not render the resulting advisory verdict of death unconstitutionally infirm. *See Blystone,* 494 U.S. at 308, 110 S.Ct. at 1084; *Atkins,* 965 F.2d at 962.

The jury was dismissed following the return of its verdicts on February 2, 1993. On March 2, 1993, the sentencing phase concluded with the imposition of sentence by the court. The court heard further argument from the prosecutor. R12–1856–66. De-

fense counsel stated he would rest on his arguments previously made. *Id.* at 1866. The Court then read from its sentencing order, and imposed a sentence of death as to each of the three convictions. In relevant part, the order of Judgment and Sentence reads as follows:

There is now no legal cause why sentence should not be pronounced and imposed. *The Court,* in determining the appropriate sentence in this cause *has carefully considered the testimony and evidence introduced both at the trial and the penalty phase of these proceedings, the advisory opinion of the majority of the jury and in addition has made its findings as to the elements of aggravation and mitigation as to each count, which are found in Section 921.141(5) and (6), Florida Statutes.*

R2–323. The court then listed each mitigating factor, and found that none were present in this case. *Id.* at 323–24. The court did not list or discuss the "any other aspect" factor that he instructed the jury to consider. The court went through each of the aggravating factors, finding that six of the nine statutory factors were present in this case. *Id.* at 324–28. The "Conclusion of the Court" was as follows:

The Court finds that there are *no statutory mitigating factors existent in this cause* and that the aggravating factors found to be present in this case require the imposition of the death penalty.

*Id.* at 328.

■ As noted above, the court was required to "set forth in writing its findings upon which the sentence of death was based" only with respect to the *statutory* factors. Fla.Stat. § 921.141(3). Thus, while the Eighth and Fourteenth Amendments mandated that the sentencing court *consider* all mitigating factors (whether enumerated in statute or not), there was and is no constitutional requirement that the court memorial-

---

**78.** Curiously, this "any other aspect" factor to which the court alluded is *today* one of the enumerated statutory mitigating factors. *See* Fla. Stat. § 921.142(7)(h) (1993). This factor appears in only this most recent version of the statutes, so it is unclear whether its addition was in direct response to the *Hitchcock* decision (1987). The bottom line, however, is that the apparent prescience of the instructing judge worked in Petitioner's *favor* at the time of his sentencing, and most directly *counter* to the position he presently espouses.

ize this "consideration."[79] In any event, the Judgment at its very beginning states that the court "has carefully *considered* the testimony and evidence introduced at both the trial and the penalty phase of these proceedings." (emphasis supplied). Thus, the court itself says that it has considered all the evidence, not merely that evidence applicable to the statutory factors. The Judgment then states that the court had made its findings pursuant to the dictates of the Florida Statutes. That the court did not memorialize its findings concerning nonstatutory factors—which factors the court said it had "carefully considered"—does not render the resulting sentences of death unconstitutional.

This Court has noted that the court, at the time it imposed sentence, made no mention of the "eighth" mitigating factor it had instructed the jury to consider. This Court has found that the sentencing court was not required to make written findings in this regard. Nevertheless, there is no reason to suggest that the sentencing court approached its own "deliberations"—which lasted quite a bit longer (one month) than the thirty-eight minutes in which the sentencing jury deliberated—any differently than the manner in which it instructed the jury. In any jury proceeding, *a court instructs a jury based on the law that the court itself knows.* Nothing in the instant case suggests that the court applied the law any differently than the manner in which it instructed the jury.

Petitioner simply has failed to establish that the court imposing sentence did not consider nonstatutory mitigating factors. The record instead reflects that the court *did* consider *all* relevant evidence, but clearly did not *accept* the evidence in a manner in which Petitioner then or now desires. There was no violation of *Lockett, Hitchcock* or any other Eighth or Fourteenth Amendment requirements.

## B. HARMLESS ERROR

The Court has found that there was no violation of *Hitchcock* or *Lockett,* either in the jury's advisory verdict or the actual sentence imposed by the court. Nevertheless, while there is no "error" upon which to conduct a harmless error analysis, this further exercise demonstrates with even greater clarity the lack of merit within the instant claim.

The "harmless-constitutional-error rule" was initially articulated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Court aimed to fashion "a rule that will save the good in harmless-error practices while avoiding the bad, so far a possible." *Id.* at 23, 87 S.Ct. at 827. In reviewing the evidence, the court must assess the "probable impact of the [error] on the minds of an average jury." *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). If there remains a possibility that the error influenced the "ultimate decisional process of the jury" and the beneficiary of the error cannot refute that possibility beyond all reasonable doubt, then constitutional errors "can never be deemed harmless." *Brown v. Dugger,* 831 F.2d 1547, 1554 (11th Cir.1987). In addition, the Supreme Court has admonished that a reviewing court should not give "too much emphasis to 'overwhelming evidence' of guilt," where constitutional error affects substantial rights. *Harrington,* 395 U.S. at 254, 89 S.Ct. at 1728 (quoting *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827).

A *Hitchcock* violation is harmless error "if the court can conclude beyond a reasonable doubt that the nonstatutory mitigating evidence regarding the defendant's character that was not considered by the jury would not have influenced the jury to recommend a life sentence." *Jackson v. Dugger,* 931 F.2d 712, 716 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 452, 116

**79.** In reviewing Petitioner's sentence on direct appeal, the Florida Supreme Court found that the mitigating evidence was not limited to that listed in the statute, and that "the court's failure to mention nonstatutory mitigating evidence" was "merely inartful drafting of the sentencing order." *Davis,* 461 So.2d at 72. This Court does not necessarily agree with this latter characterization. While this Court's analysis of Claim XX might have been simplified greatly had the judge included such a reference, the fact of the matter is that he was not required by law to draft his order any more "artfully" than he did.

L.Ed.2d 470 (1991). "Nonstatutory mitigating evidence not considered by the jury 'affects the jury's recommendation if it amounts to a significant mitigating circumstance.'" *Bolender*, 16 F.3d at 1567 (quoting *Jackson*, 931 F.2d at 716).

In the context of collateral review of a state court conviction, however, there now is a different standard than that appropriate for direct review. Chief Judge Tjoflat's panel opinion in *Bolender* referred to the Supreme Court's recent decision in *Brecht v. Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), in which the Court decided that "[t]he imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error." —— U.S. at ——, 113 S.Ct. at 1721–22. Instead, "error requires reversal only if it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Accordingly, a habeas petitioner is not entitled to relief unless he can establish that the error resulted in "actual prejudice." *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722.

In *Bolender*, the court of appeals stated that *Hitchcock* and *Lockett* violations fall within the "trial type" constitutional error to which the Supreme Court alluded in *Brecht*. 16 F.3d at 1567. Accordingly, in the instant case, assuming that there was a *Hitchcock* or *Lockett* violation either in the jury's advisory verdicts of death or the court's actual verdict—or in both—Petitioner must establish that there is a reasonable probability that life imprisonment would have been imposed had the error(s) not occurred. Petitioner cannot meet this burden.

To resolve this issue, the Court simply must look at what nonstatutory evidence would have led to a different result. As noted above, Petitioner presented only three witnesses at the sentencing proceeding. Each testified briefly, stating only that Petitioner was a warm or gentle or caring individual. This was testimony relating to the character of Petitioner and, as such, can be considered "mitigating evidence." *Bolender*, 16 F.3d at 1565 n. 27. Assuming for the purposes of the instant analysis that the jury was precluded from considering this evidence in forming its advisory verdict, this testimony in any event added little to counter the overwhelming presence of aggravating circumstances in this case. It is not likely that the same jury which took less than three hours to return guilty verdicts on three separate counts of first degree murder would have been swayed by scant anecdotal testimony that Petitioner was "good-hearted" or "kind" or "giving."

Assuming the sentencing court erred in not considering this evidence, it is unlikely that the court would have imposed a sentence of life imprisonment had it actually considered this evidence. Given its finding of multiple aggravating factors—the court found six of the nine statutory aggravating circumstances to be present in this case—it is highly unlikely that these three witnesses would have made any difference. Petitioner's own argument on its face fails to meet the requisite harmless error standard. Petitioner states that "[h]ad the sentencing judge considered, in his own review of the record, evidence of mitigation other than that fitting precisely within the seven statutory categories to which he restricted his findings, the balance of life and death *could have been significantly altered.*" Pet. at 270. However, the issue is not whether the result "could" have been different, but whether the result "would" have been different—i.e., whether there was *actual* prejudice.

Given the "balance of aggravating and mitigating circumstances established," *Bolender*, 16 F.3d at 1567, the Court finds that Petitioner has failed to satisfy the *Brecht* standard. Accordingly, assuming there was *Hitchcock* or *Lockett* error, it was harmless beyond a reasonable doubt.

For the reasons expressed above, Claim XX is without merit.

### CLAIM XXI—FAILURE TO CONDUCT HARMLESS ERROR ANALYSIS

In Claim XXI Petitioner alleges that the Florida Supreme Court's review of his sen-

tence violated the Eighth and Fourteenth Amendments because that court failed to conduct a harmless error analysis and failed to reweigh the evidence after striking one of the aggravating circumstances. Pet. at 276. Respondent contends that the issue is procedurally barred and, therefore, should not be considered by this Court. Resp. at 60.

Petitioner contends that the Florida Supreme Court "ruled upon the merits of this claim" when it struck one of the aggravating factors on direct appeal. Suppl.Pet. (Doc. No. 16) at 21. While the Florida Supreme Court's action in so doing may form the *basis* of this claim, this claim itself most certainly has never been presented to the Florida Supreme Court or any other state court. Thus, Claim XXI is an unexhausted claim.

An application for a writ of habeas corpus by a person held in state custody "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). As previously noted in this Order, the exhaustion requirement is "grounded in principles of comity," *Castille*, 489 U.S. at 349, 109 S.Ct. at 1059, reflecting a desire to "protect the state courts' role in the enforcement of federal law," *Rose*, 455 U.S. at 518, 102 S.Ct. at 1203. A district court must dismiss a habeas petition if *any* of the federal claims have not been exhausted. *Id.* at 522, 102 S.Ct. at 1205. At the same time, however, it would be inconsistent with the principles of comity "to mandate recourse to state collateral review whose results have effectively been predetermined." *Castille*, 489 U.S. at 350, 109 S.Ct. at 1059.

■ In other words, a district court should not remand a petition containing an unexhausted claim if the district court knows that the claim subsequently will be held by the state court to be procedurally barred. This "crossroads" of the exhaustion and procedural bar doctrines was well described in a recent Eleventh Circuit decision highly applicable to the instant claim:

Federal courts are precluded from addressing claims that have been held to be procedurally defaulted under state law. [citing *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991) ]. In addition, federal courts may not address claims that have been presented in state courts if the state court would have found the claims to be procedurally defaulted, unless the petitioner is able to show both cause for the default and prejudice resulting therefrom. [citing *Teague v. Lane*, 489 U.S. 288, 297–99, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989) and *Engle*, 456 U.S. at 128–29, 102 S.Ct. at 1572]. It is clear that if the state court in this case had held [the petitioner's] motion to be procedurally defaulted, we would enforce that bar in this court, as we have routinely done [citing Eleventh Circuit cases].

*Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir.1993).

■ Essentially, were the court to remand the instant Petition to state court for consideration of Claim XXI, the claim necessarily would be found to be procedurally barred. A motion to vacate a sentence under the Florida Rules of Criminal Procedure must be filed within two years of the imposition of judgment and sentence. Fla. R.Crim.P. 3.850(b). If this Court "returned" Petitioner to state court, he would be unable to obtain relief due to this time bar. The state courts would, by necessity, find such a motion to be procedurally barred. That procedural bar would have to be enforced in this Court, *Tower*, 7 F.3d at 210, unless Petitioner could show both cause and prejudice for the default.

Petitioner failed to raise this claim in his second 3.850 Motion. Petitioner raised ten claims therein, and the only claim the trial court decided on the merits was the *Hitchcock* claim. All other claims were found to have been barred either by the two-year rule or as claims that could have been raised in Petitioner's first 3.850 Motion, but were not raised therein. Had Petitioner raised the instant claim in that Motion, it would have met the same fate as the other claims he raised, namely, the trial court would have found the issue procedurally barred. If Petitioner now were afforded an opportunity to

exhaust this claim in state court, the same result would occur.

Petitioner is correct that this claim challenges the Florida Supreme Court's failure to conduct a harmless error analysis or to re-weigh the evidence after striking an aggravating circumstance. However, Petitioner incorrectly implies that because the claim is based on an alleged error occurring during direct review there is no requirement that he previously have presented this claim to the state courts. Petitioner does not cite any authority for this exception to the usual requirements of exhaustion.

Thus, the Court finds that the instant claim is procedurally barred. Furthermore, the Court finds that Petitioner has established neither cause nor prejudice for this default. This claim could have been raised in Petitioner's first 3.850 Motion. Had it been raised in *that* Motion, Petitioner then could have raised the claim in the first federal Petition filed in this Court. There would have been no procedural bar at that point, and—as opposed to the second 3.850 Motion or the instant Petition—Petitioner would have been afforded meaningful review by both the state and federal courts. Having failed to show either cause or prejudice for this default, Petitioner is not entitled now to consideration of that which he had every opportunity to raise previously.

Accordingly, the claim being procedurally barred, the Court will not pass on the merits of Claim XXI.

### CLAIM XXII—INADEQUATE SENTENCING INSTRUCTION

 In Claim XXII Petitioner alleges that his sentencing jury did not receive proper instructions "guiding and channelling its sentencing discretion by explaining the limiting constructions of the aggravating circumstances submitted to it." Pet. at 280. The resulting sentence of death, therefore, violated *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and the Eighth Amendment. Pet. at 283. Respondent contends that this claim is procedurally barred.

Claim XXII, in its present form, has never been fairly presented to the state courts. The present claim argues that the sentencing jury's instructions did not comport with the dictates of *Maynard,* and challenges the instructions on each of the six relevant aggravating factors. The only *Maynard* claim ever presented to the state courts was Claim 5 in the second Rule 3.850 Motion. That claim, however, only raised the issue with respect to the instructions on the "especially heinous, atrocious, or cruel" aggravating circumstance. PC2–R1–70–79. The trial court denied the claim "as procedurally barred as an issue which is time barred under the two year limitations period and as a claim that should have been raised on direct appeal." PC2–R1–135. The Florida Supreme Court affirmed the denial of the motion, finding that all claims made therein (with the exception of the *Hitchcock* claim) "are procedurally barred." *Davis,* 589 So.2d at 898.

Petitioner argues that this claim was reviewed by the Florida Supreme Court on direct review of the conviction. Although that court did review the sentences and the propriety of each aggravating factor, on its own motion, there is no evidence to indicate that that review included the claims made in the instant claim. Indeed, the Court's own review of the Florida Supreme Court's opinion indicates that this claim was not reviewed therein. The claim was not even briefed on direct review. The Court finds that the last state court ruling on any portion of Claim XXII has found this claim to be procedurally barred. Finally, the petitioner has not shown either cause for or prejudice from the procedural default, as required under *Sykes* and *Engle.*

Therefore, this Court is absolutely precluded from addressing the merits of Claim XXII. *See Coleman,* 501 U.S. at ——, 111 S.Ct. at 2554.

### CLAIM XXIII—"COLD, CALCULATED AND PREMEDITATED" AGGRAVATING CIRCUMSTANCE

In Claim XXIII Petitioner alleges that the finding of the "cold, calculated and premeditated aggravating factor" violated the Eighth Amendment, because "no rational factfinder"

could find the elements of this factor proven beyond a reasonable doubt. Pet. at 299. Respondent asserts that this claim relates to the weight of the evidence, and thus does not present a question for federal habeas review. Resp. at 62.

Though the Court is inclined to agree with Respondent, the claim in any event is procedurally barred. Claim XXIII was first presented by Petitioner to the trial court as Claim 10 in his second 3.850 Motion. PC2–R1–98–102. That claim was denied by the trial court as "time barred and as a procedurally barred claim that should have, if preserved, been raised on direct appeal." PC2–R1–135. The Florida Supreme Court agreed with the trial court's finding that the claim was procedurally barred. *Davis*, 589 So.2d at 898.

The Court finds that the last state court rendering a judgment—in fact the only state court to render judgment on this claim— clearly and expressly based its ruling on a procedural bar. Petitioner has not presented any argument to show either cause or prejudice for the procedural default. Therefore, the Court may not and will not reach the merits Claim XXIII.

### CLAIM XXIV—IMPROPER INSTRUCTION ON MAJORITY VOTE AT SENTENCING PHASE

In Claim XXIV, Petitioner alleges that his jury was "misled and incorrectly informed about its function at capital sentencing, in violation of the Eighth and Fourteenth Amendments." Pet. at 302. In particular, Petitioner argues that the sentencing jury was misled into believing that it could only reach a sentencing determination by a majority vote. Petitioner contends that the jury may have been deadlocked at six-to-six, which, if correctly instructed, would have resulted in a life sentence advisory verdict. *Id.* at 304. Respondent alleges that this

80. In his introduction to the Supplemental Memorandum, Petitioner stated that "the procedural bar issue will not be discussed on claims which were previously raised in state court and which the last state court addressed on the merits, unless the Respondent has alleged procedural

claim is procedurally barred and, in any event, is without merit. Resp. at 63.

Upon review of the entire record, the Court finds that this claim has never been presented to any state court. This Court specifically instructed Petitioner to file a supplemental memorandum setting forth with specificity the procedural history of each claim within the instant Petition. *See* Order of March 16, 1992 (Doc. No. 15). Curiously—or *significantly,* perhaps—Petitioner did not even discuss Claim XXIV in the supplemental memorandum. *See* Suppl.Pet. (Doc. No. 16) at 23.[80]

This claim clearly is an unexhausted claim. However, as the Court found with respect to Claim XXI, *supra,* remand to the state courts for a determination of the merits of this claim would be futile, as the state court necessarily would find this claim to be procedurally barred. This Court, therefore, finds that Claim XXIV to be procedurally barred, *Tower,* 7 F.3d at 210, and finds that Petitioner has shown neither cause nor prejudice for this default. Thus, the Court will not address the merits therein.

### CLAIM XXV—IMPROPER SHIFT OF BURDEN AT SENTENCING

Petitioner asserts in Claim XXV that his death sentence violates the Fifth, Sixth, Eighth and Fourteenth Amendments in that the penalty phase jury instructions "shifted the burden to Mr. Davis to prove that death was inappropriate and because the sentencing judge himself employed this improper standard" in fashioning his sentence. Pet. at 306. Respondent asserts, correctly, that this issue is procedurally barred.

This claim was not presented to any state court until it was raised as Claim 6 in Petitioner's second 3.850 Motion. PC2–R1–79–84. The trial court denied the claim as "procedurally barred under the two year limitation and as an issue which, if preserved, could have been raised on appeal." PC2–

bar in its response." Doc. No. 16 at 4. Claim XXIV clearly was never presented to any state court; thus, the Court cannot discern any reason for Petitioner's failure to address the procedural bar issue as it relates to Claim XXIV.

R1–135. The Florida Supreme Court affirmed the denial of the Motion, agreeing with the trial court that the claim was procedurally barred. *Davis,* 589 So.2d at 898.

The Court finds that Claim XXV is procedurally barred and that Petitioner has shown neither cause for nor prejudice for this procedural default. The Court, therefore, will not reach the merits of this claim.

### CONCLUSION

For the reasons expressed herein, the Petition for Writ of Habeas Corpus by Person in State Custody will be DENIED by an Order to be entered separately.

**DONE AND ENTERED.**

### ORDER

For the reasons discussed in the accompanying Opinion docketed separately, it is hereby **ORDERED** that the Petition for Writ of Habeas Corpus by a Person in State Custody (Doc. No. 1, filed March 9, 1992) is **DENIED.**

Petitioner is granted leave to appeal *in forma pauperis.*

The stay of execution previously granted (Doc. No. 11, filed March 9, 1992) is **DISSOLVED.**

The Clerk is directed to close the file.

**DONE AND ORDERED.**